# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Infinity Business Group, Inc.,<br><br>Debtor(s). | C/A No. 10-06335-JW<br><br>Adv. Pro. No. 12-80208-JW<br><br>Chapter 7 |
| Robert F. Anderson, as Chapter 7 Trustee, for Infinity Business Group, Inc.,<br><br>Plaintiff(s),<br><br>v.<br><br>Wade Cordell;<br>O. Bradshaw Cordell;<br>Cordell L.L.C.;<br>The Cordell Group L.L.C.;<br>Gibson Commons L.L.C.;<br>Bryon K. Sturgill;<br>Sturgill & Associates Inc.,<br>John F Blevins;<br>Law Offices of John F. Blevins, LLC;<br>Golden Ghost, Inc.;<br>Haines H. Hargrett;<br>Donald Brent Grafton;<br>D. Larry Grafton;<br>Grafton and Company, P.L.L.C.;<br>Morgan Keegan & Company, Inc.; and<br>Keith E. Meyers;<br><br>Defendant(s). | **ORDER DENYING MORGAN KEEGAN & COMPANY, INC. AND KEITH E. MEYER'S MOTION TO DISMISS IN PART ON *IN PARI DELICTO* GROUNDS** |

This matter comes before the Court on the Motion to Dismiss filed by Defendants Morgan Keegan & Company, Inc. ("MK") and Keith E. Meyers ("Meyers") (collectively, "MK Defendants"). The Plaintiff, Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc. ("Trustee"), filed an Objection to the Motion to Dismiss and a memorandum in support of the Objection. After a hearing, the Court makes the following

findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, which is made

applicable to this proceeding by Fed. R. Bankr. P. 7052.

### FINDINGS OF FACT

1.      Infinity Business Group, Inc. (the "Debtor") filed a voluntary petition for

relief under Chapter 7 of the Bankruptcy Code on September 1, 2010.  On that same date,

Robert F. Anderson was appointed as Trustee.

2.      On August 31, 2012, the Trustee commenced this adversary proceeding by

filing the Complaint, which includes the following causes of action against the MK

Defendants: Constructive Fraud; Federal Securities Fraud; Malpractice; Common Law

Fraud; Aiding and Abetting Fraud; Breach of Contract; Breach of Fiduciary Duty; Aiding

and Abetting Breach of Fiduciary Duty; and Unjust Enrichment.

3.      The Complaint alleges that the Debtor is a corporation organized and existing

pursuant to the laws of the State of Nevada. Prior to filing bankruptcy, the Debtor was in the

business of collecting dishonored checks for entities that had received those checks as

payment from third party payors through electronic check recovery.

4.      According to the Complaint, the Debtor maintained offices in Lexington,

South Carolina; Jacksonville, Florida; Pikeville, Kentucky; and Barbourville, Kentucky.

The Lexington, South Carolina office housed the offices of the President, Vice President,

and Chief Operating Officer of the Debtor.

5.      During the relevant time period, Wade B. Cordell ("Wade Cordell") served as

President and Chairman of the Board of Directors of the Debtor; O. Bradshaw Cordell

("Brad Cordell") served as Chief Operating Officer and as a member of the Board of

Directors of the Debtor; John F. Blevins ("Blevins") served as Vice President and a member

of the Board of Directors of the Debtor; and Bryon K. Sturgill ("Sturgill"), a Kentucky citizen, served as the Chief Executive Officer and as a member of the Board of Directors of the Debtor.  Haines H. Hargrett ("Hargrett") served as Chief Financial Officer of the Debtor beginning September 19, 2006.  Sturgill, Wade Cordell, Brad Cordell, Blevins and Hargrett are collectively referred to herein as "the Management Defendants."

6.      Other members of the Debtor's Board of Directors include Michael Potter ("Potter"), William Van Hoeven ("Van Hoeven"), and Thomas Handy ("Handy") (collectively, "Innocent Directors").  Potter served on the Board of Directors from May of 2003 until November 2007 and again from September 2009 until August of 2010. Potter served as President from May of 2003 until May of 2005. Van Hoeven was a director from September of 2004 through 2010, and served as Secretary from May of 2004 until October of 2006.  Van Hoeven also served as Vice President of Electronic Processing, from October of 2006 forward.  Handy was elected to the Board of Directors on June 24, 2008 and served until March of 2010.

7.      The Complaint alleges that the Management Defendants engaged in a scheme to make the Debtor appear more profitable than it was, when in fact it was operating at a loss throughout most of its existence due to the excessive salaries, unwarranted compensation, and looting by the Management Defendants.

8.      In order to facilitate this scheme, the Complaint alleges that the Management Defendants used financial statements for the years 2004, 2005, 2006, 2007 and 2008 ("Grafton Audited Financials"), which were prepared by Brent Grafton, Larry Grafton and Grafton and Company, P.L.L.C. ("Grafton Defendants").  The Grafton Audited Financials included an Independent Auditors' Report attesting that the auditing methods comported

with Generally Accepted Accounting Principles ("GAAP").  The Complaint alleges that the

Grafton Audited Financials were deficient, false, and misleading, because the stated revenue

included sums not yet earned by the Debtor, the accounts receivable were overestimated,

and the accounts payable were underestimated.  For example, the Trustee alleges that these

financials included the statutory collection fee for a dishonored check as income at the time

such dishonored check was submitted by the customer to the Debtor for its recovery services

instead of properly recognizing this income when the Debtor actually received the collection

fee.  In addition, the Trustee alleges that the face amounts of the checks submitted to the

Debtor for recovery were also improperly recorded as accounts receivable when received by

the Debtor.  The accounts receivable are also alleged to have been inflated by the accrual of

historic figures on account of potentially collectible checks when a large portion of these

checks were no longer collectible.

9.      The Complaint alleges that the Grafton Audited Financials were used to make

it appear that the Debtor was creditworthy and profitable when it was not, thereby attracting

potential investors and enabling the Debtor to obtain loans, which allowed the Management

Defendants to keep the Debtor afloat for the purpose of continuing to loot it.

10.     In late 2009, the Management Defendants' alleged scheme was uncovered,

and due to its losses as a result of the scheme, the Debtor was unable to service its

outstanding debt and pay its creditors, and ultimately sought bankruptcy protection.

11.     With regard to the MK Defendants, the Complaint alleges certain facts,

which are summarized as follows:[1]

---

[1]      The Complaint, which is 173 pages long, contains over 220 paragraphs of factual allegations
regarding the MK Defendants' involvement with the Debtor.

a) In September of 2005, Wade Cordell, Brad Cordell, Blevins and Sturgill consulted with the MK Defendants to facilitate sales of the Debtor's securities to raise capital for the Debtor.

b) In March of 2006, the Debtor entered into an engagement agreement contract with MK (the "2006 MK Contract"), whereby MK agreed to act as the exclusive placement agent for the Debtor's stock issuance.  The 2006 MK Contract provided that MK would receive a fee equal to 6% of the gross proceeds raised on behalf of the Debtor in its security sales pursuant to a private placement of securities.  Under the 2006 MK Contract, MK was also to serve as a broker in soliciting investments in the Debtor.

c) In order to assist MK in performing its duties to the Debtor, Sturgill provided multiple versions of financial reports for 2003, 2004, 2005, and 2006 to the MK Defendants. The financial reports provided to the MK Defendants are alleged to have been deficient, false, and misleading because they overstated revenue, net income, and accounts receivable.

d) MK is alleged to have known that the financial reports were false, because they included accounts receivable that were no longer collectible, but nevertheless used the fraudulent financial figures in preparing a Confidential Investor's Memorandum in 2006 ("2006 CIM").  The 2006 CIM is alleged to contain many misleading statements and material omissions, and was directed by the MK Defendants toward acquiring institutional, strategic investors for the Debtor as well as demonstrating to the Innocent Directors that procuring such investments was in the Debtor's best interests.

e) The MK Defendants allegedly conspired with the Management Defendants to conceal the Debtor's true financial condition by assisting Sturgill in constructing believable figures, which were ultimately used in the Grafton Audited Financials.

f) The MK Defendants are also alleged to have failed to communicate accurate information regarding the Debtor's financial condition to the Innocent Directors. The Trustee further alleges that the MK Defendants knew of or should have detected the wrongdoings of the Management Defendants, including the looting, inaccurate and misleading accounting, detrimental insider transactions, incomplete shareholder ledgers, and improper use of the face accounts.[2]

g) On August 29, 2006, the Debtor entered into a Referral Agreement with MK ("2006 Referral Agreement"), which provided for MK to endorse and recommend the Debtor to financial institutions, credit card processing companies, and merchant customers as a potential provider of transaction processing services; to promote and actively cause these entities to enter into services agreements with the Debtor by referrals and marketing; and referring to the Debtor all current and future financial institutions, credit card processing companies and merchant customers seeking services similar to those offered by the Debtor.  The term of the 2006 Referral Agreement was three years from the date of execution and was renewable upon agreement.

h) The Trustee alleges, upon information and belief, that MK received sales commissions for referring banks to the Debtor pursuant to the 2008 MK Contract.

---

[2]   The face accounts were separate bank accounts which held the face amounts of the checks collected by the Debtor for payment to its customers (the payee on the checks).

i) The MK Defendants are alleged to have assisted the Debtor with the preparation and publishing of a Private Placement Memorandum in November of 2006 ("2006 PPM"), and to have solicited investors to invest in the Debtor despite their knowledge of the Debtor's accounting problems, fraudulent financials, and looting by the Management Defendants.

j) The Trustee alleges that the Debtor suffered massive damages at the direction of the Management Defendants as a result of transactions by which the Management Defendants misappropriated the Debtor's funds for the personal benefit of themselves and others. The Grafton Audited Financials concealed the Debtor's losses and portrayed a false image of the Debtor's financial health by materially overstating the income and assets of the Debtor while materially understating its losses and liabilities. As a result of this false image, the Management Defendants were able to obtain for the Debtor funds from creditors, debenture holders, stockholders, and other sources, which were then immediately looted or embezzled by the Management Defendants.

k) In early 2008, the Trustee alleges that Wade Cordell and Sturgill approached the MK Defendants again regarding MK's services for the Debtor.

l) The Board of Directors convened a special board meeting on April 23, 2008. At the meeting, the Board of Directors discussed whether it was in the best interests of the Debtor to issue certain debt instruments to accredited investors in light of the Debtor's projected profitability and MK's explicit support for the issuance. Ultimately, the Board of Directors approved the issuance for the ostensible

purpose of providing bridge financing to allow time for MK to find an institutional investor for the Debtor.

m) On April 24, 2008, Debtor and MK entered into a second engagement contract (the "2008 MK Contract"). MK was retained to provide financial advisory services regarding general business and financial analysis and concerning the raising of necessary mezzanine debt. The term of the contract was from April 28, 2008 through October 24, 2008. The Debtor agreed to pay MK a contingent placement fee in cash at closing equal to 3% of the gross proceeds raised on behalf of the Debtor, and agreed to reimburse MK, upon demand, for its reasonable out-of-pocket expenses (including fees and expense of counsel) incurred in connection with its engagement.

n) The Trustee alleges that the MK Defendants presented a Management Presentation to potential investors and the Innocent Directors, which incorporated the Grafton Audited Financials, which the MK Defendants knew were fraudulent, and financial projections for 2008 to 2012, which the MK Defendants knew were greatly exaggerated. MK also solicited potential investors by letter, which included a copy of the Management Presentation, the Confidential Company Presentation, and audited financial statements.

o) The MK Defendants attempted to negotiate financing for the Debtor with Morgan Keegan Strategic Fund, L.P. ("MKSF"), which resulted in a May 29, 2008 agreement between MKSF and the Debtor containing proposed terms and conditions for a $3 million dollar loan. This deal did not close because financial

due diligence[3] conducted by MKSF revealed that the Debtor's audited financial statements were materially misstated and should not be relied upon and further stated that it was unable to procure the information it needed to complete its analysis from the Debtor's management.  The company that conducted the due diligence on behalf of MKSF prepared a transaction report ("Transaction Report") indicating these findings, which the Trustee alleges was accessible to the MK Defendants after June 30, 2008.

p)  The Trustee alleges that the Transaction Report revealed the Debtor's true financial condition, and rather than communicating its concerns to the entire Board of Directors, the MK Defendants actively continued to locate potential lenders, which caused the Debtor to incur more debt which they knew or should have known the Debtor could not repay.  The MK Defendants communicated exclusively with the Wade Cordell, Sturgill, Blevins and Hargrett, and did not disclose the Debtor's true financial condition to the other members of the Board of Directors.   The Trustee alleges that the MK Defendants continued to coordinate possible loan transactions between business investors and the Debtor up through October of 2009.

q)  The Trustee alleges that a memorandum entitled "2008 Cash Flow" was sent by Hargrett by e-mail to a partner at MKSF in order to address the problems raised by the Transaction Report.[4]  The memorandum contained projections from the addition of new bank customers. In the e-mail, Hargrett asserted that Transaction

---

[3]      In 2008, the Debtor paid MKSF over $88,000.00, pursuant to the 2008 MKSF Contract, to reimburse MKSF for its direct due diligence expenses.

[4]      The Trustee alleges that the "2008 Cash Flow" memorandum, which was purportedly authored by Wade Cordell, was actually drafted by Meyers.

Services' estimates for projected earnings were very conservative and that the addition of new bank customers was expected to generate a significant amount of cash flow not included in the Transaction Report.

r) On June 28, 2008, the Board of Directors finalized the terms of certain mezzanine debt instruments ("2008 Mezzanine Debt Instruments"), which provided for interest of 20% of the entire outstanding balance to be paid to the obligee on the maturity date. Upon maturity, the obligee had two different options to receive shares of stock in lieu of payment of the principal and interest.

s) Pursuant to an April 23, 2008 Board resolution, the Debtor issued promissory notes in the total amount of $2.1 million in October and November of 2008 ("2008 Promissory Notes") to accredited investors, which provided for interest at a rate of 12% per year. The 2008 Promissory Notes included a clause providing one share of stock in exchange for each dollar of principal loaned to the Debtor. The Trustee alleges that these loans were allowed to be made to the Debtor based on the Innocent Directors' mistaken belief that the Debtor was fiscally sound and MK's explicit support for the issuance in order to allow time for MK to find an institutional investor for the Debtor.

t) From June 2008 to 2009, the Trustee alleges that the Debtor incurred a total of $8.1 million in debt as a result of the 2008 Mezzanine Debt Instruments and the 2008 Promissory Notes to its detriment.

u) The Management Defendants, with the assistance of MK and its employees, are alleged to have falsely inflated the Debtor's accounts receivables by creating fictitious accounts receivable on the Debtor's books and records as well as

improperly reporting the aging of receivables and to have presented this information to the Innocent Directors without disclosing its falsity.

v) The Trustee alleges that in selling securities pursuant to the 2006 PPM and issuing the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes, the Management Defendants were acting outside the course of their employment and scope of their agency and apparent agency since the underlying intent for these sales and issuances was to precipitate the Management Defendants' embezzlement and looting, and that they had totally abandoned the interests of the Debtor when they entered into these transactions, which were designed by the MK Defendants to assist the Management Defendants in concealing their scheme to embezzle and loot funds from the Debtor.

w) The Trustee alleges that the Debtor's funds and credit were utilized by the Management Defendants and diverted from the corporation without any benefit to the Debtor.  The Management Defendants are alleged to have acted solely for their own benefit in carrying out the scheme.

x) The only benefit of these transactions is alleged to have been received by the Management Defendants, who could use the transactions to feign the Debtor's creditworthiness, which enabled them to keep the Debtor afloat while they continued to divert its assets.

y) The Trustee alleges that "[d]espite the peppercorn of income to the Debtor, if any, resulting from the miniscule portion of the proceeds from the sales of the securities that actually remained with the Debtor subsequent to the [2006 PPM] and the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory

Notes used by the Management Defendants to help inflate sales and facilitate public offerings, the issuances and sales were overwhelmingly adverse to the Debtor and would not have occurred but for the assistance of the MK Defendants."

## CONCLUSIONS OF LAW

### I. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)).  To satisfy the plausibility standard, the Trustee must plead factual content that allows the Court to draw the reasonable inference that the MK Defendants are liable for the misconduct alleged. Iqbal, at 1949. The Trustee must nudge his claims across the line from conceivable to plausible to resist dismissal. Bell Atlantic, 127 S.Ct. 1955 at 1960. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Iqbal, at 1949.

### II. Choice of Law

As the forum state, South Carolina provides the rules governing the choice of law determination for this proceeding.  See Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.), 839 F.2d 203, 205-6 (4th Cir. 1988).  In South Carolina, the law governing an action in tort is the law of the forum in which the injury occurred. Lister v. NationsBank of Delaware, N.A., 329 S.C. 133, 494 S.E.2d 449 (Ct. App. 1998); Witt v. American Trucking Ass'ns. Inc., 860 F. Supp. 295 (D.S.C. 1994); Hovis v. Gen. Dynamics (In re Marine Energy Sys. Corp.), 362 B.R. 247, 255 (Bankr. D.S.C. 2006) (citing Witt).  Since the

tort causes of action in the complaint allege injuries to the Debtor, a corporation, the parties agree that South Carolina law governs the tort claims because, during the relevant time period, the Debtor's offices in Lexington, South Carolina served as the "nerve center" of the corporation, where the officers, including Wade Cordell, Brad Cordell, and Blevins, directed, controlled, and coordinated the Debtor's activities.  See Central West Virginia Energy Co. Inc. v. Mountain State Carbon, LLC, 636 F.3d 101, 104 (4th Cir. 2011) (applying the "nerve center" approach to determining a corporation's principal place of business).  With respect to the federal securities claims, South Carolina law also governs the issue raised regarding the imputation of the conduct and knowledge of Debtor's agents to Debtor. See Nisselson v. Lernout, 469 F.3d 143, 154 (1st Cir. 2006) (stating in a federal securities fraud case that "[the federal court] look[s] to state law to ascertain when wrongful conduct should be imputed to a corporation").

Nevada law governs the aiding and abetting breach of fiduciary duty claim, since Debtor is a Nevada corporation, and "claims concerning fiduciary duties of corporate officers [are] governed by the state of incorporation." Menezes v. WL Ross & Co., LLC, 392 S.C. 584, 709 S.E.2d 114, 117 (Ct. App. 2011) (citing Restatement (First) of Conflicts of Laws, § 187 (1934)).  Finally, the parties agree that Delaware law governs the cause of action for breach of contract regarding the 2006 MK Contract and Georgia law governs the cause of action for breach of contract regarding the 2008 MK Contract, as each contract contained a choice of law provision setting forth the governing law for potential causes of action arising out of the contract.

### III.   Are the Trustee's Claims Against the MK Defendants Barred by the Doctrine of *In Pari Delicto*?

The MK Defendants assert that all of the Trustee's claims against them are barred by the doctrine of *in pari delicto* because each cause of action is based upon allegations of wrongdoing that was perpetrated by the Debtor's officers, directors, and managers acting within the scope of their agency, that the wrongdoing should be imputed to the Debtor and therefore bar the Trustee from asserting these claims since the Trustee stands in the shoes of the Debtor.[5]   "*In pari delicto* is an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing." Grayson Consulting, Inc. v. Wachovia Securities, LLC, ____ F.3d ____, 2013 WL 2284876, *8 (4th Cir. May 24, 2013).  If the plaintiff bears equal or greater fault in the alleged tortious conduct as the defendant, the defense of *in pari delicto* will bar the plaintiff's claims. Id.   If the *in pari delicto* defense could have been raised against the Debtor before the commencement of the case, the doctrine may also apply as a defense to actions brought against the MK Defendants by the Trustee under § 541, since the Trustee stands in the shoes of Debtor. See id. at *9 (citing Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 358 (3d Cir. 2001) (affirming bankruptcy court's application of *in pari delicto* doctrine to bar trustee's tort claims against third party broker used by the debtor to facilitate alleged Ponzi scheme).

Accordingly, to obtain dismissal of the Trustee's tort and breach of contract claims on *in pari delicto* grounds, the MK Defendants must demonstrate that the Debtor bears equal or greater fault for the conduct serving as the basis for those claims. With respect to the

---

[5]      Specifically, the MK Defendants assert that each cause of action stems from the same core allegation that MK and Meyers failed to disclose the ongoing scheme conducted by the Management Defendants to the Innocent Members of the Board of Directors and perpetuated the scheme, thereby breaching duties owed to the Debtor.

Trustee's federal securities claim, to invoke *in pari delicto,* the MK Defendants must establish that (a) as a direct result of the Debtor's own actions, the Debtor bears at least substantially equal responsibility for the violations the Trustee seeks to redress, and (b) preclusion of the suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public. Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985). Since the Debtor is a corporation and can only act and obtain knowledge through its agents, to demonstrate the Debtor's fault, the MK Defendants must first show that the law would impute liability and knowledge of the wrongdoing to the Debtor for the acts and knowledge of its officers, directors, and managers.

### a. *Imputation*

Under South Carolina law, the general rule is that a corporation is bound by the acts of its agent when such acts are done within the scope or apparent scope of his authority. West v. Service Life & Health Ins. Co., 66 S.E.2d 816, 817 (S.C. 1951) ("[A principal] is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences, and other malfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify or participate in, or indeed, know of such misconduct, or even if he forbade the acts or disapproved of them."); WDI Meredith & Co. v. American Telesis, Inc., 597 S.E.2d 885, 887 (S.C. Ct. App. 2004) ("Under the doctrine of apparent authority, a principal is bound by its agent's acts when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption."). Similarly, the knowledge of an agent is imputed to the corporation while the

agent is acting within the scope of his authority. See Bankers Trust of S.C. v. Bruce, 323 S.E.2d 523, 532 (S.C. Ct. App. 1984) ("It is well established that a principal is affected with constructive knowledge of all material facts of which his agent receives notice while acting within the scope of his authority.").

These commonly accepted principles of agency law are also applicable in Nevada, Delaware, and Georgia.  See In re Amerco Derivative Litigation, 252 P.3d 681 (Nev. 2011) (stating that "under basic corporate agency law, the actions of corporate agents are imputed to the corporation" and that "a corporation is affected with constructive knowledge ... of all the material facts of which its officer or agent receives while acting in the course of its employment and within the scope of his authority."); Verddier v. Neal Blun Co., 196 S.E.2d 469 (Ga. Ct. App. 1973) ("It is elementary that a principal is liable for the torts of its agent committed within the scope of his authority."); Chicagoland Vending, Inc. v. Parkside Center, Ltd., 454 S.E. 2d 456 (Ga. 1995) ("It is true that the law imputes to the principal all notice or knowledge concerning the subject matter of the agency which the agent acquires while acting as agent and within the scope of his authority...."); Zazzali v. Hirschler Fleischer, P.C., 482 B.R. 495, 513 (D. Del. 2012) (stating that under Delaware law, misconduct by a corporation's management in the course of employment is imputed to the corporation); J. I. Kislak Mortg. Corp. of Del. v. William Matthews Builder, Inc., 287 A. 2d 686 (Del. Super. 1972) ("Notice of an agent acquired while acting within the scope of his authority is imputable to the principal.") (citing Nolan v. Eastern Co., 241 A.2d 885 (Del. Ch. 1968), aff'd, 249 A.2d 45 (Del. 1968)).

The Trustee alleges in the Complaint that the Management Defendants were officers and directors of the Debtor during the time period at issue in the Complaint. Specifically,

Sturgill served as the Chief Executive Officer and as a member of the Board of Directors; Wade Cordell served as President and Chairman of the Board of Directors; Brad Cordell served as Chief Operating Officer and as member of the Board of Directors; and Blevins served as Vice President and a member of the Board of Directors.  Hargrett served as Chief Financial Officer.   As members of the Debtor's management, each of the Management Defendants appeared to have been authorized to act on behalf of the Debtor and thus was an agent of the Debtor.  The MK Defendants therefore argue that the Debtor should be bound by its agents' acts and its constructive knowledge of the wrongdoing.

In response, the Trustee first argues that the Debtor should not be imputed with liability for the Management Directors' conduct because the Management Defendants were acting outside the scope of their agency. Under general principles of agency law, a principal is not liable for acts of its agent that are outside the scope of the agency. See Burbage v. Curry, 121 S.E. 267 (S.C. 1923) (stating that in order for a principal to be liable for the tort of its agent, the tort must be committed while the agent was engaged within the scope of his agency); Am. Jur. 2d. Agency § 264 ("A principal is not liable for the torts committed by an agent while acting adversely to the principal or outside the scope of the agent's employment."). The Complaint contains numerous allegations that the Management Defendants' scheme was perpetuated by these individuals solely for their own benefit in order to allow them to continue to embezzle and loot funds from the Debtor. However, it is also implicit from the Complaint that the Management Defendants were authorized, as officers and directors of the Debtor, to engage in some of the conduct at issue: to approve and issue financial statements, obtain financing and raise capital, and enter into contracts on

behalf of the Debtor.[6]    It appears that the determination of whether the Management

Directors' conduct fell within the scope of their agency is ultimately an issue of fact which

is not properly decided at the motion to dismiss stage. See Murphy v. Jefferson Pilot

Communications Co., 613 S.E.2d 808, 813 (S.C. Ct. App. 2005) (stating that the issues of

agency relationship and scope of employment are generally issues of fact for the jury).

Nevertheless, even if the Court assumes that the Management Defendants' conduct was

within the scope of the Management Defendants' agency such that the general rule regarding

imputation of knowledge and conduct should apply, the Court concludes, as discussed in

detail below, that the Complaint includes sufficient allegations to prevent imputation of the

Management Defendants' acts and knowledge to the Debtor (and thus the Trustee standing

in the shoes of the Debtor) because the Management Defendants were acting fraudulently

against the Debtor or because the Management Defendants' actions were clearly adverse to

the Debtor, and thus the adverse interest exception would apply.

### i.    *Fraud by the Management Defendants Against Debtor Bars Imputation*

Even if the Management Defendants were found to be acting within the scope of

their agency, the Trustee argues that the Management Defendants' knowledge in relation to

this scheme should not be imputed to the Debtor because the Management Defendants were

acting fraudulently against their principal and had an interest in concealing these fraudulent

acts from the Debtor in order to avoid detection and continue their scheme to loot funds

---

[6] . See Kirschner v. KPMG LLP, 938 N.E.2d 941 (N.Y. Ct. App. 2010) ("When corporate officers carry out
the everyday activities central to any company's operation and well-being—such as issuing financial
statements, accessing capital markets, handling customer accounts, moving assets between corporate entities,
and entering into contracts—their conduct falls within the scope of their corporate authority."); In re Parmalat
Sec. Litig., 659 F. Supp. 2d 504, 520 (S.D.N.Y. 2009) (finding that in preparing and certifying financial
statements, the officers were engaged in conducting the work of the corporation; thus, the acts of those
corporate agents who effected the transactions were the responsibility of the corporation); Baena v. KMPG
LLP, 453 F.3d 1, 7 (1st Cir. 2006) ("The approval and oversight of [financial] statements is an ordinary
function of management that is done on the company's behalf, which is typically enough to attribute
management's actions to the company itself.").

from the Debtor.  In support of this argument, the Trustee cites <u>Crystal Ice Co. of Columbia,</u>

<u>Inc. v. First Colonial Corp.</u>, 257 S.E.2d 496, 498 (S.C. 1979), where the Supreme Court of

South Carolina identified an exception to the general rule that gives a principal constructive

knowledge of facts of which his agent receives notice while acting within the scope of his

authority, which applies in situations where the agent is acting fraudulently against his

principal or for any other reason has an interest in concealing his acquired knowledge from

his principal.  The Supreme Court further observed in <u>Crystal Ice</u> that there is a limitation to

this exception that provides that an agent's fraud cannot alter the effect of his knowledge to

his principal with respect to third persons who had no connection with the fraud. <u>Id.</u> The

Trustee argues that this limitation does not apply in this adversary proceeding because, as

alleged in the Complaint, the MK Defendants had knowledge of and participated in the

Management Defendants' defrauding of the Debtor.

The Complaint includes numerous allegations that the Management Defendants were

acting fraudulently against the Debtor as they engaged in financial transactions in order to

embezzle and loot funds from the Debtor.   The Complaint also includes numerous

allegations that the MK Defendants knew or should have known that that the financial

reports were deficient, false, and misleading and that the MK Defendants conspired with the

Management Defendants to conceal the Debtor's true financial condition by assisting

Sturgill in constructing believable figures, which were ultimately used in the Grafton

Audited Financials.[7] Further, the Trustee alleges that even after receipt of the Transaction

---

[7] For example, the Complaint includes the following allegations:

204.      MK, upon information and belief, was assisting Sturgill in crafting the 2004 Audited
financials by Grafton, which audit was purportedly completed by Grafton on February 20, 2005; however, in
reality, MK, and its employees, assisted Sturgill in constructing believable figures to result in the final figures
used in the 2004 Grafton Audited financials and such financials were then backdated to reflect an audit date of
February 20, 2005, despite the culmination of these figures in September of 2006 by MK, MK's employees,
Sturgill, and Grafton with the knowledge of Wade Cordell, Brad Cordell, and Blevins.  The September 2006

Report, which revealed that the Debtor's audited financial statements were materially

misleading and should not be relied upon, the MK Defendants actively continued to assist

the Management Defendants by locating and misleading potential investors.  These factual

allegations are sufficient to allow the Court to draw the reasonable inference that the MK

Defendants knowingly assisted the Management Defendants in their fraudulent scheme

---

versions of the 2005 financials demonstrate MK and its employees' knowledge of the falsity of the Grafton Audited Financials as well as their assistance in the creation thereof especially when considering MK's publication of the 06 CIM, which used the March 10, 2006 of 2004 Financials and stated "[financial statements for years 2003 and 2004 have been audited by Grafton & Company, PLLC."

213.     Meyers and MK actively solicited investors to invest in the Debtor, despite their knowledge of the problems with the Debtor's accounting, fraudulent financials, and looting by Wade Cordell, Brad Cordell, Sturgill, and Blevins, while simultaneously failing to disclose the Debtor's true financial condition to the Debtor's Innocent [Directors] thereby precluding the Innocent [Directors'] immediate and decisive action based on such disclosures that MK was expected and obligated to give to the Innocent [Directors].

222.     When confronted with numerous red flags concerning the accuracy of the Debtor's financial statements, MK and its agent, Meyers did not abide by the standards of due diligence, governing the conduct of brokers, underwriters, or investment advisers, but instead relied exclusively on statements made by [the Management Defendants] and furthermore, knew of the apparent falsity of these Defendants' statements and assisted in molding these statements into statements that were facially credible without disclosing the fraud they knew suffused Debtor's financial statements to the Innocent [Directors].

317.     [The Management Defendants] with the assistance of MK and its employees, falsely inflated Debtor's accounts receivable by creating fictitious accounts receivable on the Debtor's books and records as well as improperly reporting the aging of receivables and presenting the same to the Innocent [Directors] without disclosing the falsity thereof.

318.     In selling securities pursuant to the November 06 PPM and issuing the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes, [the Management Defendants] were acting outside the course of their employment and scope of their agency and apparent agency since the intent behind these sales and issuances was to precipitate embezzlement and looting of [the Management Defendants] as [the Management Defendants] had totally abandoned the interests of the Debtor when they entered into these transactions, which were designed by MK and its employees to assist [the Management Defendants] in concealing the Scheme with its attendant embezzlement and looting that [the Management Defendants] used to enrich themselves and their friends and relatives and to enhance their standing within the community at the Debtor's expense by misappropriating and fraudulently diverting Debtor's funds to third parties, including friends and relatives, and associates of [the Management Defendants] as well as business entities affiliated with or related to [the Management Defendants.]

326.     The only benefit of these transactions was to Wade Cordell, Brad Cordell, Sturgill, and Blevins, who could use the transactions to feign the Debtor's creditworthiness. This enabled them to keep the Debtor afloat, while they continued to divert assets from the Debtor. As a result of MK's knowing assistance, Wade Cordell, Brad Cordell, Sturgill, and Blevins were able to continue their embezzlement scheme while concealing Debtor's deepening insolvency and diminishing Debtor's assets, without any corresponding benefit to the Debtor which directly resulted from the Scheme.

331.     MK and its employees, including Meyers, operated and controlled the Scheme by advising the Debtor regarding as well as structuring the offerings of the Debtor's securities pursuant to the November 06 PPM and advising the Innocent Members of the Board of Directors regarding the propriety of the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes; working with Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett; and exerting their influence by omission and non-disclosure over the Innocent Members of the Board of Directors, which was part of the Scheme.

against the Debtor and thus the Debtor should not be charged with notice of the wrongdoing as a matter of law at this stage in the litigation. See Crystal Ice, 257 S.E.2d at 498 ("An equally well-recognized exception to the general rule [regarding imputation] exists in situations where the agent is acting fraudulently against his principal or for any other reason has an interest in concealing his acquired knowledge from his principal."); RESTATEMENT 2ND AGENCY § 271 ("A notification by or to a third person to or by an agent is not prevented from being notice to or by the principal because of the fact that the agent, when receiving or giving the notification, is acting adversely to the principal, *unless the third person has notice of the agent's adverse purposes.*") (emphasis added).

### ii. Adverse Interest Exception Bars Imputation

As an additional basis for preventing imputation of liability to Debtor, the Trustee alleges in the Complaint that the Management Defendants totally abandoned the interests of the Debtor when they entered into the financial transactions at issue, which were designed by the MK Defendants to assist the Management Defendants in concealing their scheme to embezzle and loot funds from the Debtor. Therefore, the Trustee argues that the adverse interest exception applies to prevent imputation of liability on the Debtor for the wrongful acts of its directors. Under Nevada, Georgia, Delaware and South Carolina law, this exception provides that where the action of the agent is clearly adverse to the principal, the agent's actions are not imputed to the principal. See Zazzali v. Hirschler Fleischer, P.C., 482 B.R. at 513; Myatt v. RHBT Fin. Corp., 635 S.E.2d 545, 547 (S.C. Ct. App. 2006);

Amerco, 252 P.3d at 695; In re Friedman's Inc., 394 B.R. 632 (S.D. Ga. 2008).   The extent

of adversity required to prevent imputation varies by jurisdiction.[8]

### a.   Nevada Standard for Adverse Interest Exception

For the adverse interest exception to apply under Nevada law, the agent's actions

must be completely and totally adverse to the corporation and provide no benefit to the

corporation.   Amerco, 252 P.3d at 695.   This standard is often referred to as the "total

abandonment" standard, and appears to be applied in the majority of jurisdictions.[9]

### b.   Delaware Standard for Adverse Interest Exception

Like Nevada, Delaware applies the total abandonment standard.   See Zazzali, 482

B.R. at 513 ("The adverse-interest exception is a narrow exception that applies only where

the fraud is entirely adverse to the corporation's interest, such that the actor has completely

abandoned the corporation's interests.").

### c.   Georgia Standard for Adverse Interest Exception

Georgia applies a fact intensive inquiry to determine whether an officer or agent has

departed from the scope of his duties and acts in such a way that his private interest

---

[8]   During the hearing, the MK Defendants did not present contrary case law regarding the adverse
interest exception and did not take issue with the Trustee's description of the applicable case law on this
exception.

[9]   See e.g., Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 325 (1st. Cir. 2008); Williams
Electronics Games, Inc. v. Garrity, 366 F.3d 569, 575 (7th Cir. 2004) (applying Illinois law); In re Bennett
Funding Group, Inc., 336 F.3d 94, 100 (2d Cir. 2003) (applying New York law); Beck v. Deloitte & Touche,
144 F.3d 732, 736 (11th Cir. 1998) (applying Florida law); Martin Marietta Corp. v. Gould, Inc., 70 F.3d 768
(4th Cir. 1995) (applying Maryland state law); Wiand v. Waxenberg, 611 F. Supp. 2d 1299, 1311 (M.D. Fla.
2009); In re Nat'l Century Fin. Enterprises, Inc. Iv. Litig., 604 F. Supp. 2d 1128, 1143 (S.D. Ohio 2009); Fine
v. Sovereign Bank, 634 F. Supp. 2d 126, 139 (D. Mass. 2008); Ladd Furniture, Inc. v. Ernst & Young, No.
2:95CV00403, 1998 WL 1093901, at *7 (M.D.N.C. Aug. 27, 1998); In re Verilink Corp, 06-8-566-JAC-11,
2009 WL 4609308 (Bankr. N.D. Ala. Dec. 3, 2009), aff'd in part, rev'd in part (on other grounds) and
remanded, 457 B.R. 832 (N.D. Ala. 2011); Kemin Indus., Inc. v. KPMG Peat Marwick LLP, 578 N.W.2d 212,
216 (Iowa 1998); Christians v. Grant Thornton, LLP, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007); Bondi v.
Citigroup, Inc., 423 A.3d 1158 (N.J. Super. 2011); Kirschner v. KPMG, LLP, 938 N.E.2d 941, 952 (N.Y. Ct.
App. 2010); Official Comm. of Unsecured Creditors of Allegheny Health Education and Research Foundation
v. PriceWaterhouseCoopers, LLP, 989 A.2d 313, 336 (Pa. 2010); James Cape & Sons Co. v. Streu
Construction Co., 775 N.W.2d 277 (Wis. App. 2009).

outweighs his obligation as a corporate representative.  If so, the law will not impute his

knowledge to the corporation.  Cohen v. Morgan Schiff & Co., Inc. (In re Friedman's Inc.),

394 B.R. 623, 632 (S.D. Ga. 2008); Keenan v. Hill, 378 S.E.2d 344 (Ga. Ct. App. 1989).

> d.   South Carolina Standard for Adverse Interest Exception

While South Carolina courts have recognized and applied the adverse interest

exception, they do not appear to have considered the issue of the extent of adversity required

to invoke this exception.  See Myatt v. RHBT Fin. Corp., 635 S.E.2d at 547 ("[T]he adverse

interest exception applies where the actions of one wrong-doer, usually an agent, are clearly

adverse to the other party's interests.").  Therefore, to fully decide this exception, this Court

must predict how the South Carolina Supreme Court would rule if presented with this issue.

Private Mortgage Inv. Servs., Inc. v Hotel and Club Assocs., Inc., 296 F.3d 308, 312 (4th

Cir. 2002).  In doing so, this Court may consider, among other things, South Carolina Court

of Appeals' decisions, restatements of the law, treatises, and well considered *dicta*.  Id.

The Trustee argues that South Carolina's adverse interest exception does not require

total abandonment, citing The Bank of Charleston v. The President and Directors of the

Bank of the State of South Carolina, 47 S.C.L. 291 (Ct. App. 1866) and Knobeloch v.

Germania Sav. Bank, 27 S.E. 962 (S.C. 1897).  In Bank of Charleston, a bank teller

fraudulently took money from his till and borrowed money from another bank in order to

escape detection.  The teller was not authorized to borrow or lend money for his bank. The

court held that the bank was not liable for its teller's acts because the knowledge of the agent

was not acquired or used by the agent in the course of his agency as teller and served only

his own unworthy purpose.  The Knobeloch case involved a bank president who also served

as an executor on a probate estate's account and wrongfully issued checks to himself on that

account.  The Supreme Court stated that knowledge of the president's fraudulent intent with regard to the transaction at issue was not imputable to the bank because the agent was acting in his capacity as executor of the estate and was not acting either wholly or partially for the bank in the particular transaction. [10]  In each of these cases, the respective court found that the agent was not acting within the scope of the agency and therefore refused to impute liability to the principal.   Neither case appears to have explicitly considered the adverse interest exception to imputation.

The Court observes that in <u>Citizens' Bank v. Heyward</u>, a more recent opinion in which the South Carolina Supreme Court examined the law regarding imputation, the South Carolina Supreme Court concluded that the agent, a bank president, was acting within the scope of his agency when he negotiated a loan with a customer, which provided for the payment of 8% interest to the bank and 2% interest to the bank president, personally. 133 S.E. 709 (S.C. 1925).[11] This case is instructive and may support a finding that the total abandonment standard would apply in South Carolina because the South Carolina Supreme Court seemed to consider the relative benefit to the bank from its agent's acts as a basis of its determination of liability for those acts. <u>See id.</u> The Supreme Court extensively examined the law regarding imputation of an agent's knowledge to a principal, noting that the proper

---

[10]      In <u>Knobeloch</u>, the Court mentions an "adversary relation" qualification  in a list of  qualifications  to the general rule of imputation of an agent's knowledge to the principal, including (1) where an agent receives professional confidences in his representation of a third party, (2) where an agent's knowledge is acquired while acting for himself or a third party and not for the principal, (3) where the agent's knowledge is such that, according to human nature and experience, the agent is certain to conceal, or (4) where the agent is acting in an adversary relation to the principal, or (5) where the agent mediates a fraud against his principal or some third person in his own interest, which would be defeated by disclosure.  However, the Court did not discuss the degree for adversity required to apply this qualification to the general rule of imputation.

[11]      The issue of imputation of liability for the bank president's act was raised by the customer as a part of his defense to a lawsuit brought by the bank to collect the debt.   The customer asserted that the loan was usurious under the usury laws in effect at the time of the loan agreement.  The trial court had concluded that the bank was not liable for usury because the customer had failed to prove that the bank knew of, authorized, or ratified the unlawful act of its president and that the president's act in collecting a commission for himself was not within the scope or apparent scope of his agency.

inquiry for imputation of notice is "whether the act was done in the course of the agency and by virtue of the authority as agent.  If it was, then the principal is responsible, whether the act was merely negligent or fraudulent."  133 S.E. at 713 (citing <u>Reynolds v. Witte</u>, 13 S.C. 5 (1880)).  Even though the agent's act of accepting the additional 2% commission was for his personal benefit and was adverse to the bank due to its unlawful nature, the Supreme Court stated that "it is a mistake to suppose that the bank was not benefited by the fraudulent act of [the president], as it could not be carried into effect, except by securing a borrower for the bank, out of whom it made several thousand dollars." <u>Id.</u> (citing <u>Brown v. Brown</u>, 17 S.E. 452 (S.C. 1983)).  Accordingly, the Supreme Court reversed the trial court, concluding that the agent's act was done in the course of his agency and by virtue of his authority as agent, thus the bank could be held liable for usury based on the acts of its agent and remanded the case to the trial court.

Therefore, considering this precedent and its review of South Carolina case law and treatises,[12] if the Court was required to determine the standard for the adverse interest exception under South Carolina law, it would be reasonable to predict that South Carolina Supreme Court would apply a standard that requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception. However, it is unnecessary to make this determination at this stage, because even under the total abandonment standard, which is the most stringent standard suggested by the MK Defendants, the Complaint sufficiently alleges facts to plausibly suggest that that there was a total abandonment of the Debtor's interest in this case such that the adverse interest exception would be applicable to bar imputation of liability to Debtor.

---

[12]      The MK Defendants cited no South Carolina case law and relied solely upon cases from other jurisdictions regarding this issue.

e.   <u>Application of Adverse Interest Exception in this Adversary Proceeding</u>

The MK Defendants argue that the adverse interest exception does not apply because the allegations of the Complaint show that the Management Defendants intended to benefit the Debtor and did benefit the Debtor through their actions by generating interest from outside investors in the Debtor.  In response, the Trustee argues that the Complaint shows that the only benefit of these transactions was received by the Management Defendants, who used the transactions to keep the Debtor afloat while they continued to divert its assets. Thus, the Trustee argues that the adverse interest exception applies because their actions did not benefit the Debtor.

*i.   Benefit to the Debtor*

The Trustee alleges that the Grafton Audited Financials concealed the Debtor's losses and portrayed a false image of the Debtor's financial health by materially overstating the income and assets of the Debtor, while materially understating its losses and liabilities. As a result of these representations, the Management Defendants were able to obtain funds from Debtor's creditors, debenture holders, stockholders and other sources, which were then immediately looted or embezzled by the Management Defendants or diverted to their confederates without any concomitant benefit to the Debtor, causing massive damages to the Debtor. The scheme is alleged to have been perpetuated by the Management Defendants with the assistance of the MK Defendants solely for the benefit of the Management Defendants and the perpetration and continuation of the scheme is alleged to have been directly antagonistic to the Debtor and its shareholders.  The Trustee further alleges that the

loans and stock issuances were clearly adverse to the Debtor because they ultimately led to the Debtor's bankruptcy.

The MK Defendants argue that the Debtor was benefitted by the illusion of solvency created as a result of the allegedly fraudulent financials because it prolonged the Debtor's existence through the infusion of additional capital. However, as stated in Kirschner v. Grant Thornton LLP, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009), aff'd Kirschner v. KPMG, LLP, 626 F.3d 673 (2d. Cir. 2010):

> Creating an illusion of solvency is not necessarily, in itself, a corporate benefit sufficient to rebut the adverse-interest exception, but neither does it harm the corporation. While a corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it, any harm done to the corporation is not done by the extension of credit itself, but by any subsequent looting or embezzlement. That is, where insiders prop up moribund entities in order to misappropriate corporate assets for personal gain, such plunder is adverse and cannot thereby be imputed to the corporation.

(internal quotations and citations omitted); see also Schacht v. Brown, 711 F.2d 1343, 1348 (7th Cir. 1983) (finding that the prolonged existence of a corporation benefited only the corporation's managers and the other alleged conspirators, not the corporation); Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349-50 (3d Cir. 2001) (finding that the fraudulent incurrence of debt can damage a corporation's value, noting that "the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation."). The Court observes that the issue of whether Debtor was benefitted by the Management Defendants' scheme is ultimately a question of fact. See Mauldin Furniture Galleries, Inc. v. Branch Banking & Trust Co., C.A. No. 6:10-240-TMC, 2012 WL 3680426 (D.S.C. Aug. 27, 2012) (concluding that whether the agent was acting on behalf of the principal and by implication, whether his own

knowledge of the activity is imputed to the principal, is ultimately a genuine issue of material fact for the jury).

Viewing the Complaint in the light most favorable to the Trustee, the Court finds that the Trustee set forth sufficient allegations that, if true, would plausibly suggest that the Management Defendants' pursuit of the scheme was solely for their personal benefit and that no tangible benefit was received by the Debtor; therefore, the adverse interest exception under South Carolina, Nevada and Delaware law would bar imputation of liability to the Debtor.[13]   Furthermore, since the Trustee has alleged that the Management Defendants embezzled and looted funds from the Debtor for their own benefit as part of the transactions at issue in the Complaint, the Complaint also adequately alleges facts which make it reasonable to infer that the Management Defendants' private interests outweighed their obligations as a corporate representatives, thus satisfying the requirements for the application of the adverse interest exception under Georgia law.

### ii.   Sole Actor Exception

There is a limited exception to the adverse interest exception, called the "sole actor" exception.   Under this exception, even if an agent's actions are totally adverse to the corporation, if the agent is the sole agent or sole shareholder of a corporation, the agent's knowledge and conduct will be nevertheless imputed to the corporation and therefore *in pari delicto* would apply to bar the Trustee's claims. See Grayson Consulting, 2013 WL 2284876 at *10 (citing Lafferty & Co., Inc., 267 F.3d at 359); Citizens Bank v. Heyward, 133 S.E. at

---

[13]      Specifically, the Complaint alleges in ¶ 325 that "[t]hrough MK and its employees' assistance, [the Management Defendants] were able to structure and execute a series of transactions, namely the sale of securities pursuant to the November 06 PPM and the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes, by way of the fraudulent Grafton Audited Financials to raise financing for [the Management Defendants'] massive looting of the Debtor, and the eventual result of these actions was the Debtor's bankruptcy."

717-18 (Watts, J.) (concurring) (recognizing the sole actor exception). The sole actor rule may also be applied when all of the corporation's management participated in the wrongdoing. See Grayson Consulting, at *10 (affirming the bankruptcy court's application of the sole actor exception where the complaint alleged that all three members of a limited liability company dominated control of the debtor); McHale v. Citibank, N.A. (In re 1031 Tax Group, LLC), 420 B.R. 178, 202 (Bankr. S.D.N.Y. 2009) (stating that "[t]he sole actor rule has been applied when the manager was also the sole shareholder of the corporation or when all [of] the corporation's management participated in the wrongdoing.").

When there are multiple members of management and some members of management did not participate in the wrongdoing, courts have considered whether those innocent members have the ability to control the corporation in order to determine whether the culpable members were the sole actors. Amerco, 252 P.3d at 696 (recognizing that if there are corporate decision-makers who are unaware of the agent's wrongdoing, then the sole actor rule would not apply because there is no unity between the agent and corporation); Breeden v. Kirkpatrick & Lockhart, LLP, 268 B.R. 704, 709-10 (S.D.N.Y. 2001), aff'd sub nom, In re Bennett Funding Group, Inc., 336 F.3d 94 (2d. Cir. 2003); 1031 Tax Group, LLC, 420 B.R. at 202-3; In re Friedman's Inc., 394 B.R. at 633 (S.D. Ga. 2008) (stating that the sole actor rule simply does not apply when innocent insiders possessed authority to stop the wrongdoing of the other directors or shareholder).

While neither the Court nor the parties were able to locate any South Carolina case law considering the sole actor exception under circumstances where innocent decision-makers were present, the Court believes that the presence of innocent decision-makers is relevant to the determination of whether the culpable agents are the sole actors for the

corporation.  See Grayson Consulting, 2013 WL 2284876, at *10 ("Although it does not

appear as if the South Carolina Supreme Court has addressed the relationship between the

sole actor rule and the adverse interest exception,... the sole actor rule is a well-established

principle of agency law."). There is persuasive precedent from other jurisdictions where

courts have considered whether an innocent decision-maker exists who has the corporate

power or authority to stop the fraud as part of their determination of whether the culpable

agents are the sole actors of the corporation.  See e.g., Breeden, 268 B.R. at 710 (stating that

the presence of a person with the ability to bring an end to the fraudulent activity at issue

would demonstrate that principal and agent are distinct entities and thus the sole actor rule

would not be applicable); 1031 Tax Group, LLC, 420 B.R. at 202 ("The innocent insider

exception is a corollary to the sole actor rule."); Amerco, 252 P.3d at 696 ("If some

corporate decision-makers are unaware of wrongdoing then there exists no unity between

the agent and the corporation such that the agent's complete adversity will impute to the

corporation").  In those circumstances, imputation of the culpable decision-makers' conduct

to the corporation would not be proper and *in pari delicto* would not apply.[14]

> With respect to the Innocent Directors, the Complaint alleges that:

> 330. MK and its employees' material omissions lulled the [Innocent
> Directors] into a false sense of security in the health of the Debtor. Without
> being told the true state of affairs, the [Innocent Directors] relied on the
> mirage created by MK and its employees in conjunction with [Management
> Defendants] and the [Innocent Directors] were prevented from investigating

---

[14]   The rationale for the innocent decision-maker exception has been stated as follows:

> [W]here only some members of management are guilty of the misconduct, and the
> innocent members could and would have prevented the misconduct had they known
> of it, the culpability of the malefactors should not be imputed to the company
> because that imputation would punish innocent insiders (e.g. non-culpable
> shareholders) unfairly.

In re CBI Holding Co., Inc., 311 B.R. 350, 372 (S.D.N.Y. 2004).

further; had the [Innocent Directors] been told the truth, they would have halted the fraud and the theft.

...

337.    At no time during the relevant transactions did the [Management Defendants] legitimately own a majority of the outstanding shares of the Debtor or otherwise own a sufficient number of the outstanding shares to control the Debtor.

338.    The Innocent [Directors] prudently considered the reports made at each Board of Directors' meeting by, *inter alia*, [the Management Defendants], and the Innocent [Directors] reviewed the acts of these officers as well as their recommendations based in part upon the recommendations of MK and its employees and ratified and/or approved them in good faith.

...

341.    The Innocent [Directors] did not have access to the truth regarding the falsity and concoction of the Grafton Audited Financials and were prevented from having such access through the actions of the [Management Defendants] who provided false documentation to corroborate the Grafton Audited Financials.

...

345.    The Innocent [Directors] exercised the real possibility of corporate control under the Debtor's By-Laws through the ability to remove the [Management Defendants] as well as [through] the ability to terminate their respective contracts for cause based on their actions, and would have taken such actions upon being apprised of the Scheme, while also acting to take immediate cost-cutting measures and other measures designed to preserve the Debtor's assets and enterprise value and if those measures failed, put the Debtor into bankruptcy.

346.    If the Innocent [Directors] had been informed of the fraudulent nature of the Grafton Audited Financials and the nature of the Scheme, the Innocent [Directors] would have immediately voted in a new regime to manage the Debtor.

...

348.    When confronted with actual suspicions of suspect activity of [the Management Defendants], the Innocent [Directors] took immediate decisive actions to stop the Scheme.

The foregoing allegations plainly state that the Management Defendants did not have complete control over the Debtor, that the Innocent Directors were unaware of the Management Defendants' Scheme, and that the Innocent Directors had the authority and control necessary to stop the fraud.

The MK Defendants argue that this case is factually similar to this Court's prior decision in Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital, LLC), 396 B.R. 184 (Bankr. D.S.C. 2008), where the Court determined that the sole actor exception to the adverse exception applied to allow the doctrine of *in pari delicto* to bar tort claims against the stockbroker used by the debtor to facilitate its alleged Ponzi scheme. However, the Grayson Consulting case is distinguishable from this case because in that case there were only three owners and operators of the debtor and all three were involved the scheme.

The MK Defendants argued that one of the Innocent Directors had no day-to-day management in the company, that another only managed a minor division and was not in South Carolina most of the time, that one did not become involved until 2008, and that the Management Defendants were the ones who actually ran the company.  However, the issue of the extent of control actually possessed by the Innocent Directors is not appropriately decided at the motion to dismiss stage, when the well-pled allegations of the Complaint are deemed true and where they appear sufficient.  Accordingly, the Court finds that the Trustee has adequately alleged facts that make it reasonable to infer that the Management Defendants

were not the "sole actors" of the Debtor and thus the sole actor exception to the adverse interest exception would not be applicable.

## **CONCLUSION**

For the foregoing reasons, the Court finds that the MK Defendants' Motion to Dismiss on grounds of *in pari delicto* should be denied because the Complaint includes sufficient allegations to plausibly suggest that that the law would not impute liability for the Management Defendants' acts and knowledge to the Debtor because the Complaint includes sufficient allegations for the Court to reasonably infer that the Management Defendants were acting fraudulently against the Debtor and that the MK Defendants participated in the fraud. Additionally, the Court finds that imputation would not occur because the adverse interest exception would apply to bar imputation and the sole actor exception to the adverse interest exception would not apply.  Without a demonstration that liability for the Management Defendants' acts and knowledge would be imputed to the Debtor, the MK Defendants are unable to show that the Debtor (and thus the Trustee standing in the shoes of the Debtor) bears equal or greater fault for the alleged tortious conduct as they do, and thus the defense of *in pari delicto* would not apply.

Accordingly, the MK Defendants' Motion to Dismiss on the grounds that the Trustee's claims are barred by the defense of *in pari delicto* is denied.   The remaining grounds of the MK Defendants' Motion to Dismiss will be addressed by separate order. Since this order does not dispose of all issues raised in the Motion to Dismiss, the time period within which the MK Defendants are required to file their answer to the Complaint

pursuant to Fed. R. Bankr. P. 7012(a)(4)(A) shall not commence until the entry of an order

addressing the remaining grounds in the Motion.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**06/19/2013**



US Bankruptcy Judge
District of South Carolina

Entered: 06/19/2013