## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **10-06335-jw**
Adversary Proceeding Number:  **12-80208-jw**

## ORDER

The relief set forth on the following pages, for a total of 134 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**10/15/2019**



US Bankruptcy Judge
District of South Carolina

Entered: 10/15/2019

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Infinity Business Group, Inc.,<br><br>Debtor(s). | C/A No. 10-06335-JW<br><br>Adv. Pro. No. 12-80208-JW<br><br>Chapter 7 |
| Robert F Anderson, as Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>Keith E. Meyers; Cordell L.L.C.; The Cordell Group L.L.C.; Gibson Commons L.L.C.; Bryon K Sturgill; John F. Blevins; Golden Ghost, Inc.; Haines H. Hargrett; Donald Brent Grafton; D. Larry Grafton; Grafton and Company, P.L.L.C.; Morgan Keegan & Company, Inc.; Law Offices of John F. Blevins, LLC; O. Bradshaw Cordell; Wade Cordell; Sturgill & Associates Inc.; Morgan Keegan & Associates, LLC,<br><br>Defendants. | **ORDER** |

This matter comes before the Court upon the Complaint filed by Robert F. Anderson, as Chapter 7 Trustee ("Trustee") in the above captioned adversary proceeding. After lengthy discovery and numerous motions and contested matters, the Court held a four-week trial to address the Trustee's remaining causes of action against Keith E. Meyers ("Meyers") and Morgan Keegan & Company, Inc. ("Morgan Keegan").

The adversary proceeding centers on the rise and eventual fall of Infinity Business Group, Inc. ("Debtor"), the business of which focused on the collection of non-sufficient funds checks ("NSF Checks") for third parties, using both electronic and manual collection methods. From its

1

inception, Debtor's business and customer base grew rapidly and attracted numerous individual investors, most of whom were family and friends of Debtor's founders and key members. These investors purchased stock, territory licenses, or promissory notes as a means of investment. Throughout its existence and due to its rapid growth, Debtor's primary goal and that of its shareholders was to attract a purchaser of the company or pursue a merger or initial public offering, and therefore, multiply the value for investors. However, Debtor's rapid business growth and expansion also caused a constant need for cash, forcing Debtor into a perpetual cycle of fundraising.

As one of the consequences of its need for cash, Debtor often delayed the turnover of the portion of checks collected on behalf of and owed to its customers and frequently used those funds to support its expansion and on boarding of more customers. In addition, during most of its operations, Debtor used an accounting practice which incorrectly stated the composition and collectability of its accounts receivable, which at any single point in time created the appearance that Debtor was in a better financial position than it was.

In 2009, as a result of the discovery of a $2 million deficit in customers' funds (also known as merchant accounts), Debtor began to lose customers, and the discovery led certain shareholders to attempt to oust some of Debtor's founding managers and key long-term members of its Board of Directors. The attempt to oust management resulted in costly litigation that ultimately settled with certain managers and directors agreeing to leave their positions in exchange for releases and cash payments from Debtor. New directors were selected, and despite new leadership, Debtor continued to lose business and was in constant need of additional funding.

Within one year of the initial ouster of three key managers, the Board of Directors removed two other officers, one being Debtor's founder and CEO Bryon Sturgill, that the new Board

deemed responsible for the improper accounting practice. Ultimately, due to its financial struggles, Debtor filed for relief under chapter 7 of the Bankruptcy Code.

Two years later, the Trustee commenced the present adversary proceeding on behalf of Debtor against certain key managers (former officers and Board members) of Debtor and several third-party Defendants who provided services to Debtor for their alleged involvement with the improper accounting practice. As the primary focus of this proceeding, the Trustee alleges that the Defendant managers and Defendants Meyers and Morgan Keegan colluded to create the accounting practice to conceal Debtor's true financial state, which ultimately led to the company's demise. Prior to trial, many of the individual Defendants defaulted, confessed judgment or entered into settlements with the Trustee. The trial addressed the liability of Morgan Keegan, a brokerage and investment banking firm, which had contracted with Debtor on two occasions to provide services relating to capital raises for Debtor, and its employee, Keith Meyers. After receiving an extensive presentation of evidence, including testimony from an 18-day trial and the admission of several hundred exhibits and several deposition transcripts for consideration,[1] the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, which is made applicable to this proceeding by Fed. R. Bankr. P. 7052.[2]

---

[1]    At the trial, the Court took several matters under advisement, including the submission of certain exhibits and the challenges to the admissibility of expert testimony.

Previously, when considering pretrial motions to exclude the challenged experts' testimony, the Court noted that it "is in the best position to weight the probative value of each expert's testimony, and there are no concerns that jury will be inappropriately swayed by the experts' testimony." With this understanding, the Court finds that the two challenged expert witnesses, John Freeman and Scott Illario are properly qualified as experts "by knowledge, skill, experience, training, or education" pursuant to Fed. R. Evid. 702. The Court finds that the challenges to their qualifications go to the weight of the opinions rendered by these experts, rather than to the admissibility of their testimony. Therefore, the Court denies the motions to strike or exclude the testimony of these expert witnesses.

Further, the Court took the admission of several of the parties exhibits under advisement. After review, the Court admits these exhibits into the record. For all other matters taken under advisement during the trial, those matters are resolved through this Order.

[2]    To the extent the following findings of fact are conclusions of law, they are adopted as such, and to the extent the following conclusions of law are findings of fact, they are so adopted.

# FINDINGS OF FACT[3]

## The Formation of Debtor

1.      In the early 2000s, Bryon Sturgill ("Sturgill") was the primary owner of FARS, Inc. ("FARS"), which specialized in the electronic collection of NSF Checks for third party merchants.

2.      In 2003, after receiving a postcard from Sturgill seeking marketing assistance, Wade Cordell and others formed FARS Marketing, Inc. ("FARS Marketing") for the purpose of marketing the services of FARS to potential customers.

3.      On May 8, 2003, Debtor, led by Sturgill, was incorporated under the laws of Nevada.

4.      To consolidate the operations of FARS and FARS Marketing with Debtor, on June 10, 2004, Debtor's Board of Directors resolved for Debtor to initiate the purchase of all capital stock of FARS and FARS Marketing, and on September 15, 2004, Debtor, FARS, and FARS Marketing entered into a Share Purchase Agreement, whereby Debtor completed the purchase of

---

[3]      The Court notes that the factual testimony presented by both parties' witnesses was inherently self-serving. The Trustee's factual witnesses consisted of former investors of Debtor who hold allowed unsecured claims in Debtor's main bankruptcy case and who may ultimately benefit from the Trustee's recovery in this adversary proceeding, and John Blevins, a former insider of Debtor who had reached an agreement with the Trustee to not enforce a confession of judgment in this proceeding in exchange for his cooperation. Conversely, Meyers, the central witness for the defense, is both personally a defendant in this proceeding and a former employee of the other defendant, Morgan Keegan. Further, while Calvin Clark, another witness for the defense and former employee of Morgan Keegan, does not appear to have a personal stake in this litigation, he may have professional implications as the proceeding relates to the propriety of his previous employment with Morgan Keegan.  In addition, much of the factual testimony regards specific conversations and remarks made over a decade ago and may be undependable due to faded recollections.

Further, the Trustee placed emphasis on certain metadata contained in electronic documents submitted as exhibits. The metadata presented by the Trustee showed the person who originated the document and the time it was originated, as well as the person who last made a change to the document and the time of that last change. The metadata did not provide the extent of the last change made to the document, nor did it provide who made changes to the documents and the extent of those changes between the origination of the document and the last change made. As a result, the metadata was of very limited probative value as it does not describe how a document was changed or who drafted the particular information within the document.

FARS and FARS Marketing, and issued stock to the former shareholders of FARS and FARS Marketing ("2004 Merger").[4]

5.      Debtor was an established payment processing company offering payment, risk management, and fraud detection services related to checks received by various clients, including banks, schools, and direct merchants.

6.      One of the focuses of Debtor's business was the collection of checks that had insufficient funds when first presented for collection ("NSF Checks"), with Debtor obtaining its revenues from check recovery service charges permitted under state laws for the collection of NSF Checks and under its agreements with its customers ("Service Charge").[5] Debtor offered its clients two separate programs for collecting NSF Checks: the Guaranteed Program and the Non-Guaranteed Program. Under the Guaranteed Program, Debtor would become the owner of the NSF Check by paying to the customer the amount that the NSF Check was written for, also known as face value. Upon any collection, Debtor would receive both the face value and the applicable Service Charge. Under the Non-Guaranteed Program, the ownership of the NSF Check remained with the customer with Debtor having a contractual right to the Service Charge upon collection. Therefore, under the Non-Guaranteed Program, upon the collection of an NSF Check, Debtor retained the Service Charge and delivered the remaining portion of the face value of the NSF Check to its customer.

---

[4]      As part of the merger, the owners of FARS and FARS Marketing were given preferred shares of Debtor in September 2004. Shortly thereafter, in December 2004, these preferred shares were converted to common shares of Debtor's stock. While not a party to these agreements, it appears Debtor's stockholder ledgers reflected that Cordell LLC received shares of Debtor's stock as part of these transactions. During these proceedings, the Trustee raised concerns regarding the shares issued to Cordell LLC as part of the merger of the companies.

[5]      For example, under South Carolina law, a payee of a check is permitted to recover a $30 service charge from the check writer for each NSF Check that is collected. *See* S.C. Code Ann. § 34-11-70 (2019).

7.    In addition, it appears Debtor had two wholly-owned subsidiaries, Infinity Collections, Inc., which focused on the manual collection of NSF Checks,[6] and Infinity Business Assurances, Inc., which focused on collections related to the insurance industry.

**Debtor's Management and Professionals**

8.    Throughout its operations, Debtor was managed by a Board of Directors and several key officers, including the following individuals who are relevant to this matter:

- Sturgill: Sturgill was Debtor's Chief Executive Officer and a member of Debtor's Board of Directors from its founding in 2003 until July 19, 2010, the day he was terminated by the Board of Directors ("Second Ouster"). As part of Sturgill's duties from 2003 to September 2006, he reviewed and prepared the company's financial statements and was effectively Debtor's chief financial officer during that period. During that period, he was also responsible for providing the Board with all financial information and for the hiring of Debtor's outside accounting firm, Grafton & Company, PLLC. On the company's website, Sturgill represented that he was a certified public accountant ("CPA"), when he in fact never passed the CPA exam. Further, Sturgill became a certified valuation analyst by falsifying his status as a CPA. It appears that Wade B. Cordell and John Blevins were aware that Sturgill was not a CPA from at least November 6, 2006. John Blevins testified that he disclosed to Debtor's Board on multiple occasions that Sturgill was not a CPA.

- Wade B. Cordell ("Wade Cordell"): Wade Cordell was Debtor's President and Chairman of the Board from 2004 until August 15, 2009, the date of his alleged termination pursuant to a vote of Debtor's shareholders ("Initial Ouster"). His removal and the removals of certain other officers at that time occurred as the result of a settlement of litigation between himself and the members of Debtor's Board based on the central allegation that Cordell allowed Debtor to improperly use customer trust funds. Among other things, Wade Cordell oversaw Debtor's operations and sales, met with prospective customers, and raised capital from individual investors.

- O. Brad Cordell ("Brad Cordell"): Brad Cordell was Debtor's Chief Operating Officer and a Board member from 2004 until August 15, 2009, the Initial

---

[6]    Based on the record, it appears manual collection of NSF Checks involved Debtor attempting to collect dishonored checks through traditional means of collection, such as contacting the drawer of the check or bringing legal action against the drawer. Manual collection would typically occur after Debtor was unable to collect the check through is electronic means of collections, using the Automated Clearing House, a bank clearing house of over 25,000 banks. With electronic collections, Debtor developed software to search the Automated Clearing House for the drawer of the NSF Check's bank and bank account and then present the check for payment multiple times, which if payment was available, the Automated Clearing House would debit the drawer's bank account for the amount of the check and Service Charge, and thereafter, electronically transfer the funds to Debtor.

Ouster. Brad Cordell was responsible for managing the daily operations of Debtor and for achieving Debtor's financial targets. In addition, he assisted with Debtor's capital raises from individual investors.

- Haines H. Hargrett ("Hargrett"): Hargrett, a Certified Public Accountant ("CPA"), served as Debtor's Chief Financial Officer from September 2006 until July 2010 when his services were terminated by Board (the Second Ouster). Hargrett was not a member of the Board, but he reported to the Board and frequently attended Board meetings. In 2015, Hargrett pled guilty to one felony count relating to his role in preparing Debtor's financial statements.

- John F. Blevins ("Blevins"): Blevins served as Debtor's general counsel and as a member of the Board from 2004 until August 15, 2009, the Initial Ouster. Blevins was in charge of compliance for Debtor, and he had all authority and responsibility for legal issues affecting Debtor, including contract review and negotiation as well as providing advice and counsel to Debtor's Board, President, and CEO. Blevins also retained and interacted with outside counsel. Prior to his involvement with Debtor, Blevins was suspended from the practice of law in the State of Maryland for a period of six months. It appears Blevins never disclosed his suspension to Meyers, Morgan Keegan or Debtor's shareholders.

- Thomas Handy ("Handy"): Handy served as a member of Debtor's Board from June 24, 2008 until March 31, 2010.

- Michael Potter ("Potter"): Potter served as a member of Debtor's Board from May 2003 until the Annual Meeting in November 2007 and rejoined the Board in August 2009 until his resignation in August 2010. After 2004, Potter rarely attended Board meetings and testified that he stopped actively participating as a director in 2006. Potter had no involvement in the day-to-day operations of Debtor and typically followed Sturgill's instructions on matters relating to Debtor.[7] Potter, in his deposition testimony, also stated that decisions were regularly made without his input or knowledge while he served on the Board.

- Van Hoeven ("Van Hoeven") served on the Board from 2004 until August 31, 2010 when Debtor filed its bankruptcy petition. Until September of 2006, Van Hoeven managed Debtor's Processing Center located in Jacksonville, Florida. In addition, Debtor employed Van Hoeven in various capacities, including the Director of Information and Technology. In addition, he assisted with Debtor's capital raises from individual investors.

- Robert Caughman ("Caughman") served as Debtor's Vice President of Administrative Support from June 15, 2004 until Debtor's bankruptcy filing. Caughman also served as Debtor's Secretary from October 1, 2006 until

---

[7]    During the trial, evidence was presented that Potter was very close to Sturgill and typically voted similarly to Sturgill during Board votes. It appears Potter resigned from the Board due to the removal of Sturgill as part of the Second Ouster.

Debtor's bankruptcy filing. In addition, he assisted with Debtor's capital raises from individual investors.

- William Danielson ("Danielson") was an investor in Debtor and chaired Debtor's Advisory Board from April 2009 until Debtor's bankruptcy filing. In addition, he assisted with Debtor's capital raises from individual investors.

- Jeffrey Lyle ("Lyle") was the Senior Vice President of Sales and worked in sales for Debtor. In addition, he assisted with Debtor's capital raises from individual investors.

- Evelyn Berry was an officer of Debtor serving as Debtor's Executive Director for Schools Initiatives from January of 2006 until Debtor filed its petition for bankruptcy relief on September 1, 2010. In addition, she assisted with Debtor's capital raises from individual investors.

9.    For the purposes of this Order, Blevins, Hargrett, Sturgill, Brad Cordell and Wade Cordell will, at times, be referred to as "Management Defendants" as they are defendants in this adversary proceeding.[8] From Debtor's inception until the Initial Ouster, the Management Defendants controlled both the day-to-day and long-term aspects of Debtor's business, including holding four of the six director positions on the company's Board,[9] and held the significant leadership positions in the company, including Chief Executive Officer, Chief Financial Officer, In-House Counsel, President, and Chairman of the Board. The Management Defendants also held a sizeable portion of Debtor's stock. It appears that the remaining non-defendant directors did not have involvement in the day-to-day operations of Debtor.

10.    The authority of Debtor's management was set by Debtor's corporate bylaws ("Bylaws"), which provided that the business and affairs of Debtor were to be managed by

---

[8]    The Trustee also brought claims against various entities associated with the Management Defendants including Cordell, L.L.C., The Cordell Group L.L.C. and Gibson Commons L.L.C. (associated with the Cordells); Golden Ghost, Inc., and the Law Offices of John F. Blevins, LLC (associated with Blevins); and Sturgill & Associates Inc. (associated with Sturgill). In addition, the Trustee brought claims against Donald Brent Grafton, Larry Grafton and Grafton and Company, P.L.L.C. for their role as the auditor of Debtor.

[9]    The Court notes that the evidence also suggests that at least some of the other directors during this period may have strongly supported the positions of the Management Defendants. For example, Michael Potter, who served on Debtor's Board for more than five years, indicated that he placed his full trust and confidence in Sturgill when it came to matters regarding Debtor.

Debtor's Board of Directors. The Bylaws provide that the chief executive officer "shall have general and active management of the business of the [company], subject, however, to the right of the directors to delegate any specific powers . . . to any other officer or officers of the [company]." As to the authority to establish accounting practices for Debtor, neither the Bylaws nor the management's employee contracts specifically addressed which individuals had the authority to set such practices.

11.     Each of the directors on Debtor's Board had a fiduciary duty to make full disclosure to the Board and keep the Board informed as to improper actions affecting Debtor, including any red flags associated with the sale of securities by the corporation.

12.     In addition to its Management, Debtor also retained several professionals, which are relevant to this proceeding, to advise and assist it, including:

- **McNair Law Firm**: McNair Law Firm served as Debtor's securities counsel until February 2006 when Debtor retained DLA Piper.

- **DLA Piper**: DLA Piper were attorneys for Debtor hired to assist with securities and business matters of the company from February 2006 until 2010. The individual attorneys who assisted Debtor eventually joined Duane Morris LLP in December 2006 and continued to serve as counsel for Debtor. For the purposes of this Order, the Court will refer to Duane Morris LLP and DLA Piper as "Outside Securities Counsel."

- **Grafton & Company, PLLC**: Grafton & Company, PLLC, a named defendant, served as Debtor's auditors from 2003 until 2009, issuing audited financials for each of those years. Grafton & Company, PLLC was led by Donald Brent Grafton, who was a certified public accountant, and assisted by his father, D. Larry Grafton. Donald Grafton pled guilty to one felony count relating to his involvement with Debtor's financial statements.  For the purposes of this Order, the Court will collectively refer to Grafton & Company, PLLC, Donald Brent Grafton and D. Larry Grafton as "Grafton."

**Early Capitalization of Debtor and IPO Plans**

13.     Before Morgan Keegan's involvement with Debtor, in 2004 and 2005, through the efforts of its officers and directors, Debtor raised approximately $4 million through a "friends and

family" offering and $1.6 million through a sale of territory licenses.[10] It subsequently appeared that these early offerings conducted by Debtor were in violation of securities laws as they constituted offerings to unaccredited investors without proper registration with the Securities and Exchange Commission. In addition, it appears Debtor paid commissions to unregistered individuals for the sale of Debtor's stock and licenses in violation of state and federal securities laws. Ultimately, these investment offerings would require Debtor to make a rescission offer in 2006 to repurchase the shares from these investors.

14.    As early as 2004 and before the involvement of Meyers and Morgan Keegan, the management of Debtor focused on "taking the company public" and filed paperwork with the NASDAQ stock exchange to acquire a stock symbol in March 2005.

15.    After obtaining the stock symbol, on September 12, 2005, Wade Cordell sent a letter to Debtor's employees announcing Debtor's plan "to go public" and referred to a potential agreement with Morgan Stanley. In the letter, Wade Cordell stated that:

> [A]round July [2005, Debtor was] approached by the largest firm on Wall Street, Morgan-Stanley, to take a look at [the] company as a possible client. Morgan-Stanley is certainly the "big league" when it comes to taking a company public. Today, [Debtor] received a call that will change all of our lives. Morgan-Stanley informed Bryon Sturgill this morning that they intend to take [Debtor] public. Their time frame is between 120-180 days. Just within the last six weeks Morgan-Stanley took a similar company as [Debtor] public. This company opened trading at $22.00 per share and in just six short weeks are trading at $26.00 per share. This company did not have the revenues [Debtor] currently ha[s]. . . . **The goal of [Debtor's] public offering is to raise between $35 million and $100 million. This money will be used for expansion and other projects in order to drive the stock to $50.00 per share.**

(emphasis added).[11]

---

[10]    In addition to selling traditional shares of its stock, Debtor sold territory licenses in which investors bought the rights to a certain percentage of the revenue generated from each and every check collected within the investor's geographical area.

[11]    Debtor's management was constantly selling the potential success of Debtor in order to raise capital, and the record contains several examples of misstatements by Debtor's management seeking to promote and leverage its business relationships with outside firms in order to sell that potential success to its employees, and its current and

16.    In October 2005, Debtor retained the McNair Law Firm to assist Debtor with the preparation of a private placement memorandum intended for use in raising monies from outside investors.  Debtor advertised that the firm would "perform all the securities legal work necessary to guide the Company in its efforts to become a public company [] sometime in 2006."

17.    Testimony was received from Van Hoeven and Handy, who served as Directors for Debtor, that Debtor's Board of Directors never officially approved any specific capital raise. Later in April 2008, the Board, including Van Hoeven, the Cordells, Blevins, and Sturgill, resolved that Wade Cordell as President of Debtor had the authority to issue certain securities in his discretion and under the terms that he set.

### Debtor's Introduction to Morgan Keegan

18.    On September 28, 2005, after learning that Debtor had completed the preliminary filing requirements for an initial public offering, Meyers, an employee of Morgan Keegan, sent an email to CEO Sturgill:

> Mr. Sturgill, It has been a couple months since we last spoke. Please let me know if you would like to continue our conversations regarding Infinity Business Group. I see per your website that you have filed preliminarily to go public. I believe that Morgan Keegan & Company would be a strong underwriter for your company and would like to discuss our participation.

19.    Meyers joined Morgan Keegan in early 2005. Meyers holds B.S./B.A. degrees in accounting and finance from Washington University in St. Louis. After Meyers passed the CPA exam in 1997, he received his New York CPA license, and for a period of time, he was an accountant with the Deloitte & Touche audit department, focusing on the audits of manufacturing

---

potential investors, sometimes hyperbolizing the extent of the relationship and/or promoting the relationship without the outside firm's knowledge, including Meyers and Morgan Keegan. Wade Cordell indicated that these type of business relationships provided Debtor with "great credibility." As a result, it creates a considerable question as to the veracity of any statements made about Morgan Keegan by Debtor's management when it was promoting Debtor, as well as raises doubts that such statements were made with the knowledge and approval of Morgan Keegan.

businesses, before attending the Duke University Fuqua School of Business. Upon obtaining an

MBA, Meyers began to work in investment banking, allowing his CPA license to become inactive

in 2001. Meyers did not practice as an accountant after 1998. Meyers holds multiple securities

licenses, including Series 7 (general broker's license), 63 (state licenses), and 24 (supervisory

designation). Meyers specifically focused his work on raising institutional capital for non-bank

lending and financial services companies. Meyers is not licensed as an investment adviser, and he

testified that he does not provide any investment advice.

20.     On November 11, 2005, Meyers emailed his supervisor at Morgan Keegan, Chip

Grayson, about Sturgill, Debtor's CEO, asking, "Remember this guy? He is coming to Atlanta in

two weeks to discuss his upcoming $100mm IPO [(Initial Public Offering)] (Infinity Business

Group). He has spoken with Morgan Stanley and we were his next call. I will keep you posted."

Grayson responded, "I vaguely remember him. Sounds like a potential good piece of business."

21.     On January 24, 2006, Meyers met with members of Debtor's management to

discuss whether Debtor should retain Morgan Keegan's services. During the meeting, Meyers

provided Debtor's management with a general overview that described the range of services that

Morgan Keegan could provide Debtor, including but not limited to assistance with obtaining

private equity capital and mezzanine funds, assistance with mergers and acquisitions, as well as

serving as an underwriter or advisor to the company.

22.     On February 22, 2006, Meyers and Calvin Clark ("Clark"), an associate of Morgan

Keegan, visited Debtor's Lexington, South Carolina facility to further discuss the possibility of

Debtor retaining Morgan Keegan's services. During this meeting, it was discussed whether it was

best for Debtor to proceed with an initial public offering or to first pursue a private equity investor.

Meyers testified that he had explained to Debtor's management that, in his view, Debtor was not

in a position at that time to make a public offering because of the size of the company. Meyers, on behalf of Morgan Keegan, provided a brochure which included a proposed timetable for Morgan Keegan to assist Debtor in the raising of private equity and a list of preliminary information Morgan Keegan would need to assist Debtor, including Debtor's historical and projected financial information. As a means of providing an example of Morgan Keegan's services, Meyers and Clark also requested information, including Debtor's financial information (i.e. financial statements), that Morgan Keegan could fashion into a draft Confidential Information Memorandum, which would describe Debtor to potential investors.

23.    Without contradiction, Meyers indicated that the February 22, 2006 meeting was to conduct Morgan Keegan's due diligence of Debtor. During the meeting, Morgan Keegan did not undertake to do a comprehensive review nor opine on Debtor's financial information. As part of its due diligence efforts, Morgan Keegan reviewed information provided by Debtor in order to have sufficient details and understanding to explain that information to potential institutional investors, but it did not audit the information or hire outside auditors to review, audit or opine on the accuracy of the information. Further, as part of the initial information gathering, Meyers requested that Debtor's management disclose any issues in their backgrounds that may be revealed in a background report. Meyers testified that neither Sturgill nor Blevins disclosed any possible issues to him.

24.    Handwritten notes of Blevins from the February 22, 2006 meeting also suggest that there was some discussion about whether Debtor should immediately pursue a public offering or whether it should delay a public offering. These handwritten notes also state "6% for private placement, 7% for IPO [(Initial Public Offering).]"

25.     On the afternoon on February 22, 2006, Meyers emailed the following message to his supervisor to report on the outcome of the meeting: "Great meeting today. We are moving forward with a 15-20mm private placement at 6%. Better news, there is no broker involved." Meyer's supervisor responded, "Great job. Do we have a signed letter?" to which Meyers replied, "I am preparing one tomorrow. This meeting was due [diligence] for us and now that we both want to move forward, we have a handshake agreement on our fees."

26.     Throughout both of the engagements between Morgan Keegan and Debtor in 2006 and 2008, Meyers understood that he directly reported to the management team of Debtor and not the Board. Further, during both engagements, the Management Defendants constituted a majority of Debtor's Board.

### 2006 Contract

27.     On March 16, 2006, Morgan Keegan and Debtor entered into an engagement agreement ("2006 Contract"), which provided that Morgan Keegan would serve for a period of one year as Debtor's exclusive placement agent,[12] seeking to assist Debtor and raise capital in exchange for a 6% commission on all gross proceeds raised on behalf of Debtor resulting from a private equity[13] placement. Based on the evidence of the parties' course of conduct, under the 2006

---

[12]     The 2006 Contract does not define "placement agent." Secondary sources state that it is not uncommon for a company seeking to issue stock "to engage a finder or placement agent to assist in locating investors and bringing the financing to a successful conclusion. The placement agent will assist the company in locating potential investors and in attempting to close the financing transaction. For its efforts, the placement agent will generally receive a fee based on a percentage of the funds raised from investors identified by the placement agent and contingent equity compensation in the form of options or warrants." Alan S. Gutterman, *Business Transactions Solutions* § 349:49 (June 2019 Update).

[13]     Private equity refers to the investment class that consists of capital not listed on a public exchange and exempt from public securities laws. *See* James C. Spindler, *How Private is Private Equity, and at What Cost?*, 76 U. CHI. L. REV. 311, 311–12 (2009).

Contract, Morgan Keegan was to assist Debtor with obtaining capital from institutional investors.

The 2006 Contract[14] included several relevant provisions, including the following:

- 4. (b) [Debtor] will furnish Morgan Keegan with such information[,] including financial statements, with respect to the business, operations, assets and liabilities of the [Debtor] as Morgan Keegan may reasonably request in order to permit Morgan Keegan to assist [Debtor] in preparing a private placement memorandum . . . for use in connection with the offering of Securities. *Morgan Keegan may rely upon the accuracy and completeness of the Information without independent verification. [Debtor] will be solely responsible for the contents of the Private Placement Memorandum and any and all other written or oral communications provided to an actual or prospective purchaser of the Securities by [Debtor]. [Debtor] represents and warrants [to Morgan Keegan] that the Private Placement Memorandum and such other communications will not, as of the date of the offer or sale of the Securities, to [Debtor's] knowledge, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.*

- 4. (c) Notwithstanding anything to the contrary set forth herein, Morgan Keegan shall be solely responsible for its own actions with regard to the transactions described herein, which actions shall be in compliance with all applicable laws and regulations, including but not limited to investment advisor, broker-dealer and similar rules and regulations.

- 6. Morgan Keegan will not have any obligations in connection with the private placement of the Securities contemplated by this Agreement except as expressly provided in this Agreement. Morgan Keegan will use its reasonable "best efforts" in connection with this engagement hereunder . . . .

- 7. The term of Morgan Keegan's appointment and authorization hereunder shall extend from the date hereof through March 6, 2007 or such other date as may be mutually agreed by [Debtor] and Morgan Keegan.

- 8. If during Morgan Keegan's engagement or within six (6) months thereafter, the Company (i) purchases all or a substantial portion of the stock or assets of or enters into a merger . . . or (ii) engages in any public offering or private placement of debt or equity of the Company[,] the Company shall give Morgan Keegan the right of first refusal to act as its financial advisor in connection with such transaction or as lead managing underwriter or exclusive placement agent in connection with such Financing, on terms and conditions customary for similar transactions.

- 11. *All opinions and advice provided by Morgan Keegan to [Debtor] in connection with this engagement are intended solely for the benefit and use of [Debtor] in connection with the matters described in this Agreement, and accordingly such advice shall not be relied upon by any person or entity other than [Debtor] and its advisers. [Debtor] will not make any other use of any such opinions or advice. In addition, none*

---

[14]     The Court previously granted summary judgment as to the Trustee's Cause of Action for Breach of Contract as it relates to the 2006 Contract. (ECF No. 549.) There are no remaining causes of action by the Trustee relating to any alleged breach of the 2006 Contract or any other contract relating to the 2006 Contract.

*of (i) the name of Morgan Keegan, (ii) any advice rendered by Morgan Keegan to [Debtor], or (iii) any communication from Morgan Keegan pursuant to this Agreement will be quoted or referred to in any report, document, release, or other communication prepared, issued or transmitted by [Debtor] or any person controlled by [Debtor], without Morgan Keegan's prior written consent, which consent will not be unreasonably withheld.*

- 15. This Agreement may not be amended or modified except in writing signed by each of the parties hereto . . . .This Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and supersedes all previous agreements should they exist with respect thereto and shall be binding upon and inure to the benefit of [Debtor], Morgan Keegan, and other Indemnified Persons and their respective successors, assigns, heirs and personal representatives.

(emphasis added). The 2006 Contract also included express provisions for Debtor to indemnify Morgan Keegan for any lawsuit that Morgan Keegan or its employees and agents are involved in and for any losses resulting from "an untrue statement of material fact contained in the Private Placement Memorandum or any other written or oral communication provided by [Debtor] to any prospective purchaser . . . or arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated . . . in order to make the statements . . . not misleading."

**Drafting of a Confidential Information Memorandum**

28. Prior to entering into the 2006 Contract, on March 5, 2006, Meyers sent to Wade Cordell, Blevins and others a rough draft of a confidential information memorandum which might be distributed to potential institutional private equity investors. The first draft of the confidential information memorandum contained no substantive information on the financials of Debtor.

29. On March 10, 2006, Sturgill, as CEO, sent to Meyers the 2003 and 2004 Consolidated Audited Financial Statements which were provided by and certified as GAAP compliant by Grafton, Debtor's auditor, for inclusion in a draft confidential information memorandum.

30. On March 19, 2006, Clark sent an email to Sturgill following up on the status of the 2005 financials since they would also need to be included in any confidential information

memorandum to be provided thereafter to potential institutional investors. On March 20, 2006, Sturgill provided Debtor's Statement of Income for 2005. At that time, Debtor's management had not produced any other financial statements for Debtor, including Debtor's balance sheet or cash flow statements.

31.     On March 22, 2006, Sturgill, Debtor's CEO, provided Morgan Keegan with forward-looking financial projections for 2006.[15]

### 2005 Financial Statements

32.     On March 27, 2006, Sturgill, as CEO and the individual preparing Debtor's financial statements at that time, provided to Clark additional financial data of Debtor for the year 2005, including a balance sheet. These 2005 financials included an accounts receivable balance of $9,936,403, which indicated a significant increase from the prior years' balance of $151,798 for 2003 and $148,460 for 2004.

33.     Shortly after reviewing the 2005 balance sheet provided by Sturgill on March 27, 2006, Meyers questioned Sturgill about the significant increase in the accounts receivable balance for 2005. Meyers testified that Sturgill explained that Debtor's historic financial statements did not reflect the company's collections entity, but that Sturgill was now merging that information into the company's financial statements. Sturgill advised him that in 2005, Debtor's business significantly increased in the area of manual or hard collection of NSF checks and that the collections entity utilizes a practice of treating the Service Charge from NSF checks as an account receivable ("Accounting Practice").

---

[15]     Clark testified at trial that Sturgill provided multiple versions of the unaudited 2005 financials in connection with Morgan Keegan's preparation of a confidential information memorandum as Grafton had not completed its audit. Considering that status, Clark did not consider it a red flag that there were multiple versions of the 2005 unaudited financials, and the Court finds his testimony credible.

34.     According to Sturgill, Debtor had adopted the Accounting Practice for the collections entity because its contracts with its clients provided that Debtor would be entitled to the Service Charge even if the client requested the check be returned. Sturgill stated to Meyers that "the fees are still contractually obligated to [Debtor]. So as such, [Debtor was] required, per GAAP, to record an asset for those receivable." Additionally, Meyers indicated that in response to his question, CEO Sturgill was adamant "that this is how he's been told that he should record it. It's GAAP. The auditors[, Grafton,] have signed off on it." The Court notes that the Trustee did not present the testimony of Sturgill or any other party to contradict Meyers' recollection of Sturgill's explanation of Debtor's use of this approach of recognizing accounts receivable.

35.     During his testimony, Meyers indicated that at that time, he was aware of a similar accounting practice utilized by debt collection companies, known as the effective yield method of accounting. According to Meyers, as he understood it, the effective yield method is a type of GAAP compliant accounting method that certain debt collection companies utilize that provides for both fees and principal to be treated as a receivable when a company buys a pool of accounts for collection. Under the effective yield method, companies will record their revenues based on expected collection rates of those accounts.

36.     Based on Sturgill's explanations, Meyers drafted explanatory notes, subject to Sturgill's approval that were provided to potential institutional investors for their review.[16]

37.     The weight of the evidence indicates that the Accounting Practice originated with Sturgill and not Meyers or Morgan Keegan. In addition, the evidence presented does not establish

---

[16]     Two examples of these explanatory notes sent to potential institutional investors based on Sturgill's representations includes an explanation of how Debtor calculated its accounts receivable balance in 2005 and a footnote to Debtor's 2005 cashflow statement that explained that the purchase of accounts receivable on the financials was not actually a purchase of receivables but a consolidation of the collection subsidiary into Debtor in anticipation of an investment by an institutional investor.

that Meyers or Morgan Keegan altered in any way the underlying numerical data that constituted

Debtor's financial statements. Further, none of the institutional investors that Morgan Keegan

introduced to Debtor made loans or otherwise relied upon the Accounting Practice.

### Debtor's Accounting Discussions with Ernst and Young

38.    On May 10, 2006, Sturgill emailed to George Nemphos, an attorney at Debtor's

Outside Securities Counsel, a letter from Grafton, Debtor's auditor, explaining Debtor's accounts

receivable revenue recognition policy, including the Accounting Practice.

39.    At some point thereafter, Meyers identified from public filings, the revenue

recognition practice of another company in the debt collections industry, Telecheck.

40.    Unbeknownst to Meyers, Sturgill sent TeleCheck's Form 10-K information to

David Jones, a partner of the accounting firm Ernst and Young. It appears Ernst and Young was

being considered as a possible accountant for Debtor at that time. On that same day, David Jones

responded to Sturgill regarding the details of TeleCheck's accounting process, indicating that the

use of TeleCheck's process would be appropriate if Debtor is guaranteeing payment to the client

prior to the checks being presented for collection, but that if Debtor is merely accepting "bounced

checks from merchants," it would need to "follow similar accounting" that was discussed between

Mr. Jones and Sturgill on the morning of May 16, 2006. While Outside Securities Counsel was

apparently copied on Mr. Jones's email response, Meyers was not a recipient of the email.

41.    On May 23, 2006, Blevins asked Sturgill to forward a copy of the letter from Ernst

and Young to him and Wade Cordell as "[i]t addresses the accounting issues and how to resolve

them according to George [Nemphos of Outside Securities Counsel]. . . ."

42.    On June 2, 2006, David Jones of Ernst and Young emailed Sturgill with a copy to

George Nemphos of Outside Securities Counsel regarding Debtor establishing an audit

relationship with Ernst and Young and indicated that David Jones had discussed with David Greene (also of Ernst and Young) about Sturgill and David Jones' "consultations regarding revenue over the past few weeks . . . ." On June 3, 2006, Nemphos forwarded David Jones' email to Blevins.

43.    Based on this correspondence, it appears that at some point in May of 2006, Debtor's management was discussing Debtor's accounts receivable revenue recognition practices with Ernst & Young, of which Outside Securities Counsel was aware. Outside Securities Counsel's responses to Ernst & Young's and Sturgill's communications were redacted from the relevant exhibits based on the Trustee assertion of the attorney-client privilege as to that communication.[17] While the Court has not considered the content of the letter due to the Trustee's privilege claim, it is apparent that Debtor's management was directly consulting with Outside Securities Counsel and an accounting firm on Debtor's accounts receivable revenue recognition of NSF checks, all without Meyers or Morgan Keegan's involvement.

44.    Meyers testified that "at no time . . .  was it disclosed to me that . . . the company had been in conversation with [Ernst & Young]" and that "[Debtor] didn't discuss that they had been in discussion with any other accounting firm other than Grafton."

**Finalization of April 2006 Confidential Information Memorandum**

45.    On March 29, 2006, Clark sent to Sturgill for approval of the final version of the confidential information memorandum ("April 2006 CIM") to be distributed by Morgan Keegan

---

[17]    It appears much of the discussion from these emails has been redacted due to a claim of attorney-client privilege by the Trustee. The Court overruled the challenges to the Trustee's assertions of privilege during the trial. Further, certain testimony of Wade Cordell was kept under seal due to concerns of attorney-client privilege and was not considered by the Court.

to potential institutional investors pursuant to the 2006 Contract.[18] The April 2006 CIM included

the financial information from the 2003 and 2004 Consolidated Audited Financial Statements by

Grafton, as well as financial information for 2005 provided by Sturgill on March 27, 2006. In

addition, the April 2006 CIM included a detailed disclosure to the potential institutional investors,

which included the following relevant provisions:

    a. The information contained in the April 2006 CIM is based on "information furnished to [Morgan Keegan] by [Debtor;]"

    b. Morgan Keegan "makes no representations . . . as to the accuracy or completeness of the information contained in this Memorandum[;]"

    c. "[A]ny prospective purchaser acknowledges its responsibility to perform a thorough due diligence review prior to consummating a transaction involving [Debtor;]"

    d. With respect to statements regarding Debtor's "anticipated future performance," "Morgan Keegan has not attempted to independently verify any such statements[;]" and

    e. "This Memorandum does not constitute an offer to sell or a solicitation of offers to buy securities of the Company."

46.    Shortly after being approved by Debtor's management, Morgan Keegan provided

the April 2006 CIM to several institutional investors for consideration of an investment in Debtor.

One such institutional investor was Bison Capital ("Bison"), which expressed an interest in

investing by sending a preliminary non-binding term sheet to Debtor on May 3, 2006. On May 12,

2006, Bison and Debtor ultimately negotiated a revised term sheet, which provided for an

investment in the form of a $25 million convertible note.

47.    It appears the parties did not intend for, nor did the 2006 Contract anticipate that

the April 2006 CIM would be distributed to individual investors. Meyers testified that he never

distributed the document to individual investors and he never authorized Debtor or its management

to distribute it to individual investors.

---

[18]    The record reflects that a Confidential Information Memorandum is a document providing information about the company seeking investment, including its history, its organization, and its financials, that is provided to potential investors considering an investment in the company.

**Bison's Due Diligence Review**

48.     As is the practice of most institutional investors in such circumstances, Bison conducted extensive due diligence of Debtor, including Debtor's financials, in determining whether to invest in Debtor. On May 12, 2006, Bison sent its due diligence requests to Morgan Keegan via Meyers, which contained significant information requests from Debtor, including descriptions of "all assumptions and estimates made . . . in recognizing revenue for each category" and "historical collection data and other relevant data (% of bad checks, collect-ability of those checks and corresponding NSF fees, etc.) for each revenue category that supports the current revenue recognition assumptions and polices." One of Bison's goals was to create a financial model of Debtor "that can be used as a guide of expectations for future financial performance." Bison also conducted background checks of Debtor's management as part of its due diligence.

49.     In July of 2006, Bison contacted Debtor regarding its concern with the speed that Debtor was responding to its due diligence requests. As result of this communication, Clark was assigned to Debtor's Kentucky offices to assist Debtor with gathering the information needed to respond to Bison's due diligence requests. Clark testified that he was at Debtor's officers for one to two weeks total to assist with Bison's due diligence requests.

50.     As part of his assistance with Bison's due diligence requests and based on financial information provided by Debtor and its CEO Sturgill, Clark prepared a draft of a projected financial model for use in predicting Debtor's future revenues to assist in marketing to potential institutional investors. Clark provided the proposed model to Hargrett, a CPA who became Debtor's CFO on October 6, 2006, for review and approval.

51.     As part of his assistance, Clark collected a sample of 400 checks in Debtor's inventory to estimate Debtor's rate of collection to provide to Bison. Based on the sample, on July

24, 2006, Clark reported to Van Hoeven with a copy to Sturgill, Wade Cordell and Meyers, that

the collection rate was 82.6%. In describing his methodology, Clark stated that he "took out any

checks that were older than 60 days and only looked at checks that were settled/resolved or

settled/unresolved." In the email, Clark reported:

> Since the overall collection rates come out so close for both the sample, and
> the actual rate, I think we can assume that Electronic and Hard Collections rates in
> the sample are close to what the actual rates overall should be. The actual rates
> might even be a bit higher.
>
> I think these collection rates are more realistic now that we've controlled
> for older checks, checks that are still in the process of being collected, and for time
> period where [Debtor's] collections was [sic] not yet up and running.
>
> Tomorrow, I'd like to show you what I've done and get everyone's
> feedback, and then I can clean up the file a bit and turn it over to Bison when we're
> ready.

Thereafter, it does not appear any party expressed concerns with his methodology. In addition,

Clark provided a similar description of his methodology to Bison's representative. The evidence

is clear that, throughout this effort,  Morgan Keegan, Meyers, and Clark knew Bison was a

sophisticated investor and likely to employ the accounting firm of Grant Thornton to assist in its

due diligence review by "perform[ing] third party validation of financial matters . . . ."[19] The Court

finds no intent to deceive or defraud on the part of Meyers and Morgan Keegan.

52.     On July 27, 2006, Louis Bissette, a partner with Bison, questioned the collection

rate: "Tell me again what the hard collection revenue recognition policy is? I was thinking that it

---

[19]     At trial, Van Hoeven testified that in his opinion, using only checks that were less than 60 days old provided
a higher collection rate than Debtor's actual collection rate for all outstanding checks and that the individual collection
rate between each industry from which the checks originated could vary significantly depending on the sampling of
checks selected. Van Hoeven testified that he orally advised Clark of these issues when Clark was determining the
collection rate in July of 2006; however, there was no email or writing presented into evidence to substantiate Van
Hoeven's communications to Clark.

was 75% of expected [Debtor] fees with a 25% reserve. But now that we think the hard collection rate is 50%, we need to reconcile." Bissette's email was forwarded to Sturgill for review and direction.

53.     On September 26, 2006, Clark provided to CFO Hargrett Bison's findings on Debtor's collection rate for hard collections, which showed a significantly lower rate of collection than the 75% used by Debtor's management.

54.     On September 27, 2006, a background report on Sturgill was completed as part of Bison's due diligence review. The background report indicated that Sturgill was not a certified public accountant as he had previously represented.

55.     Thereafter, Bison chose not to invest in Debtor, without providing a specific reason for its decision. However, Meyers testified that he was later advised that Bison declined to invest in Debtor as a result of Sturgill's misrepresentation of his background.

**Restatement of the 2003 and 2004 Audited Financial Statements**

52.     In June 2006, Debtor began seeking a loan from Regions Bank, which owned Morgan Keegan at the time.  Due to that relationship, it appears that Meyers and Clark relayed information between Regions Bank and Debtor's management regarding the loan application. On June 2, 2006, Clark emailed Sturgill, with a copy to Wade Cordell and Meyers, stating that "Will Reid at Regions [Bank] needs the consolidated, Audited Financials for '04. These would need to include the figures from the collections company, so there is no jump in the receivables number when comparing to '05." It appears, in response, that Meyers advised Debtor to provide Regions Bank with both the copies of the original 2004 audited financials and provide a *pro forma* of the 2004 financials (which includes "the figures from the collections company"), in order to clearly reflect the reason for any changes. The Court is not convinced, as the Trustee alleges, that this is a

directive by Meyers or Morgan Keegan to Debtor's management to conduct a restatement of its

historical financials, and further, having reviewed the events associated with these

communications, finds it is unlikely that Meyers or Clark would knowingly participate in a

deception involving the Accounting Practice conveyed to the parent company of their employer.

53.     Thereafter, on July 21, 2006, Grafton issued Debtor's 2005 audited financial

statements and certified them as GAAP compliant. These financial statements used the Accounting

Practice and included the accounts receivable figure of $9,936,403 that was first provided by CEO

Sturgill on March 27, 2006. The 2005 audited financial statements included a new note regarding

Debtor's policy on its accounts receivable recognition, which indicated that Debtor recognized

state mandated fees in its accounts receivable balance:

Accounts Receivable Recognition

[Debtor] offers two programs for collection assistance of NSF Checks, a
Guaranteed Program, which is fee based and a Non Guaranteed Program, which is
not fee based and is offered at no cost to the customer.  The company uses a proven
proprietary risk assessment in order to decide which program to offer a particular
merchant.  The Accounts Receivable that arises from each program is recognized
as follows.  The guaranteed program assures the customer that it will be reimbursed
for any check that is returned NSF.  This requires that [Debtor] buy the check for
the face amount of the check when returned NSF.  [Debtor] is then responsible for
collecting the face amount of the check plus the state mandated fee.  Once [sic]
[Debtor] has purchased these checks, the face amount of the check plus the state
mandated bad check fee are recorded as accounts receivable since [Debtor] is now
entitled to and actively collecting that amount.  The Non Guaranteed program, since
it is not guaranteed, only entitles [Debtor] to the state mandated fee since the
customer will be paid for the face once the check is collected.  For the Non
Guaranteed Program, [Debtor] only records an Accounts Receivable for the amount
of the State Mandated fee.  Under the Non Guaranteed Program, unlike the
Guaranteed Program where [Debtor] owns the check, the customer still has rights
to the check and can request the check back after so many days.  However, [Debtor]
by contract is still entitled to state mandated fee.

The record does not reflect who drafted this revised note regarding Debtor's accounts receivable

recognition policy; however, the note and information therein would ultimately fall within the

responsibility of Sturgill as the CEO and the officer charged at the time with the responsibility of Debtor's financial statements. Furthermore, it is noteworthy that the audited financials were certified by Grafton as continuing to be GAAP compliant. In his deposition, Grafton testified that he was not aware of anyone from Morgan Keegan, including Meyers or Clark, playing any role with respect to the preparation of any of Debtor's audited financial statements. Further, Van Hoeven testified that he was not aware that Morgan Keegan, including Meyers and Clark, ever prepared or provided the notes to Debtor's financial statements.[20]

54.     It appears in connection with Grafton's audits of Debtor's financial statements that Sturgill, as CEO, and Wade Cordell, in his capacity as President, signed representation letters, which included representations to Grafton that Debtor prepared the financial statements to be audited, that the data included in those financial statements were true and correct, and that there were no irregularities at the company.

55.     On September 6, 2006 and September 8, 2006, CEO Sturgill sent Debtor's restated financials and financial notes for 2004 and 2005 to Grafton, Clark, and Meyers. Among other changes, the income statement in the 2004 restated financials showed an increase in the amount of accounts receivable from $148,460 to $3,132,446 and a decrease in the amount of Property, Plant and Equipment by $4,455,000, and included similar financial notes as the 2005 audited financial statements. The 2005 restated financials also included significant changes to the Debtor's statement of cash flow. It appears the 2004 restated financials used the Accounting Practice for its revenue recognition policy.

---

[20]     It appears Meyers and Clark did provide some stylistic and grammatical suggestions to Sturgill for the notes to the financial statements, but the evidence does not demonstrate that Meyers or Clark created the content of these notes.

56.    According to Meyers,[21] "Sturgill indicated that Grafton was going to . . . re-audit, re-review the financial statements, and make sure that he felt it was accurately stated." [22] CFO Hargrett provided Meyers and Morgan Keegan with what he described as "'Final and Restated' audited financial statements," and indicated that Debtor's auditor had opined on these statements, accepting them as GAAP compliant. Further, the evidence does not indicate that Morgan Keegan, Meyers, or Clark had any connection or communication with Grafton.

57.    On October 4, 2006, CFO Hargrett provided to Clark, as approved, the "Final & Restated" audited financial statements for 2003, 2004 and 2005 from Grafton. The cover letter Grafton provided with the restated audited financial statements for 2004 is dated "February 20, 2005" and is nearly identical to the cover letter Grafton provided on the original consolidated financial statements for 2003 and 2004 that were issued on February 20, 2005. This letter indicated that Grafton "conducted [the] audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. . . . In [Grafton's] opinion, the financial statements . . . present fairly, in all material respects, the financial position of [Debtor] as of December 31, 2004, and the results of its operations and its cash flows for the year then ended in conformity with generally accepted accounting principles."

---

[21]    According to Meyers' understanding, based on representations from Sturgill, the change in the audited financial statements provided by Grafton was to address a mapping error that resulted from the consolidation of Debtor's related businesses FARS and FARS Marketing into Debtor. While the Trustee asserts that there was no evidence of a mapping error or need to consolidate companies, the evidence presented was insufficient to confirm or deny that Sturgill made these representations to Meyers regarding the purpose of the restated financials.

[22]    Grafton, in his deposition testimony, had a very limited recollection of the restatement of Debtor's financials and could not elaborate on why Debtor restated the financials. Grafton's testimony on the topic was essentially, "I cannot remember a restatement. I just can't. It's been so long ago. If there was anything of that nature, I can't remember it."

**Opening of the Barbourville Processing Center/Cash Needs**

58.    Indicative of its constantly growing business and client base, in September 2006, Debtor expanded and moved its processing center from its Jacksonville location to its newly constructed Barbourville, Kentucky facility. As of May 8, 2007, twenty-seven employees were employed at the Barbourville facility; this number increased to at least sixty in the year prior to Debtor's bankruptcy filing.

59.    In 2006 and 2007, Debtor incurred over $2 million in expenses relating to the startup of the Barbourville facility, $500,000 in legal fees for fundraising efforts, including direct stock and note offerings,[23] and $350,000 in start-up costs associated with two of its largest new customers, Wachovia Bank and U.S. Bank.

60.    In his deposition, Hargrett testified that when he started his employment as CFO in 2006, "funding was always a concern" and cash flow was a problem. He believed that the major reason for the cash shortfall was the "startup of the operation in Barbourville . . . hiring a lot of people in anticipation of future revenue . . . the fixed outlay of starting the facility . . .and the ramping up the sales effort to generate the revenues to cover those costs."

**November Offering**

61.    In 2006, Debtor was advised by its Outside Securities Counsel that shares and territory licenses previously issued in 2004 and 2005 appeared to have been sold in violation of securities laws because the shares and related territory licenses were sold to unaccredited investors, among other reasons. Outside Securities Counsel advised Debtor's management that to correct the

---

[23]    For the purposes of this Order, the Court intends "direct" securities sales to mean the sale of securities without the involvement or assistance of a professional to serve as an intermediary in the sale of stock. In other words, securities sold directly by Debtor's management to individual investors.

violations, Debtor would need to make a rescission offer to repurchase the shares previously sold to unaccredited investors.

62.    Due to this offering, Morgan Keegan's efforts to move forward with seeking new investment from institutional firms was delayed. In the meantime, Outside Securities Counsel asked Morgan Keegan to forward information from the April 2006 CIM for use in the offering document in order to speed up its work on the recession offering.

63.    On August 18, 2006, Clark sent to Keli Isaacson ("Isaacson"), an attorney with Outside Securities Counsel, an email which contained an "initial draft for the Reg D offering." Clark testified that he created this draft based on a template provided to him by Outside Securities Counsel. He reported to Isaacson that "[m]ost of it is complete, with the exception of the financial section, which we will need to update with information that [Debtor] is preparing. The information that is currently in the financial section is there as a place-holder. . . . [W]e wanted to get this draft into your hands so we can keep the process moving. Most of the document was taken from our original memorandum . . . ."

64.    On August 30, 2006, Meyers emailed Isaacson, providing her with a markup of the private placement memorandum for the offer. Meyers indicated that he does "not have Jones Day's [Morgan Keegan's counsel] comments in [the markup]. We are working on the MD&A [Management Discussion and Analysis,] and [Sturgill] spoke with the auditors who will revise the footnote disclosure to be in-line with a public document."

65.    Even though Clark and Meyers provided assistance as requested, it is apparent to the Court that Outside Securities Counsel was the responsible professional for this offering with Debtor and controlled the contents of the document.

66.    On September 20, 2006, after final review and approval by CFO Hargrett and CEO Sturgill, Clark forwarded the financial section for the offering to Outside Securities Counsel.

67.    Throughout the drafting process, several drafts of a private placement memorandum for the offering were exchanged between Outside Securities Counsel and Debtor's management, with copies to Meyers or Clark.

68.    Meyers and Clark testified that their understanding was that their work was being used exclusively for a rescission offer to past investors of Debtor and not to be used as document seeking new investment for Debtor from individual accredited investors. Meyers testified that Morgan Keegan consulted with the law firm Jones Day to ensure that the offering to rescind shares was conducted properly so as to avoid any issues in the future with institutional investors. An attorney at Jones Day reviewed the offering document and Debtor's 2005 financial statements, and Meyers passed those comments to Isaacson, an attorney with Outside Securities Counsel. There is documentary evidence that supports the view that Meyers thought the rescission offer would be part of the offering document that was being drafted. For example, on October 27, 2006, Meyers requested from Isaacson a copy of the 1-2 page cover letter that would include the "actual rescission terms" of the offering to pass along to an interested institutional investor in connection with its potential investment. Isaacson replied that "the rescission language will be incorporated into the document rather than in a cover letter." She also indicates that "[Outside Securities Counsel] is not in a position to weave the required language through the [offering document] because [they] don't have a final [offering document] as of yet." As late as October 31, 2006, Meyers referred to the offering as the "rescission document."

69.    Meyers testified that on October 31, 2006, he was no longer involved in any further discussions with Debtor and Outside Securities Counsel about the offering document, and it

appears there is no documentary evidence showing that Meyers or anyone else from Morgan Keegan communicated with Outside Securities Counsel or Debtor from that date until after the offering was finalized.

### Eastside's Interest in Debtor

70.      Eastside Partners ("Eastside") was another private equity firm that considered an investment in Debtor in October 2006 as a result of Morgan Keegan's services under the 2006 Contract.

71.      On October 20, 2006, Meyers relayed a request from Eastside to see "the rescission document," to Wade Cordell, Sturgill and Hargrett. On October 25, 2006, Debtor's Outside Securities Counsel provided a draft document as well as an analysis of the rescission elements under state law to Eastside.

72.      As a result of discussions and the information provided, Eastside submitted a term sheet for a potential private equity transaction on October 24, 2006.

73.      To expedite its due diligence work, Eastside requested copies of the background checks performed by Bison on Debtor's management, which upon the consent of Sturgill, Wade Cordell and Blevins, Bison released the reports to Eastside and Meyers. The background reports from Bison's due diligence indicated that the "report is confidential and is intended solely for the information and use of the client to whom it is addressed. This report is not to be disseminated to any third party without our express written consent. If the report is related to a third party without our express written consent, the client agrees to indemnify us for all costs and judgments as a result of litigation." Copies of each background report were also provided to the subject individual of each report and Meyers.

74.     On October 31, 2006, Eastside withdrew its proposal and terminated its interest in investing due to Sturgill's background report. Meyers testified that he did not believe he could disclose the contents of Sturgill's background report to other members of Debtor's management due to the confidentiality and liability provisions of the background report.

### Termination of 2006 Contract

75.     According to its terms, the 2006 Contract was to terminate on March 6, 2007 unless otherwise agreed to by the parties. At the trial, Meyers testified, that once Eastside withdrew its proposal, the parties terminated the 2006 Contract on October 31, 2006. Based on the communication of the parties and their course of conduct after October 31, 2006, it appears that, for all effective purposes, the parties ceased performing under the 2006 Contract as Morgan Keegan discontinued its efforts to find interested institutional investors on Debtor's behalf.

76.     Because Morgan Keegan's fees under the 2006 Contract were contingent on the closing of an investment transaction under the contract, and because none occurred, Morgan Keegan received no compensation pursuant to the 2006 Contract. There was no other evidence indicating compensation or fees were ever paid by Debtor to Morgan Keegan, Meyers, or Clark.

77.     Upon the termination of the 2006 Contract, Meyers conducted an exit interview with Debtor's management in which he offered recommendations, including: (1) sharing their background reports with each other; (2) hiring a more recognized auditing firm; and (3) changing the Accounting Practice to a more conservative method of recognizing revenues and writing down the accounts receivable balance, if any. Meyers' testimony is not contradicted and appears to be corroborated by the evidence presented at trial because soon thereafter, Debtor's Board of Directors discussed changing the Accounting Practice and changing auditors at its January 2007 Board meeting. Furthermore, testimony was presented that at some point thereafter, Debtor's

management attempted to exchange background reports, with Sturgill refusing to participate.

78.     In November 2006, Meyers followed up with Hargrett about the status of Debtor considering a new auditor. Hargrett advised Meyers that Debtor was in the process of selecting a new auditor. While Hargrett requested a suggestion for a new accountant from Outside Securities Counsel, the evidence does not indicate that Debtor hired a new auditor.

79.     The record reflects that Debtor's management continued to occasionally correspond with Meyers after the termination of the 2006 Contract. On November 13, 2006, Wade Cordell sent an email to Sturgill and Blevins that stated that:

> I just spoke with Keith Meyers and he said that he was "just now reviewing" the [November 2006] PPM's [sic] that I sent to him. I find it really interesting that he is just now taking a look at them even though he has been in the office all day. I really will be surprised if he actually has anyone to purchase one dollar of stock. . . . I spoke with Keith about [Regions Bank becoming an Originating Depository Financial Institution for Debtor] but all he wanted to talk about was [Debtor] finding a "new" auditor, like [Ernst & Young]. He didn't seem to want to even talk to me at all.
>
> Guys I feel Keith is exactly what [Outside Securities Counsel] is saying, "A lot of wind". But we will see.

In reply to Wade Cordell's email, Blevins responded: "You know that I don't feel that Keith [Meyers] can be trusted based on his past lack of performance and his failing to advise us about Bison's bylaws and Morgan Keegan having investments in Eastside."

### November 2006 PPM and Rescission Offer

80.     On November 3, 2006, Debtor's Outside Securities Counsel provided Blevins, Debtor's in-house counsel, a further draft of the private placement memorandum for the offering ("November 2006 PPM"). The November 2006 PPM did not list Morgan Keegan or Meyers as a placement agent, nor referenced Morgan Keegan in any way. During the course of the drafting of the November 2006 PPM, Outside Securities Counsel directly raised to Blevins, Debtor's in-house

counsel and a Board member, several concerns about the calculation of Debtor's capitalization table (i.e., the listing of shares owned by Debtor's insiders) provided by Debtor for the November 2006 PPM, including concerns that it could be later determined to be fraudulent. However, it does not appear that these concerns were ever raised by Blevins to other members of Debtor's management.  It appears a final draft of the November 2006 PPM was produced by Outside Securities Counsel on November 7, 2006; but was dated as effective as of November 3, 2006.[24] This final draft of the November 2006 PPM contained multiple differences from the drafts of the offering document that Meyers had previously seen. Before the November 2006 PPM was finalized for use, between November 1, 2006 and November 7, 2006, Debtor's management had already directly and individually sold nearly 150,000 shares of Debtor's stock using the PPM.

81.     In his efforts to individually sell stock, on November 14, 2006, Wade Cordell contacted Meyers regarding his personal ability to find investors and provided Meyers six copies of the November 2006 PPM.

82.     On November 20, 2006, Meyers personally invested $25,000 in Debtor through the purchase of stock based on the November 2006 PPM.

83.     On December 22, 2006, Debtor issued a separate rescission offering to its non-accredited investors to repurchase those investors' shares.

84.     In March of 2007, Wade Cordell sent an email to Debtor's management, with a copy to Meyers addressing Meyers' concerns that certain members of Debtor's management continued to refer to and use Morgan Keegan's name in its direct stock sales and in reference to the November 2006 PPM. Wade Cordell stated:

---

[24]     The Final November 2006 PPM is dated as of November 3, 2006; however, there is correspondence indicating that the version of the November 2006 PPM sent on November 3, 2006 remained a draft due to issues with the capitalization table contained in the document.

I assured [Meyers] that this is inaccurate. [Meyers] has a copy of the PPM and there is NO PLACE WITHIN THE PPM THAT TALKS ABOUT MORGAN KEEGAN. I can only deduce that some of you may be using the "old["] management presentation that does not talk about Morgan Keegan but it does have their logo at the bottom left corner. Please STOP using this presentation if you are doing so and Brad [Cordell] has an updated management presentation you can use.

. . . [A]s of this offering, Morgan Keegan has absolutely nothing to do with this offering. I can certainly see where they would be concerned.

### Debtor's January 8, 2007 Board of Directors Meeting

85.     On January 8, 2007, Debtor held a Board of Directors meeting. There is no evidence that Morgan Keegan, Meyers or Clark attended or participated in the meeting. The minutes from this meeting indicates that the Board discussed Debtor's Accounting Practice and its policy of recognizing accounts receivable. Specifically, the minutes provide that CFO Hargrett "addressed the [B]oard concerning the 2006 financial statements and discussed [sic] ensued regarding changing the way the revenues of the company are booked, i.e. checks in the system waiting for collection.  It was decided unanimously that it is in the Company's best interests to maintain the status quo and not to change the reporting method.  The Board decided unanimously to continue with Grafton & Company as the Company auditors for 2006."  On behalf of the Trustee, Van Hoeven testified that to his best recollection the discussions were limited to the fact that there are two different ways to recognize accounts receivable and that both were proper but one method provided for less booked accounts receivable. He indicated that he was under the impression from the discussions at the meeting that the Accounting Practice was GAAP compliant and that the Board decided to continue with the method it had always utilized. It appears from this Board meeting that this was a clear instance of issues related to the Accounting Practice being raised to the Board, thus placing all Board members on notice of the Accounting Practice, and that the Board approved the continued use of the Accounting Practice.

86.     Further, it is clear that Board members, including non-Defendant Board members such as Van Hoeven and Handy, had the opportunity to ask questions regarding Debtor's financial policies, including the Accounting Practice.

87.     It appears that Hargrett, as CFO, presented the issues associated with the Accounting Practice to the Board. The evidence also demonstrates that shortly after Hargrett joined Debtor in September 2006, he recommended to other Management Defendants and to the Board that Debtor change its Accounting Practice to recognize revenue based on when it was actually collected; in other words, move from an accrual to cash basis method of accounting. Although, Hargrett thought both methods were compliant with GAAP, he advocated for this change, which would have resulted in the deferral of "a great deal of revenue and removal of the accounts receivable from the balance sheet and align the income statement with the cash flow statement," which he "thought was a good thing."

88.     The Agenda from the January 8, 2007 Board meeting also demonstrated the ongoing rapid expansion of Debtor's customer base, indicating that Debtor had signed several new bank customers recently: "Renasant Bank has signed their contract (12,000 merchants). Alabama Banc Corp. is also ready (16,000 merchants)! Just received the contract for Arkansas Bank & Trust (6,000 merchants)." The Agenda also indicates several other relevant matters including: "Discuss the $6 million capital raise! This is absolutely a must!!!"; "Discuss where we see Morgan-Keegan and/or Steve Kane and others, fitting into our plans for 2007";[25] and "Discuss our 'Exit Strategy' for 2008."

---

[25]     Steve Kane was a businessman associated with TransFirst, who served on Debtor's Advisory Board. Per Danielson, the Advisory Board did not provide active advice to Debtor's management but served as a group of prominent names to represent Debtor publicly.

**Debtor's January 15, 2007 Special Board of Directors Meeting**

89.     On January 15, 2007, Debtor held a further special Board meeting, to which certain

of Debtor's shareholders, including Meyers, who had purchased shares in November 2006, were

invited. Testimony was received at trial from shareholders Alvin and Evelyn Berry that at the

January 15, 2007 Board meeting, Meyers presented a slide show presentation that included graphs

showing Debtor's prospects for significant growth. The Berrys also testified that Meyers stated at

the meeting that he hoped that Debtor would be sold in a few years and that in the past, he had

worked with similar companies that ultimately sold for $8 to $12 a share. The Berrys also testified

that Wade Cordell handed out a pamphlet discussing Debtor's growth and future that contained

Morgan Keegan's logo. However, a copy of this alleged pamphlet or other corroborating testimony

was not submitted into evidence. At the conclusion of the special Board meeting, Wade Cordell

announced a sale of Debtor's stock at half-price. Meyers testimony contradicts that of the Berrys

as he stated that as a practice, he does not speak to the specifics of a particular company but only

as to the industry, in general, when providing presentations for clients.

**2007 Business Activities of Debtor**

90.     Substantiating Meyers' testimony that the 2006 Contract terminated on October 31,

2006, it appears that Morgan Keegan and Meyers had little involvement with Debtor in 2007

beyond occasional phone calls and emails checking in on Debtor.

91.     On March 6, 2007, the Securities Division of the South Carolina Office of the

Attorney General ("Securities Division") began investigating Debtor's direct capital raises from

individual and issued a subpoena to Debtor requesting, among other items, a copy of the prospectus

or other documents outlining the specifics of any and all current offerings of securities or other

means being employed by Debtor to raise funds for the continued operation of the company.

Debtor did not disclose the existence of the Securities Division's subpoena to Morgan Keegan or Debtor's investors, including Meyers. On April 9, 2007, Debtor's Outside Securities Counsel provided a response on behalf of Debtor and included with that response a copy of the November 2006 PPM as the document outlining the specifics of Debtor's securities offerings. It appears that the November 2006 PPM provided to the Securities Division did not include audited or unaudited financial statements of Debtor.

92.     Debtor's Board of Directors held a meeting on May 8, 2007 to provide several updates on Debtor's business and many significant financial improvements for the company. The minutes of this meeting indicated that:

- Debtor had 43 bank agreements in hand and projected 66 closings of new bank agreements for the second quarter of 2007.

- Per CFO Hargrett, the total cost of the rescission offering for shareholders wishing to rescind was $353,100. He reported that this amount was paid and the offering had ended.

- CFO Hargrett announced that 1,963,544 shares of Class A common stock had been sold to date in the November 2006 PPM, leaving 2,836,456 shares left remaining to be sold through May 4, 2007. He also reported that if Debtor chose to sell an additional 20% under the PPM, it would have 3.6 million shares left to sell.

- COO Brad Cordell reported that 27 employees were employed at Debtor's Barbourville facility.

- The Board unanimously decided to renew the Regions Bank credit line. President Wade Cordell and CEO Sturgill agreed to continue to personally guarantee the line. The Board agreed unanimously to indemnify and hold harmless President Wade Cordell and CEO Sturgill against any debt established by the credit line, including legal fees and expenses. It was also decided that President Wade Cordell and CFO Hargrett would continue to work on establishing a new line of credit through McColl Partners to replace the Regions Bank line of credit.

- The Board unanimously agreed to use the Regions equipment line of credit to pay for the Dell line of credit for its computer equipment as far as the available line would allow.

- Twelve new client presentations were scheduled within one week in Dallas, Chicago, and Atlanta.

- **The Board unanimously agreed that bank merchants would be paid on a daily basis beginning immediately.**

- Debtor was processing bad checks for over 2,900 schools.

93.     Without Morgan Keegan's assistance or Meyers' involvement, Debtor's management individually and directly pursued capital raises from outside investors in 2007. In an email on May 21, 2007 from Wade Cordell to other members of management, including Sturgill, Blevins, Hargrett and Van Hoeven, he stated that he was "going to aggressively pursue the relationships [Debtor has] been attempting to establish between McColl Partners and Spring Capital with Debtor." Wade Cordell goes on to explain how each entity could assist with Debtor: "[McColl Partners] have agreed to finance any bank contracts (i.e. Wachovia), all we would need to provide is an invoice. They will also finance any lease or loan agreement such as Regions Bank." For Spring Capital, Wade Cordell states "[t]hey have agreed to purchase the 'insider stock' in the amount up to 15% provided [Debtor] has first sold all of the PPM."

94.     Throughout 2007, Debtor continued to add new clients. Specifically, Debtor had signed agreements with major banks, including Wachovia Bank, Synovus, and U.S. Bank. It was expensive to prepare for new clients, and Debtor was rapidly using all of its capital raised to cover the additional labor costs, insurance costs, and marketing expenses that came with adding the new clients. Debtor also required significant capital to improve its administrative office to be able to service these new accounts.

**Debtor's Discussions with Outsiders Regarding the Accounting Practice**

95.     On November 14, 2007, a representative for Regions Bank, the lender for one of Debtor's lines of credit, emailed CFO Hargrett after reviewing Debtor's financials to inquire about what Debtor's "receivables were made up of[?]" Hargrett replied on November 20, 2007, stating "Sorry for taking so long to response [sic], but [Debtor's management] w[as] reviewing our options with regard to how we handle the reporting of revenue for our uncollected checks (Accounts

Receivable) with our auditor. After evaluating various alternative methods, we have finally

decided that the best [way] was to continue the same manner in which we had been reporting." In

describing Debtor's accounts receivable recognition practice, Hargrett replied to Regions Bank

with the following:

> These represent checks that we have in the collection process. We have begun the collection effort and expensed the cost related to them. They are heavily discounted based on expected collection rate and additional collection costs.
>
> Some are guaranteed checks in which case the recorded amount is a portion of the face and fee expected to be recovered. For guaranteed checks, we have already paid the merchant and everything we collect, we keep. Some are non-guaranteed, in which case the booked amount is only the portion of the fees that we expect to collect. When we collect the face of the non-guaranteed check, we return it to the merchant.
>
> Our current systems do not give us a very reliable method to determine exactly what is in the system. We do know that there is approximately $23,000,000 in funds available to us if we collect all of them. All of these items are less than three years old, with most of that being concentrated in the more recent periods.

There is no evidence which indicates that Meyers or Morgan Keegan were involved in any way

with these communications between Regions and CFO Hargrett.

### Meyers' Personal Communications with Morgan Keegan Coworkers about Debtor

96.    In December 2007, as part of Debtor's management's direct effort to raise capital

by selling stock, Wade Cordell contacted Meyers personally to determine if he knew of any other

parties interested in investing in Debtor.

97.    On December 10, 2007, Wade Cordell emailed to Meyers Debtor's 2008 through

2012 financial models. The financial models indicated that as of December 2007, Debtor's

accounts receivable balance was approximately $19,000,000. In response to Wade Cordell's email,

Meyers inquired: "Wade, I thought you wrote off the receivables? What are the $19mm in

receivables related to?" In an apparent misrepresentation, Wade Cordell responded to Meyers by email: "We wrote off the receivable [sic] in 2007."

98.     At Wade Cordell's request, Meyers personally reached out to coworkers at Morgan Keegan by email on December 14, 2007, stating "[Debtor] is finishing up their private round from last year and have asked if I knew of any potential investors. I have committed $50k to this company. I have attached their most recent investor presentation and will follow up with another e-mail with the PPM (due to file size). Please pass this along to other accredited investors that may have an interest in investing." Later that same day, Meyers passed the November 2006 PPM to these four coworkers at Morgan Keegan. It appears that in December 2007, Meyers reached out in total to approximately six coworkers at Morgan Keegan about investment in Debtor, with one coworker, Roger Woodman, investing $50,000 in Debtor on January 14, 2008. Meyers also made an additional investment in Debtor of $25,000 on January 8, 2008.

**Debtor's Continued Expansion in 2008**

99.     According to its Form D filed with the SEC on December 12, 2007, Debtor reported raising $2,614,180 in investments from the offering under the November 2006 PPM.

100.    According to the Trustee, by the first quarter of 2008, Debtor's business was booming.[26]

101.    On January 10, 2008, Wade Cordell reported to the Board that:

Today [Debtor] began receiving the London Kentucky Stock monies that will eventually add up to the $2.25 million. I received two checks totaling $160,000.00. The original amount of money we owed out was @ $442,000. The following is what is left to be paid with a balance in our check book as of today (including a $25,000 check that will be deposited tomorrow from a sale I made last week with a check dated for 01/11/2008) would be @ $22,000.00, after paying [Outside Securities Counsel] the monthly installment of $25,000.00 (BTW, [Debtor] only owes 3 more installments to [Outside Securities Counsel] and we are paid in full):

---

[26]     P. 31 of the Trustee's Proposed Order

| | | |
|---|---|---|
| 1. | Loan to be Paid Back to Joyce Cordell | $50,000.00 |
| 2. | Back Auto Allowances for everyone | $35,000.00 |
| 3. | 2006-2007 IRS | $180,602.35 |
| | TOTAL DUE | $265,602.35 |

All other past due payroll, Kentucky State and SC State taxes are now paid up to date. [Debtor] will be receiving all of the $2.25 million by next Tuesday. I will keep everyone informed on the final payments of the "above" next week. [Debtor] should also be receiving @ $210,000.00 from the investors in Florida and an additional $100,000.00 from my investor in Columbia by next Tuesday.

Also, Bryon and Tom Smith will be meeting with the Gas-Well investors today and they should be moving forward with an additional $800,000 to $1,500,000. Then Bryon and Tom have a group with Bob Mitchell that should be adding close to $1,000,000 more. John Blevins still has his group talking in regards to adding more money (up to $10 million) and Eric Dell's guy spoke with me yesterday and is serious about purchasing @ $1,000,000. Also, Keith Meyers will be sending @ $100,000 by Tuesday.

Things are indeed looking very bright. I want to thank you all for the last two days of hard work!!!

This communication clearly shows that Debtor's managers, officers, employees and Board members continued to sell securities to investors directly.

102.    CFO Hargrett testified in his deposition that at some point in 2008, [Debtor] was processing 30,000 checks per month.

103.    The school division of [Debtor's] business increased from the thousand-school range in October of 2006 to five thousand schools in December of 2008.[27]

104.    On August 25, 2008, Debtor issued a Monthly Update of Sales ("Sales Update") to certain investors, which further demonstrated Debtor's continued growth in the second half of 2008. The Sales Update indicated that:

---

[27]    Debtor specifically marketed its services to school districts as schools used Debtor to collect on NSF Checks written by parents for lunches and other student activities.

- Debtor expected to begin earning revenues of $50,400 per day from US Bank, "given our proven collection rate of 70%-75% (minimum)," and that revenue would exceed monthly expenses by $350,000.

- The Sales Update indicated that there were 665 new school accounts to be added to the check counts beginning in September and a Bank Initiative with various banks that had contracted or were close to contracting with Debtor for check roll-outs that were scheduled to take place between October 2008 and January 2009.

### Debtor's Increasing Capital Concerns in 2008

105.    As a result of the significant growth in business accounts in 2007 and 2008, Debtor continued to have significant expenses in "on boarding" new customers and in general business expenses. This caused an additional and ongoing need for new capital.

106.    In late May 2008, Wade Cordell indicated that $500,000 would have to be raised by Debtor soon to meet its bills and payroll expenses until mezzanine financing from institutional investors would take place and stated that Debtor's current total bills at the time were $258,150.88. By early June, Debtor had $124,000 of expenses, and Wade Cordell indicated to Debtor's management that he and his wife loaned Debtor $50,000 but that they did not "want to do" it again and threatened that "if [Debtor] cannot come up with the funds then the following people will not receive checks this weeks [sic]: Wade Cordell, Brad Cordell, Bryon Sturgill, Haines Hargrett, John Powell, John Blevins and Bill Van Hoeven."

### Debtor's 2008 Contract with Morgan Keegan

107.    On April 24, 2008, Debtor and Morgan Keegan entered into a second contract ("2008 Contract"), in which Morgan Keegan agreed to be Debtor's exclusive financial advisor with respect to a possible mezzanine debt financing,[28] in exchange for contingent placement fee

---

[28]    Mezzanine debt financing is an investment mechanism that falls between senior debt (such as a secured loan) and common equity (such as stock) in a company's capital structure. Benjamin W. Baldwin, *A Primer on Mezzanine Finance*, 18 No. 4 WESTLAW J. BANK & LENDER LIABILITY, at *1 (July 2, 2012). The benefit of mezzanine debt financing is that while it is more expensive, it is easier to obtain and usually produces more financing than senior debt. *Id.* Additionally, mezzanine debt financing is generally easier and less expensive to obtain as compared to issuing common equity. *Id.* Mezzanine debt financing typically includes covenants and stock options or warrants, which

equal to 3% of the gross proceeds Morgan Keegan raises on behalf of Debtor. Like the 2006 Contract, Morgan Keegan's fees under the 2008 Contract were contingent on a transaction being closed pursuant to the contract. As part of the duties under the 2008 Contract, Morgan Keegan agreed to "[i]dentify and approach select investors on behalf of [Debtor;] . . . [c]onduct financial due diligence of the Company [Debtor], including but not limited to an examination of financial results and management projections; [c]onduct financial due diligence of potential investors[;] . . . [a]ssist the company in the preparation of any descriptive information and appropriate confidentiality agreement for marketing to potential investors[;] and] [i]dentify and select the appropriate financial partners to fund the [mezzanine debt] [t]ransaction."  By its terms, the 2008 Contract was to terminate on October 24, 2008 and included a merger clause that stated that the contract "may not be amended or modified except in writing signed by each of the parties."

108.    Unlike the 2006 Contract, the 2008 Contract does not include a provision that provided Morgan Keegan with a right to first refusal to serve as Debtor's underwriter in the future.

109.    In addition, Debtor and Morgan Keegan entered a confidentiality agreement as part of the 2008 Contract on September 2, 2008.

110.    On April 25, 2008, Irena Snider, an Associate at Morgan Keegan emailed Wade Cordell and Hargrett seeking approval of a draft of an executive summary letter to be provided by Morgan Keegan to prospective mezzanine debt lenders/investors.

111.    It appears that in late April 2008, Morgan Keegan created a solicitation packet on behalf of Debtor that included the executive summary letter and a modified version of a

---

would permit the conversion of the debt into an equity ownership of the borrowing company for the lender. *Id.* at *2–5.

presentation that Debtor had previously developed in October of 2007. The solicitation packet also included the 2008 through 2012 financial models developed by Hargrett.

### Debtor's Consideration to Change the Accounting Practice and Write Down the Accounts Receivable Balance

112.    Shortly before the entry of the 2008 Contract, Hargrett requested that Meyers gather and send public information on revenue accounting from other companies because Debtor was considering "mov[ing] to a more conservative accounting policy." [29]  Irena Snider of Morgan Keegan compiled the information and provided it to Hargrett and Wade Cordell.

113.    CFO Hargrett indicated to Meyers that Debtor was contemplating changing to a more conservative method of recognizing accounts receivable and doing a one-time write down of accounts receivable balance. Meyers testified that he advised Hargrett that Debtor should disclose this change initially when soliciting investors under the 2008 Contract to avoid any later issues. Meyers indicated that Debtor agreed to this disclosure and Hargrett "dictated to [Meyers] . . . what the policy would look like[,]" which Meyers incorporated in an overview.

114.    Thereafter, on April 30, 2008, CFO Hargrett provided a red-line version of edits that he had made to a document produced by Meyers explaining Debtor's accounts receivable and revenue recognition practice and Debtor's proposed change to the practice. The overview, as edited by Hargrett, explained that under the Accounting Practice, "[p]er the contract with Debtor's merchants, [Debtor] is entitled to the fees arising from the collection efforts of those checks and per accounting requirements of matching revenue and expenses, was required to accrue the estimated revenue that will be received upon collection of these checks. Again note that the

---

[29]    Hargrett, in his deposition testimony, stated his belief that Debtor's financials using the Accounting Practice were GAAP compliant.

accounts receivable balance only includes fees due to [Debtor] upon collection of the checks and does not include the face amount of the checks." The overview also states Debtor is experiencing a change in business model, in which Debtor would focus more heavily on electronic collections. It further explains that, under the proposed practice, the fees for an NSF Check will now be recognized at the time the check is collected. The overview indicates that as a result of this change in business model, Debtor is anticipating "a change in accounting principle" and a "one-time charge to expense and recorded as an extraordinary item." The overview approved by Hargrett was distributed by Morgan Keegan to all potential institutional investors considering a mezzanine debt investment under the 2008 Contract.

115.    On May 22, 2008, Irena Snider and Hargrett communicated by email regarding a potential institutional investor's question "regarding the amount of good receivable on the books." Snider indicated that she told the potential investors that [Debtor] was looking to potentially write off all of the receivables this year and clean-up the balance sheet . . . ." Hargrett responded that after the write down, the accounts receivable balance will not be zero but will be less than $1 million and that for practical purposes, Snider should tell the potential investors that all of the balance will be written down.

116.    On May 28, 2008, Edgar Sims, a principal of Nancy Creek Capital, one of the institutional investors considering a mezzanine debt offer to Debtor, indicated in an email to Wade Cordell, with copies to Hargrett and Meyers, that it would not extend an offer to Debtor, explaining: "In view of the unknown negative impact on the company's balance sheet and company's 2005, 2006 & 2007 income and expense statements of the probable write-off of approximately $15 million in accounts receivable, the company may not meet [Nancy Creek Capital's] standard."

117.    Confirming the likelihood of the write down of accounts receivable, on May 29, 2008, Hargrett emailed Meyers with a copy to Wade Cordell regarding suggested talking points for a potential institutional investor, which included "EBITDA carve out exception for write off of AR [(Accounts Receivable).]" It appears Hargrett was discussing the negotiation of certain covenants that would factor in the write down of Debtor's accounts receivable balance by reducing the minimum earnings Debtor must obtain to avoid a conversion of the mezzanine debt investor's interest from debt to an equity ownership interest in Debtor.

### Interest by Morgan Keegan Strategic Fund

118.    As a result of Morgan Keegan's efforts under the 2008 Contract, Morgan Keegan Strategic Fund, L.P. ("MKSF"), a private equity firm and independent venture capital wing of Morgan Keegan, expressed interest in a possible mezzanine financing deal with Debtor.

119.    On May 14, 2008, MKSF provided a preliminary term sheet offering a $6 million mezzanine debt investment in Debtor.

120.    On May 29, 2008, Irena Snider emailed Hargrett and Wade Cordell, with a copy to Meyers, an amended term sheet for up to $4.5 million in mezzanine debt investment. As part of this email, Irena Snider provided an analysis of ownership cost of going with the MKSF term sheet versus conducting a straight equity raise (through the sale of stock), with an ultimate conclusion that it is cheaper for Debtor to proceed with the MKSF deal than to directly raise capital. Debtor accepted MKSF's amended term sheet as the first step in finalizing an investment by MKSF, subject to MKSF conducting a due diligence review.

121.    On June 5, 2008, CFO Hargrett sent an email to Bill Nutter of MKSF with a copy to Wade Cordell, Meyers and Irena Snider, indicating that Debtor had revised its financial forecasts

with one of the major changes being a write down of $18 million in accounts receivable in July of 2008.

### Sale of 2008 Promissory Notes

122.     While Debtor was negotiating with MKSF, Debtor's managers continued to make additional individual direct efforts to raise capital. The direct efforts were authorized on April 23, 2008, the day before entering the 2008 Contract, when Debtor's Board of Directors approved a special resolution authorizing Debtor "to issue certain debt instruments to individual accredited investors on such basis and terms as may be determined by the President of the company from time to time in order to raise capital for the company."

123.     In appears Debtor's management viewed these "in house" capital raising efforts as necessary short-term gap funding to cover Debtor's current expenses until it obtained mezzanine financing from an institutional investor such as MKSF.

124.     On June 24, 2008, Debtor's Board of Directors held a special meeting, at which, among other matters, Debtor's financial status was discussed. According to the minutes of the special meeting, "the Directors considered an opportunity for selected investors to: 1) Loan to the company a minimum of $100,000.00 for 90 days, with a 20% rate of return, or 2) Purchase 100,000 shares of common stock and receive 100,000 additional stock warrants priced at $1.25 per share." For the purposes of this Order, the Court will refer to these loan opportunities as the "2008 Promissory Notes."

125.     On June 25, 2008, in-house counsel Blevins emailed a copy of a form promissory note he drafted to Handy and Debtor's management,[30] and stated that "[h]aving not heard from

---

[30]     The email was addressed to Handy's personal email address and "IBG-Executive Team <ExecutiveTeam@IBG.LAN>," which appears to have been an address serving as a listserv for Debtor's management.

anyone but Wade [Cordell], Haines [Hargrett], and Brad [Cordell], and assuming no one else had

comments, Wade [Cordell] has asked me to finalize the [form] Note and **get it into your hands**

**asap so that we are now fully prepared to approach our prospective contacts for this**

**opportunity**." (emphasis added).

126.    On June 26, 2008, Brad Cordell solicited investments from a possible investor for

the 2008 Promissory Notes by email. In explaining the purpose of the new offering, Brad Cordell

describes the discussions of the June 24, 2008 Board meeting:

> Here is how it will work, as I stated above, [Debtor's] Board of Directors met on
> Tuesday [June 24, 2008] & has decided because of our rapid growth that there is
> an immediate need of additional funding to cover expenses over the next 60 to 90
> day period until such time as [Debtor] will close on a signed agreement with the
> Morgan Keegan Strategic Fund in the amount of $4.5 million as well [Debtor] has
> secured approximately $5 million in funding through the Kentucky Highlands
> [I]nvestment Corporation which is a federally secured loan to our company. These
> funds will be used for the expansion of our Barbourville, KY Processing Center as
> well as for future working capital. By obtaining both the Morgan Keegan [Strategic
> Fund] as well as the Kentucky Highlands Investment capital, [Debtor] will be
> poised to take the company to the next level which is the ultimate sale of the
> company by year end 2009.

Brad Cordell further indicates that the payment of the loans will occur upon Debtor receiving funds

from the MKSF deal, stating that "your collateral [for the loan] is the Morgan Keegan [Strategic

Fund] funding that will be closed within a 30 to 45 day window ensuring that your loan gets paid

in full."  He assured the potential investor that:

> This is as solid of an opportunity as there is available out there & I would never try
> & get you into something that I did not firmly believe was going to become a reality
> as I am personally involved in all of these discussions with our company & know
> that it is all the real deal. . . . The risk you have is that [Debtor] folds within that
> 120 day period which would be impossible as the above funding from [MKSF] is
> set to be closed over the next 30 to 45 days thus solidifying your return on
> investment as these funds will be used to pay back all that loan [Debtor] capital in
> the interim time period. I personally would encourage you to pledge a minimum of
> $500,000 & earn a $100,000 return which would more than cover any penalties that
> you may incur in moving these funds but yet still make you a ton of return on
> investment in a 120 day period. Again[,] your collateral is the [MKSF] funding that

will be closed within a 30 to 45 day window ensuring that your loan gets paid in full.

### Commissions for Soliciting Investments from Individual Investors

127.    Throughout Debtor's existence, Debtor provided bonuses, stock shares, and commissions to various individuals for soliciting investments from individual investors. Caughman testified that "anyone employed or associated with the company—had the opportunity to solicit other investors" and be compensated for "successful recruiting." It appears that commissions up to 10% were a well-accepted policy, and several of the witnesses in this proceeding admitted to receiving these payments from Debtor for referring new investors to the company, including Caughman, Danielson, Scott Matula, Van Hoeven, Blevins, Wade Cordell and Brad Cordell. These commissions paid to unregistered individuals appear to have been in violation of securities laws. Debtor's in-house counsel was aware of the payments but did not take any action to address them. There is no evidence that Meyers or Morgan Keegan were aware of or participated in these improper commission payments.

### MKSF's Due Diligence Review of Debtor

128.    To conduct its due diligence prior to finalizing its investment in Debtor, MKSF hired Transaction Services, LLC ("Transaction Services"), and on June 6, 2008, Transaction Services advised Hargrett that it would be assisting MKSF with its financial due diligence review of Debtor.

129.    On July 1, 2008, Transaction Services issued a draft due diligence report ("TS Report") of its findings, which was emailed to CFO Hargrett and Meyers. On that same day, Hargrett forwarded a copy of the report to CEO Sturgill. In discussing the Accounting Practice, the TS Report states:

> Why does the "check inventory" accounts receivable exist? Based upon inquiry of Management, [Debtor] has historically attempted to estimate the amount of "revenue" still remaining in uncollected manual checks that might be collected in future periods (thus the term "check inventory"). It is our understanding that amounts were purely a monthly estimate made by Management.
>
> While [Debtor] could potentially collect some [of] the amounts in future periods, GAAP requires that contingent fee revenue recognition begin upon the collection of funds on behalf of customers. Because [Debtor's] fees are contingent under GAAP, [Debtor's] earnings process is not complete until [Debtor] receives the collection from check writers, or debtors.
>
> Materially incorrect audited financial statements? – MKSF and Transaction Services, LLC were provided audited financial statements for FY06 and FY07. Based on our findings, it is our position that **[Debtor's] audited financial statements are materially misstated,** and should not be relied upon.

(emphasis in original). The report also notes that **Debtor's management "[a]cknowledge that the accounts receivable balance was overstated, and that MKSF was made aware of an issue surrounding the accounts receivable balance.**" (emphasis added).

130.    The uncontradicted testimony of Meyers at trial indicated that he first learned that the Accounting Practice was not GAAP compliant on July 1, 2008 when the TS Report was issued to Debtor.

131.    A response to the TS Report was sent by Hargrett to MKSF on July 2, 2008 discussing Debtor's progression towards being cash flow positive but did not address the findings regarding Debtor's accounts receivable balance.

132.    On July 8, 2008, John Murdock, counsel for MKSF, emailed Debtor's in-house counsel Blevins, Hargrett, Wade Cordell, and Outside Securities Counsel, among others, regarding issues involving Debtor and MKSF. In concluding this email, Murdock states, "John Blevins, at your convenience I would like to talk with you about the accounting revisions that I understand are being undertaken at the suggestion of MK's diligence team. Please let me know when we might talk briefly about that." Meyers and Morgan Keegan were not included on this correspondence.

133.    On July 10, 2008, Hargrett emailed Blevins and Wade Cordell to report that he

spoke with John Murdock about the change in accounting for Debtor's accounts receivable.

Hargrett stated in the email that:

> [Murdock] is concerned about identifying any liability that we might have from the
> sale of shares based on financial statements that included our old method of
> accounting. He would like to call [Outside Securities Counsel] George Nemphos
> and discuss the issue with him since [Nemphos] was involved in the [November
> 2006] PPM. When he does, I would like to be on the conversation.
> He asked questions about:
> * How many shareholders did we sell shares to based on the old
>   accounting. I told him I thought it was about 25-35.
> * He asked me if I thought anyone might come back after the accounting
>   change and feel they had been wronged. I told him most of the buyers
>   were old friends of Wade [Cordell] and [Sturgill] and probably already
>   existing shareholders. I said I did not think there was much of a risk
>   there.
> * I told him that the new accounting was definitely GAAP and that I had
>   been told the previous method was GAAP also, but I had never
>   investigated the issue thoroughly myself.

134.    Hargrett testified in his deposition that Meyers supported his efforts to change the

revenue recognition policies of Debtor, indicating that Meyers "agreed that . . . was a better way

of doing it." However, Hargrett indicated that he received pushback from other members of

Debtor's management about the change in the Accounting Practice. Hargrett explained that he

believed the primary reason for the pushback was that the other members of Debtor's management

"did not want to have to explain the change to the existing individual shareholders" and that

Debtor's management agreed that "if and when [Debtor] got a significant capital infusion from a

venture capitalist who did understand the change, [Debtor] would implement it at that point in

time."

135.    On July 21, 2008, CEO Sturgill directed employees and Debtor's management to

"stop talking about our auditors and GAAP" with anyone outside the management team. Sturgill

stated, "[Grafton] ha[s] signed off in the audit that we are in compliance with GAAP. We don't

need to be talking about possible legal issues or concerns that revolve around the [accounts receivable] (potential liabilities from investors)[,] the [accounts receivable] issue is being [sic] dealt with. . . . We have worked too hard and long to allow anything to happen that would jeopardize our futures." Again, this clearly demonstrated that Debtor's management was fully aware of the Accounting Practice and issues. However, there is no evidence that Morgan Keegan or Meyers knew about, participated in, or were otherwise consulted regarding Sturgill's communication to Debtor's employees and management.

### Debtor Declining to Accept MKSF's Term Sheet

136.    Despite issues raised in the TS Report about Debtor's Accounting Practice and its financial statements, MKSF continued to pursue an investment in Debtor through mezzanine debt financing, which included as a condition the expected write down of Debtor's accounts receivable balance and change in its revenue recognition practices.

137.    Debtor's management and Board of Directors were hesitant to accept the funding from MKSF when compared to their own direct fundraising abilities. In an August 2008 email, Wade Cordell wrote to Brad Cordell, Sturgill, Blevins, and Hargrett the following:

> I just wanted everyone to be aware of the problems as I see them with the Morgan Keegan [Strategic Funding] deal:
> 1. The fact that we all have our stock pledged and could lose it all.
> 2. That [MKSF] gets 2.8 million shares including warrants.
> 3. That [MKSF] has the "PUT" clause in their warrant.
> 4. That [MKSF] will NEVER go away even after we pay them back. That means that we will pay them back somewhere between $5.5 - $6 million including interest, plus STILL own 2.8 million shares and we have to get their permission to do about anything. Plus we will pay [Morgan Keegan] (Keith Myers [sic]) $135,000 at closing, [MKSF] (Bill Nutter) $80,000 at closing, their attorney and other accounting fees will likely be @ $60-80K and our legal fees will be at least $30K. That totals @ $300,000 at closing. So [Debtor] will net @ $4.2 at closing and $1.5 will go to REGIONS, leaving [Debtor] $2.7 million.

5. If [Debtor] sold 2.8 million shares at $1.25 we would retain @ $3.5 million. And we would not have [MKSF] with us forever, nor would we be paying back between $5.5 - $6 million in loans.

6. On Monday [Blevins] and [Wade Cordell] are meeting with Steve Kane [of Debtor's Advisory Board] to talk about him finding [Debtor] the folks to buy 2.8 million shares at $1.25. Yes, we will need to pay him a hefty sum in stock[,] but it will still be better than the above.

Guys, next week we will begin receiving thousands of checks from US Bank. Let's be careful not to sell our SOULS at this stage of the game. Bryon [Sturgill], how much more can you raise with Tom before the end of the month? We are so close to break even that it would be a shame to make the wrong choice.

On that same day, Blevins responded:

Wade [Cordell,] You and I have already discussed these points[,] and you know I agree completely. On the other hand I think we need to string [MKSF] along a little longer to see what happens with the # of checks coming from US Bank, how much more money [the members of management] and anyone else can raise, and what we see for sure we think Steve can raise.

138.    On September 10, 2008, Bill Nutter of MKSF emailed to Hargrett and Wade Cordell, with a copy to Meyers, an amended term sheet for the potential mezzanine debt offering. In describing the warrant that would be given to MKSF under the deal, the term sheet provided that the amount of the warrant would be adjusted by Debtor's annual EBITDA;[31] however, the EBITDA figure "will exclude the impact of [a] one-time [accounts receivable] adjustments made prior to the closing of the proposed transaction." These terms reflect Debtor modifying the Accounting Practice and conducting a one-time write down of its accounts receivable balance, to which Debtor's management had agreed to make upon the closing of the transaction with MKSF.

139.    Ultimately, Debtor, through its management, declined to proceed with a mezzanine debt arrangement with MKSF, finding that the deal "would have been VERY expensive money for [Debtor]" and electing to raise capital on its own through various raises, including continuing

---

[31]    A warrant permits a party to purchase the issuing company's underlying stock at a fixed price for a period of time. *See* 3 Steven C. Alberty, *Advising Small Businesses* § 38:39 (2019) (discussing the differences between stock options and stock warrants).

to borrow under the 2008 Promissory Notes. Debtor's in-house counsel, Blevins, testified that he came up with the idea for Debtor to issue promissory notes, which would offer potential individual lenders the same terms as those provided in the MKSF deal.

### Debtor's September 23 and 24, 2008 National Sales Meeting

140.    On September 23 and 24, 2008, Debtor held a National Sales Meeting attended by several of Debtor's sales people and potential new sales people. The agenda for the meeting gave the impression that the meeting was to discuss becoming a sales person for Debtor and did not indicate that a stock offering would be made at the meeting. Wade Cordell asked Meyers to provide a brief presentation about Debtor's industry. Wade Cordell led the meeting, which included a slideshow presentation created by Debtor. The evidence presented did not establish that Meyers reviewed the slideshow presentation in advance of the meeting or that he knew a stock offering would be announced at the meeting. At the conclusion of the meeting, Wade Cordell announced a stock offering to those in attendance. The statements made by Meyers at the meeting have been characterized differently by witnesses. Some witnesses who attended the meeting indicated that Meyers stated that he had "reviewed [Debtor's] books," reviewed financial projections that utilized the Accounting Practice,  expressed that he had taken similar companies like Debtor to the market before and was able to sell these companies at stock valuations of $7 to $12, and was present for Cordell's stock offering during the meeting. Meyers testified that his comments were restricted to providing a general overview about the services Debtor offered and how those services were viewed in the industry as part of the presentation and not any specific details or assurances

regarding Debtor.[32] He also indicated that he was not present when Debtor's financial projections were discussed at the meeting or when Cordell made the stock offering to the attendees.[33]

141.    On September 29, 2008, Wade Cordell responded by email to a potential individual investor who attended the National Sales Meeting and requested to speak with Meyers over the phone about making an additional investment in the company. Wade Cordell stated, "I just spoke with Keith Meyers and he said he cannot speak to individual investors." This is consistent with Meyers' testimony of his position regarding communications with individual investors.

142.    On October 23, 2008, Debtor's Board resolved that certain notes issued between October 7, 2008 and November 3, 2008, varying in amounts from $25,000 to $500,000, would be treated as senior debt.

143.    By its terms, the 2008 Contract ended on October 24, 2008, ending Morgan Keegan's service to Debtor. The evidence does not indicate that there were any further agreements between Debtor and Morgan Keegan, or that Morgan Keegan was ever engaged to assist Debtor with a public offering as an underwriter.

144.    As compensation under the 2008 Contract was contingent on Debtor closing a mezzanine debt transaction, Morgan Keegan received no compensation for its work under that contract. Further, Meyers testified that whenever an engagement ends without the closing of a transaction, he does not seek reimbursement pursuant to the parties' contract for Morgan Keegan's

---

[32]    The only documentary evidence of Meyers' statements at the Sales Meeting are of questionable credibility because the drafter of the email, Brad Cordell, appeared to suggest at his deposition testimony that he may have made up his remarks about Meyer's statements at the meeting. Further, the record reflects that Brad Cordell and other members of Debtor's management had a propensity to exaggerate, if not lie, when soliciting investments from potential investors (which was the content of Brad Cordell's email). As such, the Court puts no weight into this documentary evidence.

[33]    Based on the contradictory evidence, the Court cannot conclude that Meyers made the alleged statements regarding Debtor's financial condition.

expenses. It appears in this case that Morgan Keegan did not seek reimbursement of its expenses

from Debtor for either the 2006 Contract or the 2008 Contract.

### Meyers' Conversation with Danielson

145.    Danielson testified that in December 2008, he had a meeting with Wade Cordell

about a possible individual investment in Debtor (either through the purchase of stock or serving

as a lender on a promissory note) and that at the meeting Cordell suggested Danielson speak with

Meyers. Danielson testified that he later had about a thirty minute telephone conversation with

Meyers prior to investing. He testified that:

> [Wade Cordell] told [him] that [Meyers] would give [Danielson] . . . some
> background on the company, his experience with the company, what their exit
> strategy was, . . . maybe what the company might be worth down the road, or timing.
> He told [him] that he would not speak directly to particular accounts, or he wouldn't
> opine on the financial statements . . . . That we wouldn't get into specific
> information on . . . the accounts of the company, that that would be more up to their
> CFO to ask. But it would be more of a general conversation about the financial
> health of the company, not a specific conversation about revenues or expenses or
> net worth or something.

Danielson confirmed that Meyers spoke to these subjects on his call. Danielson also testified that

Meyers stated he was very familiar with Debtor from his past experience with the company and

that Debtor was a growing company "in general terms of taking on . . . national banks." Further,

he testified that Meyers was aware of the 2008 Promissory Notes, explaining their purpose to him

and indicating that the 2008 Promissory Notes contained similar terms to those offered to

institutional investors. Danielson also testified that Meyers told him that Debtor's intention was

"to sell the company in fairly short order . . . [Danielson] had been told that [the] notes probably

wouldn't last a year. And . . . when [Danielson] asked [Meyers] . . . are they really looking to sell

the company that quickly, he indicated to [Danielson] that [Meyers] thought that by the end of the

year or certainly early the following year, they would have it sold." During cross-examination,

Danielson admitted that he "wasn't speaking to [Meyers] as an accountant, or someone that . . . I'd be asking for a validation of the financial statements."[34]

146.    Meyers testified that he did not recall having a conversation with Danielson but confirmed that it is his general practice to only speak to institutional investors such as private equity firms and not to individual investors. He testified that on multiple occasions Wade Cordell would try to get him on the phone with individuals. Meyers stated that he would advise Cordell that he could not speak with people and that Cordell would respond "well can you just tell them that you're an investor?" Meyers stated that on those phone calls he would "say 'investor', and . . . tried to get off the phone politely but quickly."

147.    After the end of the 2008 Contract, there is no evidence that Morgan Keegan or Meyers worked for Debtor.

### 2009: Continued Capital Raises and Continued Financial Struggles

148.    According to a Form D dated March 11, 2009 that was signed by Blevins and submitted to the SEC, Debtor directly raised $10,222,500 from 121 individual investors pursuant to an offering of securities that began on January 8, 2008.

149.    In 2009, Debtor prepared **in-house** another private placement memorandum for the direct sale of up to 5,000,000 additional shares of stock at $1 per share ("2009 PPM"). The 2009 PPM was used by Debtor to solicit stock investments from individuals. According to the Form D reported to the SEC dated June 22, 2009 and signed by Blevins, Debtor directly raised an additional $1,187,500 pursuant to an offering of securities that began on March 3, 2009. There is no evidence that Meyers or Morgan Keegan were involved in any way with the solicitation of these

---

[34]    While Danielson indicated that his conversation with Meyers influenced him to invest in Debtor, especially the fact that the promissory notes were modeled after the terms offered to private equity firms, there is no evidence that Danielson has brought a lawsuit against Meyers or Morgan Keegan over this alleged conversation.

investments.

150.    Despite raising significant capital in 2008 and 2009, Debtor again appeared to be

experiencing financial distress as indicated by the minutes of a special meeting of the Board of

Directors on May 5, 2009:

> "Wade [Cordell] constituted a 'Cost Cutting Committee' to address the need to
> reduce operating costs:
> - We should target a reduction in SC payroll by $50,000 per month.
> - We will reduce Barbourville payroll cost by $12,500 per month.
> - We need to raise $975,000 to pay off Regions. This will save approximately
>   $53,000 per month.
> - We will reduce [travel and expense] cost and memberships (eliminate State
>   [Chamber of Commerce], Keep Lexington [Chamber of Commerce])
> - We have cancelled the rented apartment costing $1,000+.
> - We have stopped paying car allowances.
> - We need to review IT expenditures. They seem high and have very little
>   approval process.
> - We should renegotiate the ATI agreement to get reduced processing charges.
> - We can reduce health insurance by $3,000 per month.
>    Total saving = $150,000 per month.

**Patuxent Valuation of Debtor**

151.    In May of 2009, Debtor retained Patuxent Valuation Group LLC ("PVG") to

conduct a valuation of its stock. During the development of the PVG valuation, members of

Debtor's management suggested they would request Meyers communicate with PVG about

Debtor's industry to more accurately reflect Debtor's true value. However, no evidence was

presented that Meyers was ever contacted by Debtor on this subject or that Meyers communicated

with PVG. In fact, Meyers testified that he did not contact PVG. Ultimately, PVG issued a report

valuing Debtor's shares between $1.09 to $3.19 a share. These valuations became part of a

document entitled "Talking Points" that was distributed by Debtor to various members of Debtor's

management and its shareholders to further assist with their direct efforts to solicit investment in

Debtor. It does not appear that Morgan Keegan or Meyers were involved in the preparation of the

"Talking Points."

### Assistance Provided by Meyers to Debtor

152.    In an effort to characterize Meyers', and therefore Morgan Keegan's, relationship

with Debtor as a part of a broader scheme, the Trustee points to various acts of assistance provided

by Meyers to Debtor from 2006 to 2010, including Meyers' referral of potential customers to

Debtor. For example, in July 2006, Meyers referred to Debtor Transfirst, a credit card processor

for 985 national banks. Transfirst eventually became a customer of Debtor. During this period of

time, Meyers and Morgan Keegan discussed a producing agent arrangement with Debtor in which

Morgan Keegan would be compensated for referring potential customers to Debtor; however, the

parties never entered into such an agreement. It does not appear that Meyers or Morgan Keegan

received any compensation from Debtor for referring potential customers to Debtor.

153.    Meyers served as an intermediary in exchanging information between Regions

Bank (the parent company of Morgan Keegan) and Debtor when Debtor was seeking a line of

credit.

154.    On December 2, 2008, Wade Cordell reached out to Meyers for assistance with an

individual investor who wanted to make a $500,000 investment in Debtor by withdrawing funds

from a 401K. It appears Meyers forwarded the email to a co-worker, Jeffery Schultz, who provided

some general advice on the situation. Meyers then forwarded the response from Schultz to Wade

Cordell.

155.    On February 24, 2009, Debtor held its Annual Meeting of Stockholders and

Meyers provided two slides to Wade Cordell for his presentation, entitled, "State of the Company

Address."  Specifically, these two slides addressed the growth rates and historical valuations of

companies similar to Debtor based on publicly available information. A transcript of the meeting

indicates that Wade Cordell said to the audience that the slides came from Morgan Keegan. The transcript also indicates that Wade Cordell stated that "Debtor's exit strategies are basically the same. They include to sell the company to financial investors, to sell the company to financial service processing companies, to sell the company to a bank. . . . [W]e've got[ten] calls from companies wanting to talk to us. And of course[,] we move all of those to Keith Meyers so he can chat with them." It does not appear Meyers was present at or otherwise involved in the 2009 Annual Meeting of Stockholders.

156.    It appears that Debtor's management focused on an initial public offering or sale of the company since shortly after Debtor's inception, and its management talked freely to potential and current investors of Debtor about its goals of selling Debtor. However, it does not appear that Meyers or Morgan Keegan ever addressed outside offers to purchase Debtor, and Handy, in reviewing his notes created in 2010 stated ""[Wade Cordell] always said Morgan Keegan had people offering to buy the company but offers were too low so we needed to wait for better offers. Morgan Keegan was to be paid 6% of the sale price. . . . There was never a document from Morgan Keegan that I, as investor or member of [the Board of Directors], saw evidencing a possible sale."

**Initial Ouster of Debtor's Management**

157.    Throughout its history from 2003 until late 2009, in its ordinary course of business, Debtor regularly used its customer's funds (the customer's share of the checks collected) to cover Debtor's costs and operating expenses with the intention of repaying its customers with other funds that Debtor later received. In essence, Debtor was continuing a practice of "borrowing from Peter to pay Paul" to sustain its rapid rate of growth. At any point of time, the deficit in the client's accounts ranged from $200,000 to $2.9 million. As of August of 2009, Debtor had accumulated a $2 million deficit of available funds in its customer accounts.

158.    There is no evidence that indicates that Meyers or Morgan Keegan were ever aware that Debtor was using client funds from its customer accounts to cover its operating expenses.

159.    At some point in 2009, certain shareholders of Debtor organized an effort to remove Wade Cordell, Brad Cordell, and Blevins, based on the allegations that these members of management caused Debtor's misappropriation of funds from the customer accounts ("Initial Ouster").[35] On August 17, 2009, Wade Cordell, Brad Cordell, and Blevins were purportedly removed the Board, terminated from their officer positions, and Debtor's Lexington, South Carolina office was closed. The removal of the Cordells and Blevins was based on a majority vote of Debtor's shareholders pursuant to Debtor's bylaws; however, the Cordells and Blevins disputed the validity of the removal and litigation ensued. In that litigation, John Freeman, who served as one of the Trustee's experts in this proceeding, actually served as an expert for the Cordells and Blevins. In the state court litigation, Freeman opined that controlling Nevada law requires a two-thirds majority vote to remove directors from their position under N.R.S. 78.335(1).

160.    The litigation between Debtor and the Cordells and Blevins caused Debtor to incur significant legal fees and costs. The litigation ultimately settled when the Cordells and Blevins agreed to be removed from the company in exchange for Debtor to pay $188,238 to Wade Cordell, $133,109 to Brad Cordell, and $150,081.50 to Blevins, as well as $100,000 to the attorneys who represented the Cordells and Blevins. In addition, Wade Cordell received a release of his guarantee on the $1million+ loan with Regions Bank. The settlement agreement between the parties further provided that the settlement "is not to be construed as an admission of liability on the part of that

---

[35]    There appears to still be a significant dispute about whether the ousting was appropriate and whether a legally sufficient percentage of shareholders voted in favor of the removal as the parties dedicated significant portions of their proposed orders discussing the legitimacy of the Initial Ouster. For the purposes of this Order, the Court does not need to address whether the removal of Wade Cordell, Brad Cordell and Blevins was appropriate or legal under controlling law.

party, by whom liability is expressly denied." Even after their removal, the Cordells and Blevins remained minority shareholders of Debtor, holding a combined 10,625,000 shares of Debtor's stock between the three of them. Thereafter, Debtor's Board of Directors expanded to nine members. Sturgill, Handy, and Van Hoeven remained from the former Board, and Potter, Lyle, James E. Beasley III, William G. Reed, Eason Leake, and Paul H. Newberry were added as new members.

161.    On August 31, 2009, CFO Hargrett prepared an affidavit for the state court litigation, which expressed the reasons shareholders sought the removal of the Cordells and Blevins from Debtor's management. The ultimate contention of the affidavit was that the discovery of the approximately $2 million deficit in customer accounts prompted the ouster action. Other statements in Hargrett's affidavit included that:

    a.   Hargrett asserted that, prior to the alleged ouster, the Cordells mismanaged Debtor's company accounts, misplaced certain funds, and procured loans at "extraordinary" rates without Board approval.

    b.   He explained that Debtor's business model depended upon processing a high enough volume of checks to cover variable costs and fixed expenses, but the Cordells did not follow Hargrett's advice to cut costs. To cover operating expenses, Debtor raised money through stock and loan offerings, and Wade Cordell directed Janice Barton, Vice President of Processing, to transfer monies out of customer accounts and into Debtor's operating accounts. The deficit in the customer accounts rose from $111,000.00 in March 2008 to $2,000.000.00 in August 2009.

    c.   "In June-July 2009 alone, Wade Cordell directed the transfer of approximately $261,000.00 of customers' money out of the customer accounts and into Debtor's South Carolina Bank & Trust operating account."

    d.   Hargrett asserted that "our expenses increased in anticipation and as a result of additional accounts, but the volume of business from the new accounts was not as high as anticipated."[36]

    e.   "Two new contracts with banks in 2008 and 2009 caused fixed costs . . . to increase. In addition, margins were lower on these new bank contracts."

---

[36]    Hargrett also testified to this effect in his deposition: "Probably mid to late 2008 was when [the financial crisis] began to show up." In his deposition testimony, Hargrett indicated that he believed that the 2008 recession was the central factor to the failure of Debtor's business because Debtor's bank clients were not sufficiently promoting Debtor's services to the bank's customers as a result of the recession.

    f.    Hargrett alleged that from January 2008 to August 2009 Debtor paid approximately $549,850.00 in bonuses and excess rent to the Cordells, Blevins, and their personally-owned companies.[37]

    g.    Finally, Hargrett asserted that because the Cordells did not cut Debtor's costs, the deficit from the customer accounts spiked rapidly.

**Change to the Accounting Practice and Write Down**

162.    After the Initial Ouster, Debtor's new Board of Directors considered changing the Accounting Practice. The minutes of the September 11, 2009 Board of Directors meeting provided the following:

> **Haines [Hargrett] recommended ratcheting down accounts receivable on financial statements to eventually eliminate accumulating uncollected checks to a level of $25 million. This process would be done on a "sliding" basis over a period of time and will be discussed with the external auditors [Grafton] during this year's audit.** The revised accounting policies would accomplish the intent of having our financial statements more accurately reflect true operations and would include the following:
>
> 1. Eliminate the pass through revenue and cost of guaranteeing checks processed by our merchants that are not returned to us for collection. This is an accounting change that is recommended by our auditor[, Grafton]. This will have no impact on Net Income or Cash Flow.
>
> 2. Discontinue the reporting of revenue associated with the estimated future collection of checks presented for collection. This will have a negative impact on current Net Income but should have a positive impact on future Net Income. It will have no impact on Cash Flow.

---

[37]    In the affidavit, Hargrett estimated that Debtor had paid excessive rent costs of $99,500.00 to Gibson Commons, LLC, owned by Brad Cordell, since January 2008. Hargrett also asserted that since January 2008, Debtor had paid bonuses to Wade Cordell totaling $190,750.00, to Brad Cordell totaling $187,500.00, and to John Blevins totaling $53,500.00. Finally, Hargrett asserted that Debtor had overpaid $18,600.00 in rent for a condominium used by Debtor's employees, which was owned by John Blevins' company.

    At trial, the Trustee presented the ledgers of Caughman that listed the alleged improper payments made by Debtor to Blevins and the Cordells and their personally owned companies. However, the examination of those ledgers in this proceeding indicate that much of these payments reflected the established salaries and other compensation for these former officers of Debtor. Furthermore, the Trustee did not present any testimony to show that the compensation of Debtor's management, including Blevins and the Cordells, was unreasonable in relation to the various duties, including capital raises which they performed. No evidence of comparable benefits paid to key officers in companies of similar size or value was presented to the Court.

3. Discontinue the Gross-Up of credit card revenue and cost for the portioning of credit card fees retained by the processor. This will have no impact on Net Income or Cash Flow.

4. Review the balance of Accounts Receivable currently carried on the Balance Sheet with the auditor and write down any amounts that are determined to be in excess of a very conservative collection rate. This will take place before or at year-end 2009.

(emphasis added). The minutes from the September 11, 2009 Board meeting also indicated that the Board was considering ways to reduce expenses:

> Chairman Sturgill stated that [Debtor] has the best and most sophisticated technology system in industry, but that it has been extremely under-utilized. The Information Technology staff that is currently in place is very capable to handle all aspects of development, implementation, maintenance, etc. of a total IT package. Suggestion was made to move from existing 3rd party relationships to an in-house based IT system for service applications, thereby reducing (or possibly eliminating) outsourced expense and providing more control of all IT processes.

Further, the minutes indicated that the new Board pursued the same "exit strategy" and that at least one company was interested in purchasing Debtor at that time:

> Chairman Sturgill stated that E-Payments of Colorado has expressed interest in purchasing [Debtor] and that an option for consideration by the Board may be presented as early as 4th quarter of 2009. E-Payments also does check processing, which may present an additional opportunity for [Debtor] to establish a separate relationship. Also, ReSubmitIt of Louisville, KY has expressed interest in a joint opportunity with [Debtor] for check processing. Director Bill Van Hoeven made a motion (seconded by Director Bill Reed) to invite E-Payments to make a formal presentation to the Board of Directors at the next regularly scheduled [B]oard meeting. Motion received unanimous approval.

In addition, it appears from the minutes of September 11, 2009 Board meeting that the Board concluded that **the best way to raise funds to cover the customer account deficit was to continue to [directly] sell additional shares of Debtor to current investors and to avoid additional new debt**. The Board also approved Hargrett and Grafton, who remained Debtor's auditor, to review the Accounts Receivable balance and to analyze what amounts should be written down and on what schedule.

65

163.    Ultimately, Debtor wrote down $23 million of its accounts receivable balance as a one-time event, which was retroactively applied to January 1, 2009.  The write down was publicly disclosed and made available to Debtor's shareholders by the Board. It was also included in a private-placement memorandum drafted in November of 2009, which was being used to raise capital directly by Debtor.

### Efforts to Continue Operations after the Write Down

164.    On October 5, 2009, Debtor's Board of Directors held a meeting at which it approved an "increase [of] the number of shares of Class A Common Stock authorized for issue from seventy-two million (72,000,000) shares to eighty-five million (85,000,000) shares." The minutes of this meeting also indicate that in regard to concerns over the customer account deficit, "Sturgill stated that a considerable number of potential investors have been approached and that he hopes to begin having funds coming in by Friday, October 9." The Board also approved at this meeting a capital raise not to exceed $5 million, with the plan being that $3.8 million would be used to satisfy the customer account deficit, Debtor's loan with Regions Bank, and other outstanding debt obligations, with the remaining $1.2 million to be placed in escrow for future needs including the retirement of other outstanding debt instruments, such as the promissory notes issued by Debtor. The Board also approved a plan to offer an exchange of stock in satisfaction of $6.5 million of Debtor's debt to its noteholders, including the holders of the 2008 Promissory Notes.

165.    On November 19, 2009, Debtor's Board of Directors held a meeting, which reflected Debtor's efforts to continue its operations. The minutes of this meeting indicated that Hargrett identified anticipated funding from projected investments of between $4,395,000 and $5,745,000 and provided a detailed report of current obligations totaling $3,765,977. The minutes

do not reflect that Debtor had any offers for investment at that time. Debtor also continued to pursue new clients as the minutes stated:

> Negotiations are progressing for [Debtor] to provide processing services for Diversified Check. Citizen's Bank RFP [(Request for Proposal)] has been completed with an on-site presentation at their Providence, RI headquarters – [Debtor] is one of two finalists . . . with a decision expected by the end of December[] 2009. An RFP is expected to be received from Capital One by December 1, 2009. We expect approximately 20 new agreements within the Regional & Community Banks segment by the end of the first quarter of 2010. The School Division continues to add a significant number of new school district accounts. The Credit Card Division is adding 30-35 new accounts per month. We have experienced some push back from agents and ISO's to move forward due to delays in paying commissions and management change events of the recent past.

The minutes also reflect that Debtor had taken efforts to reduce its operating expenses and overhead costs by scaling back personnel at the Barbourville facility.

166.    On January 28, 2010, Debtor's Board of Directors held a further meeting, which provided additional updates of Debtor's operations. The minutes of that meeting report that by that time, US Bank cancelled its services agreement with Debtor, and that Debtor had past due obligations of $3.67 million and **projections were "extremely ugly for continuation of operations without additional funding to satisfy these past due obligations."** (emphasis added).

### Danielson's Review of Debtor's Ledgers

167.    In March 2010, a group of Debtor's shareholders requested that Danielson, a former CEO of other companies, conduct an independent review of Debtor's ledgers and financial records.

168.    About four months later, Danielson was granted access to the entire stock ledger. Based on his review of Debtor's records, he determined that Debtor "had been booking a very material accounts receivable and recognizing earned revenue on a monthly basis that did not exist." He did not find any "material misstatements" of expenses or debt, but rather, a "stark accounts

receivable and revenue recognition policy and monthly entry that was completely wrong." He discovered a few instances of founder's stock that "didn't necessarily involve a cash deposit." He testified that those discrepancies were "fairly isolated" and maybe "ten to twenty questions as to people that were issued stock." He asserted that, based on his review of the records, those discrepancies did not have any downstream impact on Debtor's debts, losses, or revenues – only the capital accounts.

### Second Ouster of Management

169.    On July 19, 2010, Debtor's Board of Directors held a special meeting and voted to remove Sturgill as a Board member and as Debtor's Chief Executive Officer and to remove Hargrett as its Chief Financial Officer. Testimony was received that the Second Ouster was due to Sturgill and Hargrett's involvement with the Debtor's prior financial statements that included the Accounting Practice. However, Hargrett in his deposition testimony, testified that he believed the removal was the result of other Board members' concerns that Sturgill, after returning from an absence as CEO, was trying to take over the company.

170.    In late August 2010, Debtor won a request for proposal from the fifth largest school district in the country. This represented four hundred schools and fifty separate accounts for after school programs. It was the largest school district Debtor had ever signed.

171.    During the approximate 12 months of leadership of the new Board of Directors, Debtor continued to attract new customers, received interest from a buyer, directly raised capital through stock sales, but also continued to rapidly lose money. On September 1, 2010, Debtor's Board of Directors approved resolutions for Debtor to file a petition for relief under chapter 7 of the Bankruptcy Code.

172.    In total, during its existence, it appears Debtor raised at least $20 million from individual investors through sales of stock, territory licenses, and promissory notes.

### Post-Bankruptcy Developments

173.    In 2014, Hargrett and Grafton pled guilty to charges brought against them by the U.S. Attorney General on behalf of the United States, which included allegations, among other items, of inducing private investors to send money to Debtor without having provided the investors with material information as to the financial health of Debtor, all in violation of 18 U.S.C. § 1349.

174.    On May 26, 2011, the South Carolina Office of the Attorney General filed an Administrative Proceeding before the Securities Commissioner of South Carolina against Debtor, Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett for allegedly engaging in acts, practices and transactions that constitute violations of the South Carolina Uniform Securities Act. It appears the result of this proceeding was that the Management Defendants received a lifetime ban from selling securities in South Carolina.

175.    It does not appear that the United States, the State of South Carolina or other state or national regulatory authorities have asserted charges or complaints against Morgan Keegan or Keith Meyers for their involvement with Debtor.

### <u>CONCLUSIONS OF LAW</u>

At trial, there were four remaining causes of action that the Trustee asserted against Meyers and Morgan Keegan: (1) securities fraud under SEC Rule 10b-5(a) and (c), (2) common law fraud, (3) breach of fiduciary duty and (4) aiding and abetting a breach of fiduciary duty. The Trustee's causes of action are based on Meyers and Morgan Keegan's creation of or knowledge that the Accounting Practice used by Debtor was improper and caused damage to Debtor. The Trustee alleges that Meyers and Morgan Keegan either created the Accounting Practice or knew or should

have known it was improper and failed to advise Debtor. Morgan Keegan and Meyers respond that the Trustee's causes of action should be denied in their entirety because they deny creating the Accounting Practice or taking any improper action regarding it and because the Trustee has failed to prove the necessary elements of these causes of action and is barred from bringing such causes of action under the doctrine of *in pari delicto*.

### The Court's Directives on the Parties' Proposed Orders

This proceeding addressed facts and conclusions centering around the business operations of Debtor from 2004 to 2010. The proceeding included the consideration of thousands of corporate documents, many electronic, and thousands of emails and other correspondence. During multiple pre-trial hearings over a period of several years, the Court expressed significant concerns about the unnecessary breadth of the arguments being presented and the volume of documents being proposed as exhibits, many of which were duplicative, immaterial or irrelevant.  Due to the volume of proposed exhibits, during the first day of the trial, the Court set out clear directives to assist the parties in their decisions regarding the presentation of evidentiary exhibits:

> [The Court has] indicated that post-trial briefs would be in the form of proposed orders and the Court will look at those proposed orders for reference to exhibits that you introduce. And in essence, only review [those referenced] in your orders. You will have, by failing to list an exhibit, waived the Court's review of that [exhibit].[38]

---

[38]   Also, at the conclusion of the 18-day trial, the Court restated its prior directive to the parties, indicating that "for the Court to pay proper attention to any exhibits, they must be cited in the [respective] proposed order[s] to the Court. The Court will rely on the documents that you cite to it . . . ." At the conclusion of the trial, the Court again directed, "In the [parties'] proposed orders, the parties shall cite to specific exhibits for the Court's consideration. Failure to cite to a specific exhibit may result in a waiver of the Court's consideration of that exhibit and any argument related thereto."

In addition, at the conclusion of the trial, the Court directed that the parties' proposed orders address each element of the remaining causes of action and defenses raised so that the respective proposed orders "deal with the evidence and your recommended conclusions in light of the elements of each cause of action." In the Order on the Trustee's Motion for Directed Verdict, the Court reiterated that "the parties shall provide analysis as to each element of the causes of action and defenses raised by the parties [in the proposed orders]."

While the Court has reviewed all evidence submitted to it, the Court has relied heavily on the proposed orders submitted by the parties in considering this matter. To say that this proceeding was voluminous would be an understatement, and through their proposed orders, the parties were provided the opportunity to present the most clear and concise expression of their arguments, evidence, and case law that the parties deemed important and relevant to the proceeding. In consideration thereof, and after consultation and agreement of the parties, the Court allowed proposed orders of up to 100 pages[39] to fully express their positions.[40] Therefore, the case law, evidence, and arguments presented in the proposed orders have framed the Court's consideration of the matters presented. Similarly, the arguments, evidence and case law that were only briefly mentioned or not mentioned at all in the proposed orders were weighed accordingly.[41]

---

[39]     The Court notes that setting a reasonable page limitation for briefs and memoranda is a common practice to encourage a concise presentation of the relevant arguments and evidence. Both the District Court of South Carolina and the Court of Appeals for the Fourth Circuit have such limitations. *See, e.g.,* Local Civ. R. 7.05 (D.S.C.) ("Unless an exception is granted by the court, no memorandum shall exceed: [t]hirty-five (35) double-spaced pages in the case of an initial brief of any party [and] [f]ifteen (15) double-spaced pages in the case of any reply . . . ."); Fed. R. App. P. 32(a)(7)(A) ("A principal brief may not exceed 30 pages, or a reply brief 15 pages . . . ."); Local App. R. 32(b) (4th Cir.) ("The Fourth Circuit encourages short, concise briefs. An opening or response brief that cites to the paper appendix and the electronic record . . . may, without motion, exceed the length limitations in FRAP 32(a)(7) and FRAP 28.1(e)(2) by up to 200 words. Briefs may not otherwise exceed the length limitations without the Court's advance permission. . . . These motions [for permission to submit a longer brief] are not favored and will be granted only for exceptional reasons.").

[40]     The Court's Order on the Trustee's Motion for Directed Verdict also indicated that "[t]o the extent that the parties find as they draft these proposed orders that the limitation in length inhibits counsel from adequately addressing all matters before the Court, counsels for the parties may seek a reconsideration of the 100-page limit by submitting a correspondence to the Court, with a copy to opposing counsel." The Court did not receive requests to reconsider the 100-page limit for the proposed orders. Therefore, the Court must conclude that the proposed orders submitted to the Court fully and adequately raise and address all of the parties' legal and factual arguments and any support thereof for the Court to consider in this proceeding.

[41]     Implementing this approach, the Court notes that the Trustee's proposed order did not address or reference in any way the cause of action alleging a breach of the 2008 Contract. Similarly, Meyers and Morgan Keegan's counterclaims against the Trustee were not addressed in their proposed order. Therefore, the Court has concluded that each of the parties have abandoned or otherwise waived those causes of action, and the Court will not address those causes of action in this Order other than to deny them.

71

### Choice of Law

The Court has previously determined the choice of law for each of the Trustee's remaining causes of action in its June 19, 2013 Order on Meyers and Morgan Keegan's Motion to Dismiss. In that Order, the Court determined that South Carolina law applied to the breach of fiduciary duty and fraud causes of action,[42] and that Nevada law applied to aiding and abetting breach of fiduciary duty cause of action. As to the federal securities fraud cause of action, the Court determined that federal law applies, but that South Carolina law governs the issue regarding the imputation of the knowledge and conduct of Debtor's agents to Debtor.[43]

### Burden of Proof

For the common law fraud cause of action, the Trustee must prove his claim by clear and convincing evidence. *See Turner v. Milliman*, 708 S.E.2d 766, 769 (S.C. 2011) (holding that under South Carolina law, a party must establish fraud by clear and convincing evidence). For the other remaining causes of action, the Trustee must establish his claims by the preponderance of evidence. *See e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–88 (1983) (stating that the preponderance of the evidence standard is generally applicable in civil actions and applying it to securities fraud claim); *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 334 S.E.2d 131, 138 (S.C.

---

[42]     The Court notes that its Order on Meyers and Morgan Keegan's motion for summary judgment entered on December 22, 2016 stated incorrectly that Nevada law is applicable to the breach of fiduciary duty cause of action asserted against Meyers and Morgan Keegan. *See Bowen v. Houser*, C/A No. 3:10-02398-MBS, slip op. 2011 WL 380455, at *9 (D.S.C. Feb. 3, 2011) (applying South Carolina law to the state law claims of breach of fiduciary duty because the plaintiff's claims are based on events that occurred in South Carolina); *Moore v. Moore*, 599 S.E.2d 467, 475 (S.C. Ct. App. 2004) (holding "a cause of action for breach of fiduciary duty sounds in tort rather than in contract"); *Bannister v. Hertz Corp.*, 450 S.E.2d 629, 630 (S.C. Ct. App. 1994) ("Under South Carolina conflict of law principles, the substantive law governing a tort action is determined by the state in which the injury occurred."). The Court finds that this error was not material to the Court's ruling on the motion for summary judgment as the outcome would be the same.

[43]     The Court notes that its Order on Meyers and Morgan Keegan's motion for summary judgment entered on December 22, 2016 stated that South Carolina law governs the federal securities fraud cause of action. It was the intention of the Court that South Carolina law governs the issue regarding imputation of the conduct and knowledge of Debtor's agents to Debtor as to the federal securities fraud cause of action. The Court finds that this error was not material to the Court's ruling on the motion for summary judgment as the outcome would be the same.

Ct. App. 1985) ("In South Carolina, a party having the burden of an issue ordinarily must carry it by a preponderance of the evidence.").

## Summary of Allegations

According to his Complaint, the Trustee asserts these causes of action in his capacity as the successor-in-interest of Debtor pursuant to 11 U.S.C. § 541. In other words, the Trustee is standing in the shoes of Debtor in its corporate capacity in alleging liability and damages as opposed to asserting the causes of action based on the standing of Debtor's investors or its creditors. While any recovery in this adversary proceeding by the Trustee would benefit the bankruptcy estate, which in turn may benefit the creditors and equity holders of Debtor that have allowed claims in the bankruptcy case, the causes of action are to be considered from the position of Debtor's rights and standing, not the separate, independent rights of shareholders or investors.

The Trustee has proposed multiple narratives for establishing Meyers and Morgan Keegan's liability under his causes of action. First, the Trustee asserts that Meyers and Morgan Keegan were actively involved in, colluded or schemed with the Management Defendants in creating and introducing the Accounting Practice used by Debtor to recognize its accounts receivable with the intent of inflating Debtor's revenues in order to overvalue Debtor and make it appear more profitable, the benefits of which would be realized by a higher commission for Meyers and Morgan Keegan upon any ultimate sale, merger, or initial public offering ("IPO") of Debtor. However, as an alternative theory, the Trustee asserts that Meyers and Morgan Keegan were aware or should have been aware of the alleged impropriety of the Accounting Practice used by Debtor and certified by its auditor, Grafton, from 2005 until late 2009, and failed to adequately report it to the company, which resulted in a detriment to Debtor because it prevented certain non-managing or "innocent" Board members from forcing a change in the Accounting Practice, seeking earlier

73

the ouster of key managers and Board members, or closing the business earlier, which would limit the damages suffered by it.

To establish liability, the Trustee also asserts that Meyers and Morgan Keegan's relationship with Debtor went beyond their written contractual relationship established in the 2006 Contract and 2008 Contract and that they agreed, either in word or by action, to serve in additional roles, including as Debtor's underwriter,[44] its investment advisor, its broker for Debtor's offerings to individual investors and its "producing agent." The Trustee asserts that, based on the existence of these alleged other roles, Meyers and Morgan Keegan owed additional fiduciary duties to Debtor that were breached.

The Trustee also asserts that the Management Defendants, with the assistance of Meyers and Morgan Keegan, looted Debtor and used capital raised by Debtor though the use of the Accounting Practice for their own personal benefit.[45]

---

[44] *Black's Law Dictionary* defines "underwriter" as "[o]ne who buys stocks from the issuer with an intent to resell it to the public; a person or entity, [especially] an investment banker, who guarantees the sale of newly issued securities by purchasing all or part of the shares for resale to the public." Underwriter, *Black's Law Dictionary* (9th ed. 2009). While not asserting a cause of action under the Securities Act of 1933, the Trustee seeks the Court's acceptance of the definition of "underwriter" under that Act:

> The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

15 U.S.C. § 77b (11) (2019).

[45] The Court notes that there is an inherent conflict between the Trustee's characterizations of the motivations for the Accounting Practice. As to the Management Defendants, it would appear the Trustee is alleging that they were personally benefitting on an ongoing basis from the Accounting Practice through the looting of Debtor. On the other hand, it would appear the Trustee is also alleging that, contrary to siphoning assets, Meyers and Morgan Keegan were seeking a delayed long-term benefit from the Accounting Practice to be achieved through an inflation of value and the eventual sale of Debtor through a corporate merger or initial public offering. It would appear that any immediate looting of Debtor would be inconsistent with the alleged motivation of Morgan Keegan and Meyers to inflate the long-term value of Debtor for an IPO, sale, or merger.

Conversely, Meyers and Morgan Keegan assert that they did not create the Accounting Practice but that Sturgill, Debtor's longstanding CEO, or another party did; that the Accounting Practice had been reviewed and certified as GAAP compliant by Debtor's auditor, Grafton, from 2005 to 2009; that the practice was well known and understood by Debtor's management and Board of Directors; and that Meyers and Morgan Keegan had a right to, and did in fact, rely upon the accuracy of Debtor's representation of its financials without their own independent verification. Meyers testified that whenever he raised questions regarding the Accounting Practice to Sturgill, Debtor's CEO (who purported to be a CPA and was also overseeing Debtor's financials at the time), Sturgill was adamant about using the Accounting Practice and indicated that Debtor's auditor had approved of the policy as GAAP compliant. Meyers and Morgan Keegan indicate that they did not have sufficient information or indication that the Accounting Practice was questionable or improper until the July 2008 TS Report. Even after that date, Meyers and Morgan Keegan believed and understood that Debtor's management was making efforts to change the Accounting Practice and reconcile the financial records in a generally acceptable fashion by writing down a significant portion of the company's accounts receivable balance at that time. Further, Meyers and Morgan Keegan assert that their relationship with Debtor was governed by and confined to the terms of their written contractual relationships. Finally, Meyers and Morgan Keegan assert that they were not aware of any looting by or unreasonable payment to the Management Defendants, as alleged by the Trustee. In total, Meyers and Morgan Keegan maintain their actions were consistent with the written contracts, and that they did not conspire, collude, or participate with the Management Defendants in any improper actions.

Prior to the trial, the Trustee's previous counsel indicated to the Court that the Trustee's case was heavily circumstantial and required significant evidence to infer liability.[46] As demonstrated by the record in this proceeding, the Court received 18 days of testimony from 21 witnesses and ultimately admitted nearly 700 exhibits (down from a pretrial total of over 2,000 exhibits) from the parties to establish their respective positions. The Court has been provided a very robust "blow by blow" record of the operations and ultimate collapse of Debtor's business operations as well as the involvement of Meyers and Morgan Keegan with Debtor. Because of the circumstantial nature of this adversary proceeding, much of the evidence presented by the Trustee in support of his causes of action could also be viewed as supporting the defenses presented by Meyers and Morgan Keegan.[47] For the most part, the Court often received testimony presenting two opposing explanations of the events—a veritable "he said, she said"—and was asked to apply the appropriate burdens of proof to determine liability.

Prior to addressing the individual merits of each of the Trustee's remaining causes of action, the Court will first consider Meyers and Morgan Keegan's affirmative defense of *in pari delicto* as Meyers and Morgan Keegan assert that it is determinative of all the Trustee's remaining causes of action.

### *In Pari Delicto*

While the Trustee's causes of action center on the extent of Meyers and Morgan Keegan's knowledge, Meyers and Morgan Keegan's defense conversely focuses on the extent of the knowledge and use of the Accounting Practice by Debtor's management. Specifically, Meyers and

---

[46]     As stated by the Trustee's previous counsel, Clarence Davis, in a pre-trial hearing: "This is . . . what I would call a circumstantial case. . . . [T]here are hundreds of documents that are needed in order to prove that. Maybe even 1,000. . . . The problem you have in this case is . . . what I have found is one thing had to build on another, has to build on another, has to build on another, has to build on another . . . ."

[47]     For example, the Court received identical exhibits from both parties to support each of their respective cases.

Morgan Keegan allege that knowledge of the Accounting Practice, and any impropriety related thereto, were imputed to Debtor through its managing agents, and since the Trustee stands in the shoes of Debtor, his remaining causes of action would be barred by the doctrine of *in pari delicto*.

"*In pari delicto* is an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing." *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital, LLC)*, 716 F.3d 355, 367 (4th Cir. 2013). If the plaintiff bears equal or greater fault in the alleged tortious conduct as the defendant, the defense of *in pari delicto* will bar the plaintiff's claims. *Id.* If the *in pari delicto* defense could have been raised against Debtor before the commencement of the case, the doctrine also applies as a defense to actions brought against Meyers and Morgan Keegan by the Trustee under 11 U.S.C. § 541, since the Trustee stands in the shoes of Debtor. *See id.* (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 358 (3d Cir. 2001) (affirming bankruptcy court's application of *in pari delicto* doctrine to bar a trustee's tort claims against a third party broker used by the debtor to facilitate an alleged Ponzi scheme)). As *in pari delicto* is an affirmative defense, the burden is on Morgan Keegan and Meyers to establish the defense. *See Youmans v. S.C. Dep't of Transp.*, 670 S.E.2d 1, 10 (S.C. Ct. App. 2008) ("The defendant asserting an affirmative defense bears the burden of its proof."); *Nev. Ass'n Servs., Inc. v. Eighth Judicial Dist. Ct.*, 338 P.3d 1250, 1254 (Nev. 2014) (holding that the defendant bears the burden of proving the application of an affirmative defense).

Meyers and Morgan Keegan assert that Debtor had both constructive knowledge and actual knowledge of the Accounting Practice as a result of the knowledge of its agents, Debtor's management and Board members.

**Constructive Knowledge**

A corporation, like Debtor, is a distinct legal entity, which may only act through its agents. 1 W. Fletcher, *Cyclopedia of the Law of Corporations* § 30, p. 30 (Supp. 2012–13); *see also Inter'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)( "[T]he corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact . . . ."). Therefore, a corporation's knowledge stems from its agent's knowledge, which is imputed to the corporation as the law presumes that an agent will disclose all information to its principal. *See Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas*, 34 P.2d 1076, 1077 (Nev. 1934); *In re 1031 Tax Group, LLC*, 420 B.R. 178, 199 (Bankr. S.D.N.Y. 2009).

Generally, a principal has constructive knowledge of an agent's knowledge and actions if the agent learned of that knowledge or took the action within the agent's scope of authority. *See In re Amerco Derivative Litigation*, 252 P.3d 681, 694–95 (Nev. 2011) ("'[T]he general rule [is] that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all the material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority . . . even though the officer or agent does not in fact communicate his knowledge to the corporation.'" (quoting *Strohecker*, 34 P.2d at 1076)); *Crystal Ice Company of Columbia, Inc. v. First Colonial Corp.*, 257 S.E.2d 496, 497 (S.C. 1979) ("It is well established that a principal is affected with constructive knowledge of all material facts of which his agent receives notice while acting within the scope of his authority."). Morgan Keegan alleges that imputation is appropriate in this matter because the creation, implementation, and use of the Accounting Practice and issuance of financial statements

were done by and within the scope of the authority of Debtor's management in their roles as officers and Board members.

A corporate officer or director's scope of authority generally stems from the corporation's bylaws. *See* Nev. Rev. Stat. § 78.130(3) (2015) ("[O]fficers . . . have such powers and duties as may be prescribed by the bylaws or determined by the board of directors.")); S.C. Code. Ann. § 33-31-841 (2016) ("Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties and authority prescribed in a resolution of the board or by direction of an officer authorized by the board to prescribe the duties and authority of other officers.").

In the instance of Debtor, its bylaws are silent as to the explicit authority of Debtor's management to create and implement accounting policies or to issue financial statements. However, Debtor's bylaws provide that the business and affairs of Debtor were to be managed by the Board and gave the Board the right to delegate any specific "powers . . . to any other officer or officers of the corporation." The employee contracts for the company's officers provide that:

> [The officer] shall have the full authority and responsibility prescribed by the Company's Bylaws relating to or otherwise normally attendant to an officer of a corporation holding such position and shall have, subject to the review and approval of the Board of Directors of the Company . . . or any committee thereof and the CEO, general supervision, direction and control of the financial business and affairs of the Company and such other duties commensurate with the Executive's position that may be assigned to him from time to time by or under the authority of the Board.

Without clear direction from the bylaws or employee contracts, the Court will look to the general corporate practice and course of conduct of Debtor and its management to determine if the Management Defendants' actions fell within their scope of authority. Multiple courts have logically held that issuing and approving financial statements and practices are within the corporate management's scope of authority. *See Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951 (N.Y. Ct.

App. 2010) ("When corporate officers carry out the everyday activities central to any company's operations and well-being—such as issuing financial statements—their conduct falls within the scope of their corporate authority."); *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 520 (S.D.N.Y. 2009) (finding that in preparing and certifying financial statements, the officers were engaged in conducting work of the corporation; thus, the acts of those corporate agents who effected the transactions were the responsibility of the corporation); *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) (applying Mass. Law) ("The approval and oversight of [financial] statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's action to the company itself.").[48] This Court agrees that even without express designation in the bylaws or other direction from Debtor's board, the day-to-day activities of a corporation, including implementing accounting procedures and issuing financial statements, would fall to the corporation's management and be within their scope of authority as agents of the corporation.

Without any express designation, the authority to implement accounting policies and issue financial statements would not only appear to be inherent in Debtor's employment of a chief executive officer and chief financial officer but would be the usual impression of anyone dealing with the company.[49] Based on the record, the Court finds that the Management Defendants,

---

[48]    The District Court for the District of Nevada in applying Nevada law, cited favorably the following proposition from *Kirschner v. KPMG LLP*, 938 N.E.2d at 951: "Everyday activities central to any company's operation and well-being such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities, and entering into contracts constituted conduct within the scope of a corporate officer's authority." *See USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1218 (D. Nev. 2011).

[49]    The Trustee argues that because the bylaws and employment contracts were silent as to the authority of Management Defendants, Meyers and Morgan Keegan must establish an apparent agency in regards to the Management Defendants, citing to the requirements under South Carolina law for a party to establish an apparent agency, namely that they relied upon an indicia of authority originated by the principal and such reliance must have effected a change of position by the third party.

However, it is clear from the record that the Management Defendants were agents of Debtor as officers and board members. Debtor's selection and employment of the Management Defendants alone is sufficient indicia of

including Sturgill and Hargrett, had authority, whether actual or apparent, to implement accounting policies and practices and issue financial statements on behalf of Debtor and in fact implemented and maintained the use of the Accounting Practice. Therefore, it appears that Debtor had constructive knowledge of the Accounting Practice and any alleged misstated financial statements.

### Actual Knowledge

In addition to constructive knowledge, Meyers and Morgan Keegan also allege that Debtor, through its officers and directors, had actual knowledge of the Accounting Practice. Specifically, they call the Court's attention to the minutes of the January 2007 meeting of Debtor's Board of Directors and the explanatory notes of Debtor's historic audited financial statements. The minutes of the January 2007 meeting show that the Accounting Practice was known to, specifically discussed by, and expressly approved by Debtor's Board of Directors. Further, Wade Cordell, Van Hoeven, and Hargrett all testified that they knew how Debtor was recording its accounts receivable. All members of Debtor's Board received and reviewed the company's audited financials and were aware of the growth in Debtor's accounts receivable balance. Also, the record shows that Debtor's management actively discussed changing the Accounting Policy throughout 2007 and 2008, including such a change as part of the term sheet for an investment by MKSF. Further, Debtor's historic audited financial statements included an explanatory note outlining that

---

authority from the principal, and it is clear from the record that Meyers and Morgan Keegan relied upon these representations and changed their position as result of this authority. "[T]he principal is bound by the acts of its agent when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption." *R&G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 540 S.E.2d 113, 117 (S.C. Ct. App. 2000). As already discussed, Debtor's management had the authority to implement accounting practices and issue financial statements.

Further, the Trustee asserts that Meyers and Morgan Keegan could not have a reasonable belief that the Management Defendants had the authority to bind Debtor to a perpetration of fraud against Debtor because the Management Defendants' employment contracts provided that they must perform their duties in good faith and for the benefit of Debtor. However, this argument assumes Meyers and Morgan Keegan knew of the alleged impropriety of the Accounting Practice when it was created and used, which, based on the evidence, the Court does not conclude. Therefore, the Court rejects this argument.

the accounts receivable balance includes state mandated fees and that Debtor is "actively collecting

that amount." This note in the audited financial statements described the Accounting Practice.

Further, while the Trustee asserts that issues regarding the Accounting Practice may have

not been known at any one point in time by the entirety of Debtor's Board since it periodically

changed, the general principles of agency law provide that a single agent's knowledge can be

imputed to the company as a whole. *See USACM Liquidating Trust*, 764 F.Supp.2d at 1217

("Under Nevada law, the knowledge of an officer or agent is imputed to the corporation when the

agent obtains the knowledge 'while acting in the course of his employment and within the scope

of his authority, and the corporation is  charged with such knowledge even though the officer or

agent does not in fact communicate his knowledge to the corporation.'" (quoting *Strohecker*, 34

P.2d at 1077)); *Bankers Trust of S.C. v. Bruce*, 323 S.E.2d 523, 532 (S.C. Ct. App. 1984) ("It is

well established that a principal is affected with constructive knowledge of all material facts of

which his agent received notice while acting within the scope of his authority.").

The Court agrees with Meyers and Morgan Keegan that these facts show that members of,

if not the entirety of, Debtor's governing body had actual knowledge of the Accounting Practice

that they received within the scope of their authority, and that this actual knowledge is therefore

imputed to Debtor.

## Adverse Interest Exception

The Trustee also argues that the knowledge of the alleged impropriety of the Accounting

Practice cannot be imputed to Debtor because the Management Defendants' actions were clearly

adverse to Debtor's interest. Both South Carolina and Nevada courts have recognized an exception

to imputation when the agent is acting clearly adverse to the principal, commonly known as the

"adverse interest exception." *See Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 547 (S.C. Ct. App.

2006); *In re Amerco Derivative Litigation*, 252 P.3d at 695. The extent of adversity required to invoke this exception and prevent imputation varies by jurisdiction.

Nevada law requires that the agent's actions must be completely and totally adverse to the corporation and provide no benefit to the corporation. *In re Amerco Derivative Litigation*, 252 P.3d at 695. In other words, the standard under Nevada law requires what is often referred to as "total abandonment." Total abandonment is the approach taken by the majority of jurisdictions that have considered the extent of adversity required under the adverse interest rule.[50]

South Carolina's courts have not defined the level of adversity required to prevent imputation under the exception and have only stated that the "exception applies where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests." *Myatt*, 635 S.E.2d at 547. In the absence of more direction, this Court must predict how the state's highest court would rule on the matter.

In the Court's Order on Meyers and Morgan Keegan's Motion to Dismiss, the Court indicated that "it would be reasonable to predict that the South Carolina Supreme Court would [follow the majority of jurisdictions and] apply a standard that requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception."

---

[50]     *See e.g., Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 325 (1st. Cir. 2008) (applying Massachusetts law); *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 575 (7th Cir. 2004) (applying Illinois law); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (applying New York law); *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (applying Florida law); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768 (4th Cir. 1995) (applying Maryland law); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1311 (M.D. Fla. 2009); *In re Nat'l Century Fin. Enter., Inc. Inv. Litig.*, 604 F. Supp. 2d 1128, 1143 (S.D. Ohio 2009); *Fine v. Sovereign Bank*, 634 F. Supp. 2d 126, 139 (D. Mass. 2008); *Ladd Furniture, Inc. v. Ernst & Young*, No. 2:95-CV-00403, 1998 WL 1093901, at *7 (M.D.N.C. Aug. 27, 1998); *In re Verilink Corp.*, 06-8-566-JAC-11, 2009 WL 4609308 (Bankr. N.D. Ala. Dec. 3, 2009), *aff'd in part, rev'd in part (on other grounds) and remanded*, 457 B.R. 832 (N.D. Ala. 2011); *Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 216 (Iowa 1998); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007); *Kirschner v. KPMG, LLP*, 938 N.E.2d 941, 952 (N.Y. Ct. App. 2010); *James Cape & Sons Co. v. Streu Construction Co.*, 775 N.W.2d 277 (Wis. App. 2009); *MCA Financial Corp. v. Grant Thornton, LLP*, 263 Mich. App. 152, 164, 687 N.W. 2d 850, 857 (App. Ct. 2004); *American Fidelity & Cas. Co. v. Backstrom*, 47 Wash. 2d 77, 82, 287 P.2d 124, 127 (1955); *Goldstein v. Union Nat'l Bank*, 109 Tex. 555, 568, 213 S.W. 584, 591 (1919); *Smith v. Boyd*, 162 Mo. 146, 62 S.W. 439, 443 (1901).

The Court previously considered the Supreme Court of South Carolina's opinion in *Citizens' Bank v. Heyward*, 133 S.E. 709 (S.C. 1925) to find support that South Carolina law would likely apply the total abandonment standard.[51] The Court has no reason to believe that the Supreme Court of South Carolina would not follow Nevada and the majority of jurisdictions and apply the total abandonment standard in regards to the adverse interest exception.

### What is "Totally Adverse" Conduct?

While the Court is convinced that both Nevada and South Carolina courts would rely upon the total abandonment standard when applying the adverse interest exception, the Court must also consider what constitutes "totally adverse" conduct so as to bar imputation of an agent's actions and knowledge to a principal.

In discussing the total abandonment standard, the Supreme Court of Nevada has indicated that such a standard "'avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party.'" *In re Amerco Derivative Litigation*, 252 P.3d at 695 (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d at 952). The Supreme Court of Nevada has emphasized the narrowness of the application of the exception by explaining that "[s]imply because an agent has a conflict of interest or is acting mostly for his own self-interest will not invoke the [adverse interest] exception." *Id.* (citing *In re American Int'l Grp., Inc.*, 965 A.2d. 763, 824 (Del. Ct. Chan. 2009) (applying N.Y. law)). Therefore, while an agent's action may provide a clear personal benefit to the agent, the key inquiry under the total abandonment standard is whether the principal received any benefit, however minor, from the

---

[51]      It does not appear that any South Carolina courts have addressed the extent of adversity required to establish the adverse interest exception since the Court's entry of the Order on Meyers and Morgan Keegan's Motion to Dismiss.

agent's conduct. *Id.* at 696 (in addressing the total abandonment standard, noting that the agent's actions clearly benefited themselves, but finding the actions were not adverse because the corporation was not completely harmed by the agent's actions and the agents did not act solely for their own benefit). It appears Nevada law follows a similar approach taken by New York courts.

While South Carolina courts have not defined the degree of adversity required under the total abandonment standard, this Court has no reason to believe that South Carolina state courts would follow a different approach.

In reviewing the case law from various jurisdictions that apply the total abandonment standard, it appears courts look to both the benefit and the harm that the principal incurred as a result of the agent's actions to determine if the principal benefited at all from the actions or was completely harmed by the agent's actions. Determining the harms and benefits to a corporate principal resulting from an agent's action requires a fact-intensive inquiry that must be conducted on a case-by-case basis.

### Actions that Benefit the Corporation

In the present matter, the Trustee's causes of action raise claims against Morgan Keegan and Meyers, who, unlike a corporation's auditor, did not have a duty to audit Debtor's financials, and seek damages resulting from an alleged fraud by the Management Defendants.

Even in actions involving auditor liability, courts have emphasized that the critical distinction for imputation of the officer's and director's alleged accounting fraud to the company is whether the fraud is "on behalf of" or "against" the company. As stated by one court:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries, after the fraud is unmasked and the corporation is sued—that is a

> question of damages, and is not before us. But the primary costs of a fraud on the
> corporation's behalf are borne not by the stockholders but by outsiders to the
> corporation, and the stockholders should not be allowed to escape all responsibility
> for such a fraud, as they are trying to do in this case.

*Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982). In other words, if an

officer's or director's alleged fraud was "on behalf" of the company, it would be imputed to the

company and *in pari delicto* would apply; whereas, if the fraud was "against" the company, the

alleged fraud would not be imputed to the company. In many jurisdictions that apply the total

abandonment standard, it appears those courts utilize the total abandonment standard to determine

if the alleged fraud is "against" the company so as to bar imputation. *See, e.g., Kirschner v. KPMG*

*LLP*, 938 N.E.2d at 952–53 (noting "[t]he crucial distinction . . . between conduct that defrauds

the corporation and conduct that defrauds others for the corporation's benefit" and noting that the

total abandonment standard would apply to determine if the adverse interest exception is applicable

in the matter). Therefore, the Court will take a similar approach and apply the total abandonment

standard to determine if the Management Defendant's alleged fraud was "on behalf of" or

"against" Debtor.

### Timing of Corporate Benefit

Generally, courts look to the time of the agent's action to determine if those actions had a

benefit to the corporate principal rather than relying on hindsight. *See, e.g., Rogers v. McDorman*,

521 F.3d 381, 395 (5th Cir. 2008) ("It cannot be . . . that [the corporate directors and employees]

were acting adversely simply because the scheme eventually hurt [the corporation]."); *Robinson*

*v. GEO Licensing Co., LLC*, 173 F.Supp.2d 419, 424 (D. Md. 2001) (explaining that adversity

must be determined at the time the knowledge is acquired).

As such, courts generally do not consider the consequences from the unmasking of the

alleged fraud, such as the fact that the alleged fraud contributed to the insolvency or bankruptcy

of the corporation, in determining if the agent's actions benefitted the corporate principal. *See, e.g., Beck*, 144 F.3d at 736 (applying Fla. Law) ("[T]he knowledge of a corporate officer whose fraud or misbehavior ultimately brings short-term gain to the corporation, or merely injures a third party, is imputed to the corporation, even if the officer's misbehavior ultimately causes the corporation's insolvency."); *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 242 (S.D.N.Y. 1987) ("[C]ourts have identified '[t]he relevant issue [as being the] short term benefit or detriment to the corporation, not any detriment…resulting from the unmasking of the fraud.'" (quoting *Security America Corp. v. Schacht*, No. 82-c-2132 (N.D. Ill. 1983))); *CEPA Consulting Ltd. v. King Main Hurdman (In re Wedtech)*, 138 B.R. 5, 9 (S.D.N.Y. 1992) (same); *Kirschner v. KPMG LLP*, 938 N.E.2d at 953 ("[A]ny harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies"); *In re Maui Indus. Loan & Fin. Co., Inc.*, 88 F. Supp. 3d 1175, 1186 (D. Haw. 2015) (applying Haw. law) (same); *In re Pitt Penn Holding Co.*, 484 B.R. 25, 39–40 (Bankr. D. Del. 2012) (applying N.Y. law) (same); *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d at 523 (applying N.C. law) ("[P]laintiffs' proposed focus on the end result for purposes of determining whether the adverse interest exception to the rule of imputation underlying *in pari delicto* defense is misdirected.");[52] *Restatement (Third) of Agency* § 5.04 cmt. c ("[T]he fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely.").

Therefore, even if an agent's actions may be detrimental to the corporation in the long-term, most courts find there is no total abandonment and imputation applies as long as the agent's actions provided even a short-term benefit to the corporation. *See, e.g., Baena*, 453 F.3d at 7

---

[52]     While the Court of Appeals for the Second Circuit vacated a significant portion of the District Court's order in *In re Parmalat Securities Litigation*, the Court of Appeals affirmed the District Court's findings on the adverse interest rule and the application of *in pari delicto* under North Carolina law. *See Parmalat Cap. Fin. Ltd. v. Bank of America Grp.*, 412 F. App'x 325 (2d Cir. 2011).

(applying Mass. law) ("A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company, but, like price fixing, it profits the company in the first instance."); *Beck*, 144 F.3d at 736 (holding under Florida law that a corporate officer's fraud that provides a short-term gain to the corporation is imputed to the corporation); *Maui Indus. Loan & Fin. Co.*, 88 F. Supp.3d at 1186 (finding imputation to the corporation was appropriate when agent's actions provided short-term benefit to the corporation); *In re Parmalat Sec. Litig.*, 659 F.Supp.2d at 522–23 (rejecting the plaintiff's arguments that the total abandonment standard should look only to the long term effects of the agent's actions on the corporation); *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 303 (Del. Ct. Chan. 2015) (applying Del. law) ("The adverse interest exception, if applied correctly, should cover only the 'unusual' case in which the allegations support a reasonable inference of 'the type of total abandonment of the corporation's interests' that is characteristic of, for example, outright stealing from the corporation. Because most instances of fraud or illegal misconduct by corporate actors confer at least some benefit on the corporation, the adverse interest exception may not apply even when the 'benefit' enjoyed by the corporation is outweighed by the long-term damage that is done when the agent's mischief comes to light." (quoting *In re American Int'l Grp. Inc. Consol. Derivative Litigation*, 976 A.2d 872, 891 (Del Ct. Chan. 2009))).

Courts have identified examples of benefits to a corporation that fall short of the total abandonment standard and therefore allow imputation to the corporate principal:

- **Growing and Expanding the Company's Business:** Courts have found that a corporate agent did not totally abandon the interests of the corporation when the agent's action led to the company being able to grow and expand its business.

  - As a result of the corporate officers' misrepresenting the corporation's true financial condition, the corporation was able to raise $14 billion in capital that was

used to expand the corporation's production facilities, workforce, product line, and international presence. *In re Parmalat Sec. Litig.*, 659 F.Supp.2d at 520–25.

o   The involvement of Bank's CEO and employees in a check-kiting scheme, which generated, developed, and grew the Bank's business, was a benefit to the Bank to permit imputation of the CEO's and employees' actions to the Bank for *in pari delicto* purposes. *Rogers*, 521 F.3d at 394–85.

- **Paying Down Other Corporate Liabilities:** Courts have also found that when an agent's action results in funds which are then used to pay corporate liabilities, there was a short-term benefit to the corporation such that the agent did not totally abandon the interest of the corporation.

   o   A corporation benefited from an agent's Ponzi Scheme when the proceeds from that scheme were used to pay down other corporate liabilities. *In re Liberty State Benefits of Del., Inc.*, 541 B.R. 219, 236 (Bankr. D. Del. 2015).

- **Benefits Resulting from an Inflated Corporate Value:** Courts have also found that a corporation benefitted when the corporation took advantage of certain opportunities that would have otherwise not been available but for the corporation's inflated value resulting from the agent's actions.

   o   A court has found that a corporation, whose value was overinflated based on an agent's action, benefited when it was able to acquire another company for a lower premium due to its own inflated value of its stock. *In re American Int'l Grp., Inc.*, 965 A.2d at 827.

- **Raising Capital for the Company's Use:** Courts have also found that an agent's actions which caused the company to raise capital for the company's use is a benefit to bar the application of the adverse interest exception.

   o   A fraud by a company's top management to overstate earnings in order to facilitate stock sales or acquisition, which did not benefit the company in the long-term, was found to still "profit the company" such that the adverse interest exception did not apply. *Baena*, 453 F.3d at 7.

   o   The proceeds raised as a result of a partner's Ponzi scheme was a short-term benefit to a partnership so as to impute the scheme to the partnership and bar the application of the adverse interest exception. *Maui Indus. Loan & Fin. Co.*, 88 F. Supp.3d at 1186.

- o A complaint which alleges that a CEO's misstatement of financial statements that allowed the corporation "to thrive, attract investors, or raise funds" would be subject to an *in pari delicto* defense. *ShengdaTech Liquidating Trust v. Hansen, Barnett & Maxwell, P.C. (In re ShengdaTech, Inc.)*, 519 B.R. 292, 300 (D. Nev. 2014).

- o The corporation's management who utilized misrepresentations to obtain investments from the public created a benefit to the corporation (not implicating the adverse interest exception) because a portion of the $22 million raised from the investors was utilized by the corporation, including paying promised returns to certain investors. *Cobalt Multifamily Invs I, LLC v. Shapiro*, C/A No. 06-Civ.-6468, slip op. 2008 WL 833237 at *4 (S.D.N.Y. Mar. 28, 2008) (applying N.Y. law).

- o Accounting frauds by a corporation's management, which hid the corporation's true financial situation and led to the corporation attracting investors provided short-term benefits to the corporation so as to prevent the application of the adverse interest exception. *In re American Int'l Grp., Inc.*, 965 A.2d at 827.

- **Extending the Company's Life:** Courts have also found that an agent's actions which help the corporation extend its life is a benefit to bar the application of the adverse interest exception.

  - o "So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—[the total abandonment standard] test is not met." *Kirschner v. KPMG LLP*, 938 N.E.2d at 953.

  - o A corporation's managers were not acting adversely to the corporation when they concealed the corporation's financial issues in order to obtain funding because the funding benefited the corporation and the managers "were acting to enable [the corporation] to survive through new sources of shareholder capital or debt financing." *Brickley for Crypto Metrics, Inc. Creditors' Trust v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 842 (W.D. Tex. 2017) (applying N.Y. law).

Courts applying New York law have rejected the proposition that an agent's incurring of debt for an insolvent corporation is automatically adverse to the corporation. As stated by the District Court for the Southern District of New York in *Kirschner v. Grant Thornton, LLP*:

> It is a basic principle of corporate finance that extending credit to a distressed entity in itself does the entity no harm. Cash infusions expand the debt of a corporation in precise proportion to the expansion of assets in the form of new cash contributed by the underwriters and investors. Accordingly, with respect to injury to the corporate body, as distinguished from any injury thereby to creditors or prospective shareholders, the extension of credit is—at worst—neutral.

90

That is the case even where, as here, credit is extended to an entity that is, as the Trustee alleges, "insolvent or in the zone of insolvency." Creating an illusion of solvency is not necessarily, in itself, a corporate benefit sufficient to rebut the adverse-interest exception, but neither does it harm the corporation. While a "corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it," any *harm* done to the corporation is not done by the extension of credit itself but by any subsequent looting or embezzlement. That is, where insiders prop up moribund entities in order to misappropriate corporate assets for personal gain, such plunder is adverse and cannot thereby be imputed to the corporation.

*Kirschner v. Grant Thornton LLP*, C/A No. 07-Civ.-11604-GEL, slip op. 2009 WL 1286326, at

*8 (S.D.N.Y. Apr. 14, 2009), *aff'd sub nom. Kirschner v. KPMG LLP*, 626 F.3d 673 (2d Cir.

2010) (quoting *Bankruptcy Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d

432, 453 (2d Cir. 2008)). The Court finds the reasoning of *Grant Thornton* to be convincing.[53]

---

[53]        The Trustee cites to the Court of Appeals for the Seventh Circuit's opinion in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) for the proposition that no benefit is conferred to a corporation when a corporate agent's actions continue a business past the point of insolvency. In *Schacht*, the defendants alleged that the plaintiff should be estopped from bringing claims because the corporate agent's fraudulent acts benefited the company by continuing the corporate existence of the company past the point of insolvency to the detriment of outside creditors and policyholders. *Id.* at 1348.  As put by the Seventh Circuit, "the fact that [the company's] existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial insolvency of [the company] benefitted only [the company's] managers and other alleged conspirators, not the corporation." *Id.*

In *Rogers v. McDorman*, 521 F.3d 381, 395 (5th Cir. 2008), the Court of Appeals for the Fifth Circuit upheld a lower court's decision to apply the adverse interest exception, distinguishing *Schacht* in that matter because the agents did not loot the corporate principal, but through the agent's actions, attempted to grow and develop the corporate principal's business. *See also Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. Dist. Ct. App. 1992) (distinguishing *Schacht* in an auditor liability case because "the fraud committed by the managing director was not intended to loot the corporation" but was a fraud on behalf of the corporation when the managing director misrepresented the value of the corporation that allegedly artificially prolonged the corporation's life").

Further, the Court notes that the circumstances of *Schacht* appear to be like those described as adverse by the court in *Grant Thornton*— that is the propping up of an insolvent company to serve management's central purpose of looting the company. In *Schacht*, the Seventh Circuit emphasized the fact that by prolonging the artificial insolvency of the company,  the company's management was also systematically looting the company "of its most profitable and least risky business and more than $3,000,000 in income—all actions which aggravated [the company's] insolvency" and noted "the real damage . . . inflicted by the diminution of [the company's] assets and income." *Schacht*, 711 F.2d at 1347–48.

## Subjective Motivation of Agents

Courts also disagree as to whether an agent's subjective motivation should factor into the determination of whether the agent totally abandoned its interest to the corporate principal. Most courts hold that the subjective motivation of the agent is not relevant to the determination of whether the agent totally abandoned its interest to the corporate principal, applying the objective test of determining the beneficial nature of the agent's actions. *See In re Parmalat Sec. Litig.*, 659 F. Supp. 2d at 524 ("Plaintiffs are incorrect also in contending that the Court must look primarily to the intent of the agents while ignoring or discounting evidence that the agents acted for the benefit of the company."); *Kirschner v. KPMG LLP*, 938 N.E. 2d at 954–55 (suggesting the adverse interest exception would become a "dead letter" if the exception depended upon the subjective intent of the agent as almost all corporate fraud cases would result in a bar to imputation under the exception). Nonetheless, other courts have considered the subjective motivation of the agents in determining whether an agent acted adverse to its principal. *See MCA Fin. Corp. v. Grant Thornton, LLP*, 687 N.W.2d 850, 858 (Mich. Ct. App. 2004) ("The 'adverse interest' exception will not apply if the wrongdoers' motivation was not entirely for personal gain at the expense of the corporations, but was, even in part, a misguided belief that their wrongdoing would benefit the corporations."); *In re CBI Holding Co.,* 529 F.3d at 451 ("[I]t is important to remember that the 'total abandonment' standard looks principally to the intent of the managers engaged in misconduct.").[54] In addition, the *Restatement (Third) of Agency* suggests that the subjective intent of the agent may be relevant in determining if the agent's knowledge and actions should be imputed

---

[54]       This holding of *In re CBI Holding Co.* have been called into doubt as a result of the Court of Appeals of New York's holdings in *Kirschner v. KPMG, LLP*, 938 N.E.2d 941 (N.Y. 2010). *See Kirschner v. KPMG LLP*, 626 F.3d 673, 678 (2d Cir. 2010) ("To whatever extent language in *CBI* might be thought to misstate New York law concerning the adverse interest exception, such language must henceforth be understood in light of the authoritative views expressed by the Court of Appeals.").

to the principal. *See Restatement (Third) of Agency* § 5.04 (stating that an agents knowledge "is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, *intending* to act solely for the agent's own purposes or those of another person" (emphasis added)).

With this general framework, the Court will apply the facts of the present proceeding to determine if the Management Defendants totally abandoned the interests of the Debtor.

### Management Defendants' Actions

The record in this proceeding is replete with evidence that during the time that the Accounting Practice was in place, Management Defendants' constant efforts and goal were to raise capital for Debtor to grow the company and increase its value for all constituents and stockholders through an IPO or sale of the company.[55] Their actions resulted in the influx of millions of dollars to Debtor. For example, Debtor filed several filings with the SEC regarding its capital raises based on the Management Defendants' personal efforts, including reporting $2,614,180 raised in 2007, $10,222,500 in 2008, and another $1,187,500 in 2009. The vast majority of the funds raised by Management Defendants' efforts were expended to benefit Debtor, allowing it to grow and operate.

### Payment of Debtor's Expenses and Other Liabilities

It clear from the record that capital raised when the Accounting Practice was in place went to the payment of Debtor's legitimate expenses. For example, in January 2008, Wade Cordell reported in emails to other members of Debtor's management that funds received from a sale of Debtor's stock would be used to decrease the company's bills by nearly $200,000, and pay their monthly bill to Debtor's Outside Securities Counsel and all of the company's past due payroll and

---

[55]     Many of Debtor's shareholders were friends and family members of the Management Defendants, and local investors recruited due to close, personal acquaintance with the Management Defendants.

taxes. The evidence also shows that the capital raised was spent on professional fees and infrastructure. The Court also notes that the stated purpose of the November 2006 PPM was to raise capital to allow Debtor to buy back potentially improperly issued shares and territory licenses. Not only were the proceeds from the November 2006 PPM used for that purpose, but the capital raised also went towards the purchase of new technology, the hiring of new personnel, and the payment of expenses to expand Debtor's business to new areas. Further, Hargrett, during his deposition testimony indicated that the capital raised during his service as Debtor's CFO went to fund the growth and operations of Debtor. The payment of these operating expenses and liabilities benefited Debtor.

### Supporting Debtor's Growth

The capital raised when the Accounting Practice was in place also went to fund the significant growth that Debtor experienced from 2006 through 2009. The Trustee does not dispute that "[a] successful infusion of capital was critical for [Debtor] to realize its full growth potential." Beginning in 2006, Debtor made significant expenditures to reach this growth potential, including $2 million in expenses relating to the startup of the Barbourville check processing facility and $500,000 in legal fees for advice relating to Debtor's direct fundraising efforts.

As a result of the Management Defendants' actions, Debtor grew its customer base significantly. As the Trustee indicated, "business was booming" for Debtor in 2008. For example, between 2006 to 2008, the number of Debtor's school customers increased five-fold, from around 1,000 schools to 5,000 schools. By 2008, Debtor was processing 30,000 checks per month.  As part of this growth, it was necessary for Debtor to increase the number of employees it employed, and at one point, the Barbourville facility employed at least 60 employees (more than doubling its size from 27 employees). The Management Defendants' efforts culminated in the landing by

94

Debtor of two "dream" accounts, Wachovia Bank and U.S. Bank. The costs to Debtor to on-board

both Wachovia Bank and U.S. Bank were $350,000, requiring a capital influx to accomplish.

The evidence clearly indicates that the capital raised by Management Defendants during

the time the Accounting Practice was in place permitted the expansion of Debtor's operations and

its customer base, and therefore, benefited Debtor.[56]

### Lack of Sufficient Evidence of Embezzlement or Looting & Nexus with Accounting Practice and Morgan Keegan

Throughout this proceeding, the Trustee has alleged that Management Defendants utilized

the Accounting Practice in a scheme to loot Debtor to personally benefit themselves at the

detriment of Debtor.[57] However, at trial, the evidence the Trustee presented of the existence of this

alleged looting and any relationship with the Accounting Practice was weak and unconvincing.

The Trustee first points to Debtor's payment of excessive and unreasonable salaries, bonuses and

personal expenses to the Management Defendants as well as Debtor's payment of excessive and

unreasonable rent to Management Defendants for property leased by Debtor. However, the Trustee

presented no comparative evidence of the salaries and bonuses of management for similarly sized

or situated companies or the monthly rent amounts for similar properties in order to show that

Debtor's payments were excessive.[58] Based on the evidence presented, the Court cannot conclude

---

[56]   The Trustee, relying on *Schacht v. Brown*, asserts that the actions of the Management Defendants, including implementing the Accounting Practice, provided no benefit to Debtor because it artificially prolonged Debtor's insolvency. However, when the Accounting Practice was implemented, it was not a situation where Debtor's operations were on the brink of collapse and that, but for the capital raised, Debtor would not have been able to continue its operations. Rather, when the Accounting Practice was implemented, capital was being raised and used to assist Debtor with expanding its business, which in turn resulted in Debtor experiencing unprecedented growth. Therefore, the Court is not convinced by the Trustee's arguments or evidence that the Management Defendants' actions provide no benefit to Debtor.

[57]   The Court notes that the Trustee dedicated only a very minor portion of his proposed order in this proceeding (3 of 100 pages) to address the adverse interest exception, which predominately focused on the Trustee's assertions that South Carolina would not apply the total abandonment standard.

[58]   While the Trustee notes that many of the bonuses received by Management Defendants were not authorized by Debtor's Board, the Court notes that the Management Defendants constituted the majority of the Board and that such bonuses would have likely been formally approved regardless.

that these payments were unreasonable or that they were veiled attempts by Management

Defendants to siphon funds from Debtor. It is not unexpected that the management of a growing

company with considerable revenues would be: (1) paid a salary for their work or (2) receive

bonuses, especially when their efforts included successful and significant fund raising and rapid

expansion of the company's customer base and its business operations.[59]   While there may be

circumstances where the salaries and bonuses of agents are so clearly exorbitant and excessive that

they provide strong evidence that the agent was systematically utilizing a fraudulent scheme for

the sole purpose of stealing from the principal (and therefore acting adverse to and totally

abandoning the interests of the corporate principal), the present case is not that situation.

Second, the Trustee points to evidence that on two occasions Wade and Brad Cordell were

paid directly by investors for shares issued by Debtor. In the first instance, in November 2006,

Wade Cordell accepted $40,000 from Scott Matula in exchange for 32,000 shares of Debtor's stock

issued directly by Debtor. The second instance was alleged by Al Berry, who stated that he paid

Brad Cordell $50,000 and Cordell LLC another $50,000 in exchange for shares issued directly by

Debtor.[60] Accepting the testimony as true, these instances appear to be unrelated to the utilization

---

[59]     In addition, considering the company had a long-standing policy of paying commissions to any officer, director or third party who precipitated the sale of Debtor's stock to investors, it can be inferred that these bonuses resulted from the company-wide policy.

[60]     It appears the stock that Mr. Berry purchased was Debtor's stock originally held by Cordell LLC. It appears Cordell LLC sold 1,461,000 shares of Debtor's stock it held from August 28, 2007 to November 12, 2008; however, the record does not indicate the amount that Cordell LLC received for the sales of these stock. The Trustee alleged that Cordell LLC misappropriated these shares during the merger of FARS, FARS Marketing and Debtor in 2004, and relies on the general Confessions of Judgment executed by Wade Cordell, Brad Cordell and Cordell LLC as evidence that they intentionally misappropriated the Cordell LLC shares. However, as Confessions of Judgments are entered for various reasons and are not an admission to all the facts alleged against the defendant unless specifically asserted, the Court does not find the Confessions of Judgment to be probative that Wade Cordell and Brad Cordell knowingly used the shares of Cordell LLC to loot Debtor. However, even considering these sold shares in the determination of the benefit received by Debtor through the Accounting Practice, the Court would still hold that the evidence does not convince the Court that the Management Defendants systematically looted the company or totally abandoned the interests of Debtor.

of the Accounting Practice.[61] In fact, Danielson, who conducted a "look-see" of Debtor after the ousters, testified that such incidents were isolated and that Caughman, who conducted a thorough review of Debtor, only identified 10-20 stock transactions that created questions for further investigation out of the hundreds of stock transactions completed by Debtor.

Further, even accepting the Trustee's arguments, the sums and circumstances at issue do not indicate or amount to an overarching scheme of looting and would not be significant in light of the total amount of capital raised by the Management Defendants—the same capital that clearly benefited and sustained Debtor through the payment of expenses and the expansion of its business and customer base.[62] The issue before the Court under the total abandonment standard for imputation is not whether Management Defendants received a personal benefit from their actions, but whether Debtor also received a benefit, which it is apparent from the record that it did. *See Giddens v. D.H. Blair & Co., Inc. (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794, 801 (Bankr. S.D.N.Y. 2002) ("[T]he [adverse] exception is inapplicable when the agent acts both for himself and for the principal though the primary motivation for the acts is inimical to the principal.").

Finally, the Trustee asserts, based on *Sonoco Products Co. v. Guven*, C/A No. 4:12-cv-00790-BHH, slip op. 2015 WL 127990 (D.S.C. Jan 8, 2015), that the payment of salaries to the Management Defendants during a period in which they were disloyal constitutes total adversity to Debtor. While the Court is not fully convinced that *Guven* stands for the proposition as alleged by the Trustee,[63] the evidence presented does not sufficiently establish that the Management

---

[61]    Overall, the Court is not convinced that all of the Management Defendants implemented the Accounting Practice for the purpose of allowing the Cordells to obtain personal benefits.

[62]    The Trustee in his proposed order indicates that Debtor raised several *millions* of dollars in capital but alleges that the Management Defendants "loot[ed] *thousands* of dollars from [Debtor] to fund their lavish lifestyles." (emphasis added).

[63]    *Guven* addressed a breach of loyalty claim, noting that a corporation is entitled under that cause of action to recover compensation paid to a disloyal employee during the period that the employee engaged in disloyal acts. *Guven*, 2015 WL 127990, at * 10. The facts of *Guven* were distinguishable from the present matter as the employee formed

Defendants were disloyal to Debtor when the Accounting Practice was in place. Based on the evidence, the Court believes that the Management Defendants' actions, including utilizing the Accounting Practice, were ultimately intended to be used in furtherance of the interest of Debtor. In fact, the evidence indicates that the Management Defendants were driven and worked tirelessly to grow Debtor and sustain its business. The vast majority of capital raised by Management Defendants during that period went to Debtor for its expenses and liabilities and resulted in significant growth of Debtor's business. The Court also notes that an eventual sale of Debtor as hoped for by the Management Defendants would have benefited all shareholders alike.

The evidence also indicates examples that contradict the Trustee's theory that the Management Defendants primarily intended to use Debtor as a vehicle for theft. For example, the record shows that Management Defendants loaned personal funds to Debtor in times of need and enacted cost cutting measures to assist Debtor in financially difficult times. On at least one occasion, Management Defendants considered suspending payments to officers and managing employees in a cost-cutting effort. Debtor was a real business with real customers and provided desired services to those customers. This is not a circumstance where the business is merely a front or sham to centrally serve the purposes of the company's insiders. The significant and continual efforts of Management Defendants to attract and retain customers, including major banks, and to raise capital evidence Management Defendants' genuine belief in the likelihood of Debtor's success. These are not actions indicative of an agent placing his own interests above his principal's. While Management Defendants, like all of Debtor's shareholders, would have benefited from the

---

a competing company using his employer's protected information while employed by the corporation. *Id.* at *11. Issues of imputation and the adverse interest exception were not present or addressed in *Guven*.

success of Debtor's business, that secondary benefit does not indicate that Management Defendants were acting against Debtor.

The evidence is clear that Management Defendants trusted Debtor's business model and that they steadily believed they were just a few steps away from reaching a level of stable growth or attracting a buyer.[64]  The Management Defendants' actions, including the maintenance of the Accounting Practice, were not fueled by self-interest to the detriment of Debtor, but were aimed towards helping Debtor's business grow and succeed. Unfortunately, as is the case for many companies that appear before this Court which have a great or timely business idea, the challenge of managing rapid growth and sustaining profitable operations is often difficult and success frequently depends on changing markets, the costs and availability of capital, proper management decisions, and professional advice, amongst other factors. In this case, the hope of permanent success did not materialize in time, and the reality was that rapid growth caused constant capital needs, resulting in an increase of fixed costs and lower profit margins for Debtor. However, the fact that Management Defendants' actions did not result in the hoped-for success for Debtor is not indicative that Management Defendants totally abandoned Debtor's interests. *See Restatement (Third) of Agency* § 5.04 cmt. c ("[T]he fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely.").

For the foregoing reasons, it is apparent to the Court that Management Defendants' actions provided benefit to Debtor. As a result, the Court finds the Management Defendants did not totally abandon the interests of Debtor through their actions, including the use of the Accounting Practice. Therefore, the Court finds, based on the evidence presented, that the adverse interest exception

---

[64]     While the subjective motivation of an agent is not generally relevant in determining if the agent totally abandoned the interests of the corporate principal, it appears to the Court that the actions of the Management Defendants were taken because of their belief that it would help Debtor succeed and grow and not solely for their own personal gain.

does not apply in this matter to prevent imputation of the Management Defendants' knowledge and actions to Debtor. [65]

### Alleged Collusion Exception to Imputation

The Trustee also alleges that the knowledge and use of the Accounting Practice should not be imputed to Debtor because Meyers and Morgan Keegan colluded with the Management Defendants to defraud Debtor. To succeed on this theory, the Trustee argues that South Carolina and Nevada courts would adopt a "collusion exception" to imputation, which, in effect, would prohibit a third party from asserting an agent's knowledge is imputed to the principal when the agent and third party secretly collude to commit a wrong against the agent. Therefore, the Trustee alleges that without imputation to Debtor due to an alleged collusion, *in pari delicto* is unavailable as a defense to Meyers and Morgan Keegan.

In support of this argument, the Trustee cites to the Supreme Court of South Carolina's holdings in *Crystal Ice Company of Columbia, Inc. v. First Colonial Corp.*, 257 S.E.2d 496 (1979). In *Crystal Ice*, the court indicated that a "well-recognized exception to this general rule [of imputation] exists in situations where the agent is acting fraudulently against his principal or for any other reason has an interest in concealing his acquired knowledge from his principal." *Id.* at 498. The Supreme Court of South Carolina further held that "an agent's fraud [against the principal] cannot alter the effect of his knowledge to his principal with respect to third persons who had no connection with the fraud." *Id.* The Trustee argues that the inverse of the holdings of

---

[65]     Agency law provides a further exception, known as the sole actor exception, to permit imputation of knowledge to a principal even when the adverse interest exception applies. *See In re Derivium Capital, LLC*, 716 F.3d at 368. Under the sole actor exception, imputation will occur regardless of whether the agent acts adversely to the interest of the principal if the agent exercises so much control over the principal that the agent could be considered one in the same as the principal. *Id.* Significant argument and evidence were presented from the parties as to whether the Management Defendants were the sole actors of Debtor; however, as the Court finds that the adverse interest exception is not applicable in this matter and that the knowledge of the Accounting Practice is imputed to Debtor, it is not necessary for the Court to consider at this time whether the Management Defendants were the sole actors of Debtor.

*Crystal Ice* is also applicable to bar imputation, namely that there will be no imputation if the third party seeking to impute the agent's knowledge and actions to the principal has colluded with the agent to defraud the agent's principal.

The Trustee also suggests that both Nevada and South Carolina courts would follow the public policy considerations adopted by the Supreme Court of Pennsylvania's holdings in *Official Committee of Unsecured Creditor of Allegheny Health Education & Research Foundation v. PriceWaterhouseCoopers, LLP (Allegheny)*, 989 A.2d 313 (Pa. 2010). In *Allegheny*, the Supreme Court of Pennsylvania addressed certified questions regarding the application of imputation based on the *in pari delicto* defense in an *auditor-liability* case brought by a bankruptcy committee. *Id.* at 314–15. The *Allegheny* court, after recognizing a collusion exception to imputation, categorically "declined to consider that a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company" and therefore, declined to review the adverse interest exception to imputation in the matter to determine if the management's actions provided a benefit to the company under the total abandonment standard. *Id.* at 337–38. Instead, the Supreme Court of Pennsylvania allows imputation only in circumstances where the auditor has acted materially in good faith. *Id.* at 338–39.

In the nine years since it was issued, it appears that no other jurisdiction has adopted the broader approach of *Allegheny*. Both the Court of Appeals of New York and Delaware's Court of Chancery have questioned the policy considerations of *Allegheny*. *See Stewart*, 112 A.3d. at 317-18; *Kirschner v. KPMG LLP*, 938 N.E.2d at 958. The Court of Appeals of New York noted that the equities of such a rule are not as apparent as indicated in *Allegheny*, questioning, "why . . . the interests of innocent stakeholders of corporate fraudsters trump those of innocent stakeholders of the outside professionals who are the defendants in these cases" and that such holdings:

may be viewed as creating a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents. And, of course, the corporation's agents would almost invariably play the dominant role in the fraud and therefore would be more culpable than the outside professional's agents who allegedly aided and abetted the insiders or did not detect the fraud at all or soon enough.

*Kirschner v. KPMG LLP*, 938 N.E.2d at 958. The Delaware Court of Chancery also noted that the policy considerations relied upon in *Allegheny* are misguided, as the approach would provide limited deterrence considering "the numerous government and non-governmental bodies regulating and otherwise overseeing the audit industry." *Stewart*, 112 A.3d at 317.

Similarly, while a Nevada state court has not yet addressed the arguments raised in *Allegheny*, the United States District Court for the District of Nevada, applying Nevada law, noted that "the Pennsylvania Supreme Court's requirement [in *Allegheny*] that the auditor act in good faith creates a double standard. [The liquidating corporation's] innocent stakeholders would be able to avoid the bad faith conduct of [its] agents imputed to [it], but [the Auditing Firm's] innocent stakeholders would have no such opportunity." *USACM Liquidating Trust*, 764 F.Supp.2d at 1228 n. 3 *aff'd*, 754 F.3d 645 (9th Cir. 2014).

The Court first notes that the present matter is distinguishable from *Allegheny* as Debtor did not retain Meyers and Morgan Keegan to serve as its accountants or auditors. Further, the Court finds the reasoning of the Court of Appeals of New York and Delaware Court of Chancery to be compelling and relevant to the present matter.[66] For these reasons, the Court is not convinced that Nevada or South Carolina state courts would follow the approach taken in *Allegheny*.

---

[66]    For example, applying an approach similar to *Allegheny* in this matter would provide minimal additional deterrence as there are several regulatory authorities that monitor and oversee financial professionals like Meyers and Morgan Keegan, including the Financial Industry Regulatory Authority, the Securities and Exchange Commission, the South Carolina Attorney General, as well as enforcement of matters through investor lawsuits under the federal and state securities laws. Also, similar concerns of a "double standard" are present in this matter.

Ultimately, in the present matter, to the extent South Carolina or Nevada recognizes a collusion exception, the Court finds, based on the evidence presented, that Meyers and Morgan Keegan did not participate in secretive, collusive conduct with Management Defendants in connection with the Accounting Practice to defraud or otherwise act against Debtor.[67]

### Meyers and Morgan Keegan's Knowledge of the Accounting Practice

The Trustee in his proposed order states "[t]he heart of this case is [Debtor's] recognition of AR and revenues, in violation of GAAP and the [M]anagement [D]efendants' scheme and actions with [Meyers and Morgan Keegan] designed to bring [Debtor] to its exit without the hampering of full disclosure of the material facts [Meyers and Morgan Keegan] knew or were recklessly indifferent in trying to avoid." Central to determining if Meyers and Morgan Keegan secretly and fraudulently colluded with the Management Defendants using the Accounting Practice is the extent of Meyers and Morgan Keegan's knowledge of its impropriety. While Meyers, personally and as the representative of Morgan Keegan, does not dispute that he was aware of the Accounting Practice, the Defendants strongly deny that they created it or knew of any possible issues with the practice until the release of the TS Report, but instead relied upon the repeated statements and assurances of CEO Sturgill (a purported CPA), CFO Hargrett (a CPA), and Debtor's auditor, Grafton (also a CPA) that the policy was GAAP compliant. Contrary to the Trustee's arguments, the evidence showed that Meyers raised questions about the accounts

---

[67]     To the extent it is recognized, it appears the burden to demonstrate the alleged collusion between Meyers and Morgan Keegan and Management Defendants to defraud the Debtor is on the Trustee. *See Pilot Life Ins. Co. v. Pulliam Motor Co.*, 229 F.2d 912, 917–18 (4th Cir. 1956) (applying S.C. law) (in the context of rescinding an insurance policy, finding the knowledge of the insurer's medical examiner was imputed to the insurer because there was no evidence of a fraud or collusion presented involving the insurer's medical examiner and the insured); *see also* 23 S.C. Jur. § 57 Agency, Presumptions and Burden of Proof (1994) ("Once a party proves that an agent has acted within the apparent scope of his authority, the burden becomes that of the principal to demonstrate by a preponderance of the evidence that the agent's acts were outside his authority.").

receivable approach and required full disclosure to institutional investors with whom Morgan Keegan dealt pursuant to its contracts. Furthermore, Meyers understood from Debtor's management, including Debtor's CEO, CFO, and an institutional investor considering an investment in Debtor that a write down of the accounts receivable balance was an acceptable fix of the issue—a write down that Debtor's management indicated it was considering.

The Trustee asks the Court to conclude that the Accounting Practice was created by Meyers due to his original training as a certified public account and financial professional; whereas, Sturgill, Debtor's CEO (and effectively Debtor's CFO until Hargrett's arrival), who had apparently failed all four sections of the CPA exam on six separate occasions (although not disclosed to Meyers or other members of Debtor's management at the time the Accounting Practice was first put in place), was incapable of creating the policy. The Trustee's theory is speculative and not proven according to his burden. It is the Court's view that the fact that the Accounting Practice may not have correctly applied generally accepted accounting principles could equally suggest that it was created by someone with inexperience or limited knowledge. Ultimately, the evidence indicates that its use was dependent upon and perpetuated by both CEO Sturgill and Debtor's auditor, Grafton.

Next, the Trustee points to the fact that the Accounting Practice was first implemented shortly after Morgan Keegan formed a relationship with Debtor and first appeared in the April 2006 Confidential Investor Memorandum (April 2006 CIM) that was compiled by Morgan Keegan. However, the evidence before the Court clearly indicates that the 2005 financials first reflecting the Accounting Practice were provided by CEO Sturgill to Morgan Keegan's agents on March 27, 2006 for incorporation into the April 2006 CIM.

Finally, the Trustee relies on an array of events over a period of many years to indicate some broader involvement by Morgan Keegan in Debtor's Accounting Practice and financial statements. Included in this argument were the following: (1) Meyers and Morgan Keegan became familiar with Debtor's financials as it was the intermediary for communication between potential institutional investors and Debtor; (2) Morgan Keegan's employee, Clark, helped to assist Debtor with its responses to the due diligence requests of the institutional investor, Bison, and created financial models of Debtor for use by potential institutional investors;[68] and (3) occasions where Meyers and Clark provided assistance to Sturgill regarding financial matters, such as providing minor stylistic and formatting suggestions to the notes of Debtor's financials,[69] and assisting with a draft of a monthly statement of income for the first six months of 2006. However, the evidence cited by the Trustee does not provide a connection from Meyers or Clark to the creation of the Accounting Practice and furthermore, it appears that Meyers and Clark's suggestions were always given to Sturgill and Hargrett for final approval.[70] Ultimately, the evidence does not establish how and by whom the Accounting Practice was created beyond its initial presentment by CEO

---

[68]    The evidence indicated that Meyers insisted on full disclosure of the Accounting Practice to Bison and all institutional investors with whom he dealt. As Meyers testified, his "goal is to have as much disclosure as possible" to the institutional investors when considering an investment. There is no convincing evidence that he acted deceptively to hide the Accounting Practice.

[69]    The Trustee's expert asserted that the financial notes regarding Debtor's revenue recognition practice included with the 2005 audited financial statements were misleading because they used the term "entitled" in describing Debtor's rights to the fees of the uncollected NSF checks. The Trustee alleges that this term was misleading in that it gave the impression that Debtor had already earned the Service Fee. While the Court is not fully convinced that the use of the term "entitled' was misleading, the Court notes that the evidence does not suggest that Meyers or Morgan Keegan drafted this note or suggested the use of the term "entitled."

[70]    The Trustee suggests that Clark's calculation of Debtor's collection rate as part of his work on the due diligence requests of Bison was an effort to conceal the Accounting Practice. However, the Court is not convinced that this was an effort to conceal as Clark was open to both to Debtor's management and to Bison as to his methodology in calculating the collection rate. Further, there was no documentary evidence presented showing that any member of management or the Board expressed issues or concerns with Clark's methodology.

105

Sturgill.[71] Therefore, weighing the evidence presented, the Court cannot conclude that Meyers or

Morgan Keegan created the Accounting Practice or introduced it to Debtor.

### Knowledge of Impropriety

The Trustee also argues that Meyers and Morgan Keegan knew about the alleged

impropriety of the Accounting Practice when it was implemented in 2006.

The Trustee's expert opined that the Accounting Practice violated basic principles of

accounting, namely that revenue, like a receivable, is not earned until "you've done everything

you have to do, you've provided a service," and that, because Debtor had not yet collected every

check associated with the fee, Debtor could not count that fee as a receivable. Therefore, the

Trustee's expert opined that it is not possible for someone with Meyers' prior training to be

unaware of the impropriety of the approach.

To the contrary, Meyers testified that he relied on the repeated assurances of Sturgill and

Grafton that the Accounting Practice was proper.  Furthermore, Meyers testified that he was aware

of an accounting method in certain sectors of the debt collection industry that treated collection

fees as a receivable, known as the effective yield method of accounting. Meyers explained that, as

he understood the effective yield method, when a company buys a pool of accounts for collection,

---

[71]     The record reflects that Blevins testified that he believed Meyers created or introduced the Accounting
Practice and that Sturgill was not educated enough to create such a policy. However, the Court had serious doubts
about the veracity of Blevins's testimony due to his pre-trial communications with the attorneys on both sides in this
matter in which he appears to be "shopping" his testimony to each side in this matter by suggesting to offer testimony
to benefit whichever side would benefit him. Further, there were discrepancies between Blevins's testimony and the
evidence presented. For example, Blevins testified that he never received communication of the findings of the TS
Report or that Debtor's financial statements were misstated; however, documentary evidence indicated that he was
included in the discussions regarding the use of and change from the Accounting Practice after the release of the TS
Report. *See* Def. Ex. 127. As such, the Court does not find Blevins' testimony to be credible.

During the trial, the Court also received testimony from others that Wade Cordell had told investors of Debtor
that Meyers was "working the financials." However, the evidence indicated that Wade Cordell had a tendency to
hyperbolize and misrepresent facts to investors, and he, in fact, testified at trial that he believed Sturgill with Grafton
provided the financial information that first used the Accounting Practice for the April 2006 CIM and that Sturgill
"put this whole system together of . . . how you book accounts receivables . . ."  The evidence presented lacked the
necessary specificity to convince the Court that Meyers created or introduced the Accounting Practice to Debtor.

the company may treat both the principal debt owed and the fees associated with the collection of the debt as a receivable. According to Meyers, companies using the effective yield method record revenues based on the expected collections rate for those accounts, which may be later written down based on the actual amount of the accounts collected. Further, Meyers' experience while he was an accountant was limited to the accounting of manufacturing businesses and not the accounting of debt collections businesses. Without more, these factors reasonably explain how Meyers could have been unaware of the alleged impropriety with the Accounting Practice, despite being aware of its use.

In addition, the record shows that throughout its use of the Accounting Practice, Debtor had several professionals working for it that did not question the practice, and therefore, provided additional legitimacy for its use. Debtor's independent auditor, Grafton, indicated that the policy was GAAP compliant, and it appears the auditor issued certified audited financials, that incorporated the policy. Hargrett, Debtor's subsequent chief financial officer and a CPA, believed or accepted that the policy was GAAP compliant, and while Jones Day, Morgan Keegan's counsel, reviewed the 2005 audited financial statements and noted that the Accounting Practice was "aggressive GAP [sic] revenue recognition," it did not identify it as improper. Further, while unbeknownst to Meyers, it appears Debtor also discussed certain revenue accounting issues with the accounting firm of Ernst and Young in conversations with its Outside Securities Counsel. Based on the number of professionals employed by Debtor who were familiar with the Accounting Practice or expected to be but did not report it as improper, the Court is not convinced any impropriety of the Accounting Practice was apparent to Meyers and Morgan Keegan.

Also, pursuant to Morgan Keegan's contracts, Meyers and Morgan Kegan dealt exclusively with sophisticated institutional investors or lenders who, in considering lending or investing,

would be expected to conduct their own due diligence in reviewing Debtor's financials, often with the assistance of their own accounting professionals. In fact, that was exactly what occurred when MKSF employed Transaction Services, which issued the first written report, the TS Report, that raised several concerns about the Accounting Practice. Under neither the 2006 Contract nor the 2008 Contract were Meyers and Morgan Keegan retained to conduct an audit or provide accounting services to Debtor. Finally, pursuant to the express terms of the 2006 Contract, Morgan Keegan had no duty to verify the financial information provided to it by Debtor. In fact, Debtor had a duty to provide accurate information to Morgan Keegan.

Further, by the time the parties entered the 2008 Contract and after the TS Report, it appears that Debtor's management were actively discussing a change in the Accounting Practice and a one-time write down of the company's accounts receivable balance, which was generally viewed as an acceptable method of correcting or clarifying the issues with it.

There is also affirmative evidence which raises a significant doubt that Meyers and Morgan Keegan schemed to introduce or even knew the Accounting Practice was improper for use by Debtor. On many occasions, far from hiding its use, the Accounting Practice was openly discussed by Meyers and Morgan Keegan with Debtor's management and the institutional investors it consulted. The evidence is uncontradicted that Meyers insisted on transparency regarding the Accounting Practice with the institutional investors he brought to Debtor. The record includes several instances where Meyers provided explanations regarding the Accounting Practice with interested institutional investors, including providing those potential investors an explanatory note as to how Debtor calculated its accounts receivable balance during the 2006 Contract and providing institutional investors an explanation regarding Debtor's proposal to change its accounts receivable recognition policy and conduct a one-time write down of its accounts receivable

balance.  In fact, the evidence shows that under the 2008 Contract, one such institutional investor withdrew its interest in Debtor due to the possible negative effects of a one-time write down. Furthermore, at the end of the 2006 Contract, in November 2006, during his closing conference with Debtor's management, Meyers actively recommended that Debtor hire a more recognized auditor, such as Ernst and Young, and for Debtor's management to consider changing the Accounting Practice to a "less aggressive revenue recognition policy." His testimony appears supported by the fact that soon after the conclusion of the 2006 Contract, Debtor's Board of Directors actively discussed and considered changes to the Accounting Practice at the Board's January 2007 meeting, but the Board affirmatively decided not to make a change. Later in 2008, in anticipation of a new engagement of Morgan Keegan by Debtor, Meyers was surprised that Debtor had not already written down the accounts receivable balance and encouraged CFO Hargrett's efforts to change the Accounting Practice and conduct a one-time write down of the company's accounts receivable to correct any concerns.

Furthermore, it seems counterintuitive that Meyers and Morgan Keegan would risk their reputations and jobs to knowingly promote the use of an improper Accounting Practice in dealing with sophisticated institutional investors who were certain to undertake their own due diligence reviews, including financial reviews, and likely discover the improper practice.

The record reflects that Meyers, and therefore Morgan Keegan, had a genuine belief in the prospects for Debtor, its business model, its products, and its industry. This is further bolstered by the fact that Meyers made a significant personal investment of $50,000 in Debtor, introduced the investment opportunity in Debtor to certain co-workers at Morgan Keegan (which resulted in at least one additional investment in Debtor), introduced Debtor to Regions Bank (the parent company of Morgan Keegan) which extended a $1 million+ line of credit to Debtor, referred

Debtor to MKSF (a related company of Morgan Keegan), who offered a multi-million dollar investment in Debtor, and introduced Debtor to many of his industry connections as potential customers for Debtor.

Considering all of these circumstances, even after the release of the TS Report on July 1, 2008, the Court cannot find sufficient evidence that Meyers and Morgan Keegan secretly colluded with the Management Defendants through the Accounting Practice to defraud or otherwise act against Debtor. The record reflects that even before the release of the TS Report, Debtor's management expected a sophisticated investor, lender or buyer would understand the change of its Accounting Practice and accept a write down as a suitable correction. On several occasions, the Management Defendants advised Meyers of that intention. Importantly, and perhaps telling, regarding the concerns expressed in the TS Report is the fact that MKSF, the actual recipient of the TS Report, still wanted to and, in fact, did offer to make a significant investment in Debtor's business with the contemplation that Debtor would write down its accounts receivable balance.[72] In anticipation of the MKSF transaction, Hargrett created monthly financial projections reflecting a write down in the middle of 2008. The understanding was that Debtor would write down the accounts receivable balance upon the closing of the MKSF deal, which remained pending until September 2008.

The evidence also reflects that when Meyers received the TS Report, a copy was also received by Hargrett, who passed it along to Sturgill. Hargrett testified that he believed copies of the TS Report were also given to Blevins and Wade Cordell. While it appears certain members of Debtor's Board may not have been presented with the findings on the Accounting Practice in the

---

[72] Not only did the Board sitting at the time of the TS Report not change the Accounting Practice, but the succeeding new Board, seated after the Initial Ouster, first determined to transition from the Accounting Practice over time by a series of accounts receivable write downs over time to mitigate concern for Debtor, but later wrote down the accounts receivable balance in a single event, retroactively applying it to the entirety of 2009.

TS Report, the Court finds, weighing the evidence presented, that Meyers was not aware of this fact and was not aware that any of the Management Defendants would conceal the findings of the TS Report from other members of the Board. It appears such a belief is reasonable considering Debtor's management was actively and openly discussing changing the Accounting Practice and/or writing down the accounts receivable balance.[73]

Based on his testimony and considering Meyers' previous openness and disclosure of the Accounting Practice to institutional investors, it appears Meyers believed that the findings of the TS Report were communicated to all of the relevant parties within Debtor by its management, and it does not appear he consciously intended to conceal the findings to any individuals within Debtor. Further, the evidence does not demonstrate that Meyers and Morgan Keegan were aware of any alleged misappropriation of Debtor's assets by Management Defendants.

It appears, even after the release of the TS Report, Meyers as well as Debtor's management and most of its stockholders continued to have a strong belief in the potential success of Debtor when considering the demand for its services in the industry. This outlook was bolstered by the fact that Debtor was still attracting more and more customers and that, despite a possible write down of the accounts receivable balance and change in the Accounting Practice, a sophisticated private equity firm, MKSF, was still interested in making a significant investment in Debtor. For these reasons, the Court is not convinced that Meyers and Morgan Keegan secretly colluded with

---

[73] The Trustee calls the Court's attention to several events involving Meyers after the release of the TS Report, including the September 2008 Sales Force Meeting where Meyers gave a presentation, the December 2008 phone call between Meyers and Danielson, and Meyers' alleged assistance with Debtor's 2009 stock valuation. However, all of these events appear to be genuine "he said, she said" disputes regarding the statements and conduct of Meyers, for which both sides could be viewed as credible. Even assuming the Trustee's allegations to be true, which the Court is not concluding, the Court does not find based on this evidence that the Trustee has demonstrated that Meyers and Morgan Keegan were acting in concert or otherwise secretly colluding with Management Defendants to defraud Debtor through the use of the Accounting Practice.

the Management Defendants. Therefore, to the extent South Carolina or Nevada law would accept *Crystal Ice* as a possible bar to imputation, the Court finds that the Trustee has not satisfied his burden to invoke such an exception.

### The "Greater Fault" Exception to *In Pari Delicto*

As an additional theory to escape the consequences of imputation of the knowledge of the Accounting Practice to Debtor, the Trustee also argues that *in pari delicto* should not apply because Meyers and Morgan Keegan bear greater fault than Debtor for the alleged injuries to Debtor resulting from the Accounting Practice.

Both South Carolina and Nevada courts have recognized that *in pari delicto* applies when the plaintiff is at equal or greater fault as the defendant. *See Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 893 (S.C. 2015) ("'[W]here parties are in pari delicto, that is equally in the wrong, no affirmative relief will be given to one against the other and that no one shall be permitted to profit by his own wrong.'" (quoting 4 S.C. Jur. *Action* § 21 (1991 & Supp. 2015))); *Magill v. Lewis*, 333 P.2d 717, 719 (Nev. 1958) (in addressing *in pari delicto*, noting that the defense should not be applied "where the defendant is the one guilty of the greatest moral fault"). Further, in the context of private causes of action for damages under federal securities laws, the Supreme Court of the United States has indicated that *in pari delicto* should only be applicable when "the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).

However, based on the evidence presented, the Court does not find Meyers and Morgan Keegan were at greater fault in this matter. The decision to implement and utilize the Accounting Practice was made by Debtor, and not Morgan Keegan or Meyers. Further, the Trustee has failed

to establish that Meyers and Morgan Keegan participated with the Management Defendants in any type of scheme involving the Accounting Practice.

While the Trustee has attempted to frame Debtor as a neophyte to the world of securities and raising capital that relied heavily on Meyers and Morgan Keegan for advice, translating into greater blame on Morgan Keegan, the Court does not agree. Over the company's history, most, if not all, of Debtor's significant capital raises were conducted without the participation of Meyers and Morgan Keegan, and in fact, the record reflects that on the one occasion that Meyers and Morgan Keegan finalized a possible agreement between Debtor and an institutional investor, MKSF, Debtor's management instead elected to pursue a capital raise on its own through the personal efforts of the Management Defendants, and other officers, Board members and shareholders.

To the degree this factor should be considered, the evidence simply does not demonstrate that Meyers and Morgan Keegan were masterminds of a scheme or otherwise controlled Debtor's operations, such that they should be considered more to blame in this matter than Debtor. Debtor, through its management, bears the greater fault in this matter for the implementation and consequences of the use of the Accounting Practice, including any capital raises during the time period that the policy was in use.

**Public Policy Exception to *In Pari Delicto***

Finally, the Trustee argues that public policy should bar the application of *in pari delicto*, noting that the doctrine is rooted in equity and that both South Carolina and Nevada law recognize that in certain circumstances, an overriding public policy consideration may permit relief to be granted despite the application of *in pari delicto*. *See Proctor*, 778 S.E.2d at 893 ("'On the other hand, there may be an overriding policy consideration that permits relief to be granted [even if *in*

113

*pari delicto* were applicable to the matter]." (quoting 4 S.C. Jur. *Action* § 21 (1991 & Supp. 2015))); *In re Amerco Derivative Litigation*, 252 P.3d at 696 (noting that "there are public policy grounds for not applying in pari delicto as a bar to an action among wrongdoers").[74]

Here, the Trustee again relies heavily on the Court of Appeals for the Seventh Circuit's opinion in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) for the proposition that public policy should bar the application of *in pari delicto*. In *Schacht*, the Seventh Circuit found that the directors of an insurance company participated in a fraud *against* the company (and not a fraud *on behalf* of the company) based on an alleged "far-reaching scheme in which, as a consequence of the illegal activities of [the Insurance Company's] directors and the outside defendants, [the Insurance Company] was, *inter alia*, fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income—all actions which aggravated [the Insurance Company's] insolvency." *Schacht*, 711 F.2d at 1347–48. As an initial matter, the Court notes that it is not convinced the use of the Accounting Practice amounted to a fraud against Debtor or that the Management Defendants' actions were otherwise adverse to Debtor. As discussed above, the significant majority of the capital was utilized for Debtor's growth and expenses and served to benefit Debtor. *See McDorman*, 521 F.3d at 395 ("The situation here clearly differs from that in *Schacht*; in short, trying to generate and develop business for the corporation is a far cry from looting the corporation's assets. Accordingly, we conclude that there was sufficient evidence to support a jury finding that Directors—and

---

[74]     Nevada Courts have listed public policy factors to consider when applying *in pari delicto*: "Where, by applying the rule, [1] the public cannot be protected because the transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault, and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied." *In re Amerco Derivative Litigation*, 252 P.3d at 696 (internal quotation omitted).

[therefore the Insurance Company]—were *in pari delicto*."). On those grounds, this case is distinguishable from *Schacht*.

Nonetheless, the Trustee insists upon the Court's application of the two-pronged analysis utilized in *Schacht* to determine whether a director's actions and knowledge should be imputed to the company: "whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing." *Schacht*, 711 F.2d at 1348.

First, the Court notes that it appears neither South Carolina nor Nevada law have considered this two-pronged analysis in *Schacht* in determining if *in pari delicto* should be applied. In addition, in the present case, the weight of the evidence convinces the Court that Debtor, through the actions of members of its management and officers, were the originators of the Accounting Practice and could not recover from others if the Accounting Practice was improper. In other words, Debtor should not be able to recover damages against a third party for a wrong that it itself created and implemented. Further, as Morgan Keegan and Meyers received no compensation from Debtor, it appears that Morgan Keegan or Meyers would not be unjustly enriched by allowing the application *in pari delicto*.

This Court further believes that South Carolina or Nevada law would also not apply a public policy exception to *in pari delicto* under these circumstances. While the Trustee asserts that any recovery in this proceeding would inure to Debtor's estate and not to the Management Defendants, South Carolina and Nevada courts have applied *in pari delicto* equally to receivers and bankruptcy trustees who stand as the successor to an insolvent company without such a consideration. Specifically, the Court notes the holding of the Court of Appeals for South Carolina in *Myatt v. RHBT Financial Corp.*, 635 S.E.2d 545, 548 (S.C. Ct. App. 2006), which addressed

the application of *in pari delicto* in the context of a claim brought by a receiver of a corporation, holding that when the receiver is seeking only tort damages, "in the absence of a fraudulent conveyance case, the receiver of a corporation used to perpetuate fraud may not seek recovery against an alleged third party co-conspirator in the fraud." *See also Hays v. Pearlman*, C/A No. 2:10-CV-1135-DCN, slip op. 2010 WL 4510956, at *5–6 (D.S.C. 2010) (following *Myatt* and applying *in pari delicto* as to claims brought by a company's receiver against the company's attorney who allegedly assisted or should have known he was assisting the Ponzi scheme organized by the company's management); *In re Agribiotech, Inc.*, C/A No. CV-S-02-0537-PMP, slip op. 2005 WL 4122738, at *8 (D. Nev. Apr. 1, 2005) (applying Nev. law) ("[A]n equitable defense is as good against a bankruptcy trustee as it would have been against the debtor as of the commencement of the bankruptcy case."). In addition, the Court notes the Fourth Circuit's holdings in *Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital, LLC)*, 716 F.3d 355, 367 (4th Cir. 2013), that even though the appointment of a bankruptcy trustee removed the alleged wrongdoer from the matter, based on the language of § 541, "to the extent *in pari delicto* would have barred a debtor from bringing suit directly, it similarly bars a bankruptcy trustee—standing in the debtor's shoes—from bringing suit."

Further, the Court is not convinced that a recovery by the Trustee in this matter would create a significant impact the deterrence similar alleged wrongdoing in the future. First, the Court finds that applying *in pari delicto* in this matter would not undermine the securities laws of this country.[75] Any wrong-acting securities professional would still be subject to possible enforcement actions from the Securities and Exchange Commission, Financial Regulatory Authority and the

---

[75]     In the context of Federal Securities law, *in pari delicto* should only be applied if "the preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman*, 472 U.S. at 310.

South Carolina Attorney General as well as possible direct causes of action from investors. [76]  The Court finds that this possibility serves as a powerful deterrent to such wrongdoing and that it is not necessary to permit Debtor, the party originating the alleged fraud, to recover in the present matter as a means of further deterrence. Further, to allow a recovery in this matter could also effectively excuse fraudulent accounting practices by a corporation because, in spite of being the originator of the fraudulent practice and the party in the best position to stop such a practice in such situations. The corporation, who not only enjoyed the benefits of its actions,[77] could pass any costs and damages resulting from such a practice to a third party who may have allegedly assisted.

For these reasons, the Court finds that public policy considerations should not bar the application of *in pari delicto* in this matter.

## Application of *In Pari Delicto*

As the Court finds that the Management Defendants were acting within their scope of authority when implementing the Accounting Practice and issuing the alleged misrepresented financial statements, these actions and knowledge are imputed to Debtor. Therefore, the Court finds *in pari delicto* applies to this proceeding, and the Trustee, standing in the shoes of Debtor, is barred from recovering for his causes of actions against Morgan Keegan and Meyers as they relate to their alleged involvement with the Accounting Practice, as Debtor (and therefore, also the Trustee) would equally (or to a greater degree) be a wrongful actor in regards to the alleged impropriety and the consequences resulting from the Accounting Practice.

---

[76]    For example, in the present matter, the record reflects that certain investors have brought separate, individual causes of action in a state court lawsuit against Morgan Keegan, which the Court addressed in a motion for relief in Debtor's main bankruptcy case.

[77]    While the Trustee has emphasized the alleged harm that the Accounting Practice caused Debtor's shareholders, the Court cannot discount the fact that if Debtor had been purchased by another company or conducted an initial public offering at an increased value resulting from the use of the Accounting Practice, Debtor's shareholders would have primarily benefited from the increased value.

### *Merits of the Trustee's Causes of Action*

While the Court finds that the Trustee's remaining causes of action are all fully barred by *in pari delicto*, the Court has nonetheless considered the Trustee's remaining causes of action on their merits and finds for the reasons stated herein and in prior sections, that Meyers and Morgan Keegan are entitled to judgment in their favor.

### *Causation*

Common to all of the Trustee's remaining causes of action is that Meyers and Morgan Keegan's actions/inaction relating to the Accounting Practice caused Debtor's net operating losses from the time that the April 2006 CIM was finalized until Debtor's bankruptcy filing. Causation is an essential element of each of the Trustee's remaining causes of action. *See Troutman v. Facetglas, Inc.*, 316 S.E.2d 424, 426 (S.C. Ct. App. 1984) ("The elements of a tort are (1) duty; (2) breach of that duty; (3) proximate causation; and (4) injury."); *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (holding that causation is an element of a Rule 10b-5 securities fraud claim); *In re Amerco Derivative Litigation*, 252 P.3d at 702 (holding that the breach of fiduciary relationship that was aided and abetted, resulted in damages).

Each of the Trustee's claims is premised on the theory that Meyers and Morgan Keegan failed to disclose to every member of the Board that Debtor was engaged in a fraudulent Accounting Practice, details regarding Sturgill's background,[78] and the findings of the TS Report.[79]

---

[78] The Court finds credible Meyers' testimony that he did not believe he was free to communicate the findings of Sturgill's background report because of the confidentiality and liability provisions of the report. The evidence does indicate that Meyers encouraged Debtor's management to exchange their background reports, which it appears that it in fact occurred with Sturgill refusing to release his background report.

[79] As previously discussed, the Court finds that the Trustee has not met his burden of showing that Meyers and Morgan Keegan knew that findings of the TS Report would not be communicated to all of Debtor's management and members of the Board.

As a result of Meyers and Morgan Keegan's failure to affirmatively disclose, the Trustee argues that Debtor continued to operate and incur losses for a number of years which ultimately caused the prolonged collapse of the company and enabled the Management Defendants to embezzle funds from Debtor. Damages equal to Debtor's total operating losses are the only theory of damages the Trustee offered at trial. Specifically, the Trustee offered the expert testimony of George DuRant to establish Debtor's operating losses over a period of approximately four years, ending with the date that Debtor filed its chapter 7 bankruptcy petition, which was nearly two years after the end of the 2008 Contract between Debtor and Morgan Keegan.

DuRant's testimony is only relevant to the extent the Trustee first establishes that Meyers and Morgan Keegan were the cause of these alleged losses; a damages assertion without a causal link is of no use to the analysis. *See Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) (holding "[a]n expert's opinion as to damages must be causally related to the alleged harm" and "should be excluded when it is based on assumptions which are speculative and are not supported by the record"); *PBM Prod., LLC v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2010 WL 56072, at *6 (E.D. Va. Jan. 4, 2010) (excluding damages expert who failed to establish a "causal link between the alleged misconduct and the claimed damages"). As outlined below, the Trustee has failed to satisfy this burden on the causation of damages.

**Proximate Cause of Debtor's Net Operating Losses**

The Trustee has failed to prove that Debtor would not have remained in operation (and, therefore, continue to incur losses as alleged by the Trustee) absent Meyers and Morgan Keegan' actions. The evidence at trial fails to demonstrate that Meyers and Morgan Keegan independently and proximately caused Debtor's alleged net operating losses. *Cf. In re Acterna Corp. Sec. Lit.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) ("Here, Plaintiffs have alleged no facts which, if proven,

would show that their economic loss, i.e., the decline in the value of their purchased stocks, was caused by the alleged misstatements of Defendants, as opposed to an alternative intervening event.").

Meyers and Morgan Keegan did not cause Debtor to implement or continue to utilize the Accounting Practice. Meyers and Morgan Keegan had no significant role in the preparation of Debtor's financial statements—that was the role of Sturgill and later Hargrett. Similarly, Meyers and Morgan Keegan had no role in auditing the Company's financial statements—that was Grafton's role. Furthermore, all Board members had a legal obligation to review and understand the financial statements of the company, which they acknowledged and yet failed to perform.

Equally determinative is the fact that Debtor had notice that the Accounting Practice may not accurately reflect the financial condition of Debtor —information it chose to ignore. In early 2006, Debtor discussed its Accounting Practice with Outside Securities Counsel and Ernst and Young. Specifically, the evidence showed that Sturgill sent Debtor's "Accounts Receivable Recognition" section to Outside Securities Counsel. Likewise, Debtor involved Ernst and Young, which provided a letter to Sturgill, with a copy to Outside Securities Counsel that "addresses the accounting issues and how to resolve them." When Hargrett joined Debtor in October 2006, he questioned Debtor's Accounting Practice and recommended to Sturgill and Wade Cordell that Debtor change it.  Debtor refused. In addition, both Meyers and Jones Day described the Accounting Practice as "aggressive," and communicated as much to Sturgill.  These facts sufficiently show that Debtor had knowledge (or should have had knowledge)—imputed to it through notice to one or more of its Board members and officers—that there were potential issues with its audited financials. Debtor, however, ignored these warnings, and in January 2007, the Board, with this knowledge, affirmatively voted to continue with the Accounting Practice and re-

engaged Grafton.

The evidence also convinces the Court that Debtor's operations were effectively controlled by the Management Defendants until the Initial Ouster in 2009, which was completely attributed to Debtor's failure to timely pay customers' funds and its related loss of business, and not the Accounting Practice. It is noteworthy that thereafter, Management Defendants Sturgill and Hargrett, parties fully aware of the Accounting Practice for many years, remained as CEO and CFO of Debtor respectively. Throughout the history of Debtor, it was the Management Defendants who controlled nearly all aspects of Debtor's operations, individually raised the significant capital used to operate the business, held the significant officer positions, owned a significant portion of Debtor's stock,[80] and held a voting majority of Debtor's board positions.[81]

While the Trustee presented testimony of employees and managers of Debtor who indicated they would have taken action if they knew of the alleged impropriety of the Accounting Practice, this testimony lacked specificity, even with the benefit of hindsight. Further, while the Trustee points to the fact that the Management Defendants were eventually ousted from Debtor, it is important to note that this ouster took place in two phases and that the first phase of the ouster had the support of certain members of the Management Defendants. The Initial Ouster in 2009 removed Wade Cordell, Brad Cordell and Blevins, resulted from the discovery of the deficit in

---

[80]    Significant evidence and argument were presented by the parties regarding the extent of the Management Defendant's ownership of Debtor, with the Trustee alleging that the Cordells misappropriated stock from Debtor without consideration and that Management Defendants improperly retired Michael Potter's 4.5 million shares. However, even considering the changes to Debtor's stock ledger as asserted by the Trustee, there is a significant question of whether the Management Defendants could have been removed from their positions over the period when the Accounting Practice was used, especially if the Court considers the shares of Michael Potter (who routinely voted in line with Sturgill). With Potter's shares, the Management Defendants' ownership of Debtor was near, if not over, a majority of the company's shares when the Accounting Practice was first used, and they continued to own approximately one-third of the company's shares until Debtor filed its petition for bankruptcy.

[81]    Until the 2009 Initial Ouster, Management Defendants held four of the six director positions on Debtor's Board.

customers' trust accounts. According to the ouster litigation, the impropriety of the Accounting

Practice was not an issue during the 2009 Ouster. Further, the Initial Ouster in 2009 was heavily

contested, including disputes regarding whether the ouster was legally proper and whether there

was a sufficient shareholder vote in favor of the removal. The litigation was an expensive cost to

Debtor that was ultimately resolved with an agreement in which Debtor would continue weekly

payments to the Cordells and Blevins. Importantly, two of the Management Defendants, Sturgill

and Hargrett, voted in favor of the ouster of the Cordells and Blevins in 2009 and remained as key

officers and directors of Debtor. The second phase of the ouster did not occur until a year later,

with the removal of Sturgill and Hargrett by Debtor's Board. Considering the years of "borrowing

from Peter to pay Paul" and related loss of confidence by some large customers, the removal of

key founders and leaders and managers, which were the face of Debtor for its entire history, and

the other contributing factors, including the constant need for more and more new capital, it is not

surprising that Debtor incurred large net operating losses and failed.

### Foreseeability

Regardless of which state's law governs the Trustee's remaining claims, the Trustee may

only recover those damages that were the foreseeable result of Meyers and Morgan Keegan'

alleged misconduct. *Young v. Tide Craft, Inc.*, 270 S.C. 453, 462, 242 S.E.2d 671, 675 (1978)

("Foreseeability of some injury from an act or omission is a prerequisite to its being a proximate

cause of the injury for which recovery is sought."); *Goodrich & Pennington Mortg. Fund, Inc. v.

J.R. Woolard, Inc.*, 101 P.3d 792, 797 (Nev. 2004) ("More particularly, we define proximate cause

as any cause which in natural [foreseeable] and continuous sequence, unbroken by any efficient

intervening cause, produces injury complained of and without which the result would not have

occurred." (alteration in original) (internal quotations omitted)). Therefore, a question before the

Court is whether it was foreseeable that Meyers and Morgan Keegan' conduct would cause Debtor's net operating loss?[82] In this case, the evidence requires an answer of "no," which precludes a finding in favor of the Trustee.

The Trustee's claimed damages were not foreseeable because, in the Court's judgment, the alleged damages "would have happened with or without" Meyers and Morgan Keegan involvement. [83] Meyers and Morgan Keegan played no controlling role with respect to Debtor's direct capital raises, and therefore did not cause Debtor to continue its operations. Meyers and Morgan Keegan had no role with respect to Debtor's friends and family offering, sale of territory licenses, its issuance of promissory notes, or its 2009 capital raise. Although the Trustee contends Meyers and Morgan Keegan were involved with the November 2006 PPM, Meyers and Morgan Keegan were purposely excluded from any involvement in the issuance of securities to non-institutional investors after October 31, 2006, and Debtor's management confirmed that "Morgan Keegan has absolutely nothing to do with this offering." Indeed, Meyers and Morgan Keegan' name does not appear anywhere on the November 2006 PPM that Debtor provided to investors and Meyers and Morgan Keegan had no communications with Debtor or with Outside Securities

---

[82]     In fact, the 2006 Contract specifically provided that Meyers and Morgan Keegan could rely on the financial information provided by IBG without independent verification.

[83]     Meyers and Morgan Keegan called the Court's attention to the District Court of South Carolina's opinion in *Inheritance Funding Co. v. Chatman*, C/A No. 3:12-CV-1308-JFA, slip op. 2013 WL 3946237 (D.S.C. July 31, 2013). In that case, Inheritance Funding Company ("IFC") advanced money on a probate estate to the decedent's children. *Id.* at *1. But unknown to IFC, the decedent's child had created fraudulent financial records, vastly inflating the value of the estate. *Id.* After IFC advanced funds on the estate, an accountant – retained by one of the decedent's children – provided records to the probate court; "[r]elying on documentation entirely provided by [the decedent's son], [the accountant] composed a letter accounting for the estate funds. While [the accountant] did no independent verification of the estate information, he did include in the letter that the financial transactions at issue were 'as indicated by the [decedent's son]'." *Id.* at *2. IFC then sued the accountant, claiming the letter "played a central role in the cover-up of the fraud," and the "existence of the letter delayed discovery of [the decedent's son's] fraud after the fact." *Id.* The court, in rejecting IFC's constructive fraud claim and granting summary judgment in favor of the accountant, found the lack of proximate cause determinative, noting the foreseeability requirement of causation and holding that that "the injury would have happened with or without the existence of the [accountant's] letter." *Id.* at *3.

Counsel with respect to the November 2006 PPM after October 31, 2006, a date prior to the use

or issuance of that PPM. Moreover, Debtor's management decided not to complete a mezzanine

debt financing transaction with MKSF in 2008, electing instead to again directly raise capital—

this time through the issuance of promissory notes to individual investors. Meyers and Morgan

Keegan did not authorize or allow any use of Meyers and Morgan Keegan' name on any materials

used by Debtor to solicit non-institutional investors, as required by the 2006 Contract; in fact, the

evidence shows Debtor's agents were explicitly told to remove Meyers and Morgan Keegan' name

from all investor materials. Accordingly, the alleged operating losses are too tenuously connected

to Meyers and Morgan Keegan' actions to meet the foreseeability requirement.[84]

### Intervening Factors

At trial, the Trustee presented, in essence, an "all or nothing" damage theory based entirely

upon Debtor's operating losses from March 29, 2006 through the date it filed its bankruptcy

petition. The fatal flaw in this analysis is that there appears to be many other causes for Debtor's

operating losses, causes which are wholly unconnected with the actions of Meyers and Morgan

Keegan. These intervening factors include: (1) Debtor's direct issuance of stock, territory licenses,

and promissory notes in violation of securities law and the resulting cost associated with a

rescission offer; (2) Debtor's longstanding misuse of monies ostensibly held in trust for the benefit

of its customers to pay its operating expenses, which led to the Initial Ouster; (3) the removal of

---

[84]     As noted by the U.S. District Court for the District of South Carolina, "[t]ypically, to prove proximate cause in South Carolina, a Plaintiff must establish: (1) causation in fact; and (2) legal cause. Causation in fact requires proof that the injury never would have occurred 'but for' the defendant's actions. Legal cause, meanwhile, pertains to foreseeability." *Chatman*, 2013 WL 3946237, at *3 (citing *Whitlaw v. Kroger Co.*, 410 S.E.2d 251, 253 (S.C. 1991)). For the reasons specified in this Order, the Court also finds the evidence presented by the Trustee is insufficient to determined that Debtor would not have incurred its total net operating losses "but for" Meyers and Morgan Keegan's actions/inactions or the Accounting Practice. In addition, based on the evidence presented and for the reasons stated, the Court does not find that the Accounting Practice or Meyers and Morgan Keegan's actions/inactions were a substantial factor in Debtor's total net operating losses. Finally, the Court finds the Trustee has not sufficiently demonstrated a nexus between the Accounting Practice and Meyers and Morgan Keegan's actions/inactions and Debtor's net operating losses to establish loss causation.

founders and key managers of Debtor under allegations of wrongdoing; (4) illegal payment of sales commissions to unlicensed personnel; (5) interest Debtor paid on the illegal promissory notes; (6) costly litigation expenses incurred during the ouster of Debtor's key management and resulting settlement payment to resolve the litigation; (7) Debtor's continued use and approval of its Accounting Practice and re-hiring of Grafton with actual and constructive knowledge that the Accounting Practice had been called into question; (8) Debtor's continued direct capital raises from individuals even after the TS Report put Debtor on notice that its financial statements may be materially misstated; and (9) Sturgill's misrepresentations of his background, which deterred institutional investors from proceeding with an investment in Debtor.

The Trustee's damage calculation did not adequately consider these intervening factors, each of which undoubtedly caused Debtor's total net operating losses. Because intervening causes increased the amount of Debtor's operating loss, the Court rejects the Trustee's attempt to attribute the entirety of Debtor's downfall to Meyers and Morgan Keegan or the Accounting Practice.

This ruling is consistent with cases from other circuits finding that a party may not recover net operating losses if an intervening cause breaks the link between the alleged wrongful conduct and the damages suffered. *Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 75 (2d Cir. 2010). In *Carco*, the Second Circuit noted that the mere existence of a wrongful act "[does] not necessarily mean the [wrongful act] caused the company [seeking to recover net operating losses] to be unprofitable." *Id*. Accordingly, the Court reversed the trial court's award of damages, remanding the case with instructions to consider whether "potential intervening causes . . . might have broken the link between [the] breach and any damages suffered." *Id*.

In sum, because the Trustee failed to prove the requisite nexus between the losses he seeks to recover and Meyers and Morgan Keegan' alleged misconduct, each of the Trustee's claims fail.

### *Damages*

It is well established that a plaintiff has the burden to prove its damages with reasonable certainty. *Jackson v. United States*, No. 4:16-CV-03219-RBH, 2018 WL 1755503, at *19 (D.S.C. Apr. 12, 2018) ("[F]or damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy."). "[W]hile proof with mathematical certainty is not required, the amount of damages cannot be left to conjecture, guess, or speculation." *Whitfield v. John Bourne Co.*, 16 F. App'x 116, 124–25 (4th Cir. 2001) (applying South Carolina law); *accord Uhlig LLC v. Shirley*, No. 6:08-CV-01208-JMC, 2012 WL 2923242, at *14 (D.S.C. July 17, 2012). In the present matter, the Trustee relies on the testimony of his damages expert, DuRant, who derives his opinions exclusively from Debtor's financial statements, the same financial statements that have been repeatedly described as fraudulent and misleading.

The Court finds that the Trustee has failed to meet his burden to prove damages to a reasonable certainty by relying exclusively on financial statements that, according to his expert, are "deficient, false and misleading" due to the fraudulent actions and malpractice perpetrated by Debtor's management and by Grafton. The Trustee's expert concedes that Debtor's financial statements are an example of fraudulent accounting, and there is no trial balance or aging schedule to support the calculations in those statements. Grafton and Hargrett, two parties chiefly responsible for Debtor's financial statements, both pled guilty to felonies for their roles in preparing the fraudulent financial statements. The evidence indicates that Grafton may have never actually conducted an audit of Debtor's financials. Nevertheless, the Trustee bases his analysis on the very same fraudulent financial statements and argues that the Court should rely on those statements to calculate damages. The Court declines to do so.

In sum, the Court finds that the Trustee has failed to establish damages to a "reasonable certainty." For this additional reason, Meyers and Morgan Keegan are entitled to judgment in their favor on each of the Trustee's claims.

### Other Elements of the Trustee's Remaining Causes of Action

In addition to not meeting his burden on causation and damages, the Court finds that the Trustee has not met his burden of proof on other elements in each of the remaining causes of action. As to his Rule 10b-5 securities fraud and common law fraud causes of action, the Trustee is not able to establish the required reliance by Debtor due to the imputation of knowledge of the Accounting Practice, including its impropriety, to Debtor. *See Matrix Capital*, 576 F.3d at 181 (stating that a plaintiff's reliance is an element of a § 10(b) private action); *Hollman v. Woolfson*, 683 S.E.2d 495, 499 (S.C. 2009) (stating under South Carolina law that fraud requires the Plaintiff to establish by clear and convincing evidence that the plaintiff was ignorant of the falsity of the representation and that the plaintiff relied on the truth of the representation).

Further, weighing the evidence presented and for the similar reasons that have already been discussed in this Order, the Court finds that the Trustee has not met his burden of proof to establish that Meyers and Morgan Keegan "knowingly and substantially participated in or encouraged" the Management Defendants' breach of their fiduciary duties. *See Gulfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 198 (Nev. 2014) (stating that an element of aiding and abetting breach of fiduciary duty under Nevada law is "the defendant third party knowingly and substantially participated in or encouraged that breach [of fiduciary duty]).

Finally, as to the Trustee's breach of fiduciary duty cause of action, the Trustee alleges that Meyers and Morgan Keegan had an expansive overarching role that went beyond the parties' written contracts, including agreements to serve as Debtor's underwriter, investment adviser, and

127

producing agent. However, in weighing the evidence, the Court finds that the Trustee has not met his burden of proof that Meyers and Morgan Keegan agreed to serve Debtor in these expanded capacities. In making this determination, the Court considers, among other evidence, (1) the provision of the 2006 Contract Morgan Keegan's right to first refusal to serve as Debtor's underwriter for a period of six months after the terms of that contact,[85] (2) the relative lack of communication between Meyers and Morgan Keegan and Debtor between the 2006 Contract and the 2008 Contract, and (3) the nature of the additional actions taken by Meyers, which appeared to be more in line with business courtesies and not evidence of an agreement for Meyers and Morgan Keegan to serve Debtor in an expanded role.[86] The Court finds that the parties' relationship is defined only by the two written contracts that they entered.

Under this framework and weighing the evidence presented, the Court finds that the Trustee has not satisfied his burden of establishing the necessary fiduciary relationship between Meyers and Morgan Keegan and Debtor, specifically, in regard to Debtor's financial statements and accounting procedures, including the Accounting Practice. This conclusion is supported by a number of factors, including: (1) the express provision in the 2006 Contract that Morgan Keegan may rely on the accuracy of the financial information Debtor provides it without independent verification, (2) the provision of the April 2006 CIM that others may not rely on Morgan Keegan for the accuracy of the financial information provided in the document, (3) the fact that neither Meyers nor Morgan Keegan had any control over Debtor's operations, its accounting policies, or

---

[85]     If Debtor and Morgan Keegan had an overarching agreement for Morgan Keegan to serve as its underwriter or investment adviser, there would have been no need for this right to first refusal in the 2006 Contract.

[86]     For example, Meyers referred potential customers to Debtor (without receiving compensation) throughout their relationship. In addition, he introduced Debtor to several of his co-workers for considering an investment in Debtor. While the Trustee presented testimony of several individuals related to Debtor stating that Meyers and Morgan Keegan had agreed to take Debtor "over the finish line" to an initial public offering or merger, it appears that most of these individuals received this impression based on comments by Wade Cordell and other members of Debtor's management, who often took liberties in such statements to impress both current and potential investors.

its assets, (4) the fact that Debtor did not retain Meyers and Morgan Keegan to conduct an audit

of or opine on Debtor's accounting practices,[87] (5) the fact that Debtor made all of the decisions

with respect to its financial statements and capital raises, and (6) the fact that on the one occasion

that Meyers and Morgan Keegan created a lending investment opportunity with MKSF, Debtor's

management declined to proceed with the investment, electing to raise capital directly on their

own.

Further, even if Meyers and Morgan Keegan were fiduciaries of Debtor in regard to its

financial statements and accounting policies, the Trustee has not satisfied his burden of

establishing a breach when considering Meyers and Morgan Keegan's efforts to advise Debtor's

management of potential issues regarding the Accounting Practice, its openness to institutional

investors about the Accounting Practice, and its support of Hargrett's efforts to change the practice.

For the foregoing reasons, the Trustee has failed to satisfy his burden of establishing the

elements of his remaining causes of action, and the Court finds Meyers and Morgan Keegan are

entitled to judgment in their favor.

### Motion to Amend Complaint Post-Trial

At the conclusion of the trial, the Trustee orally moved to amend the Complaint pursuant

Fed. R. Civ. P. 15(b) to add two new causes of action: a claim under the South Carolina Unfair

Trade Practices Act and a claim for securities fraud under the South Carolina Code. The Trustee's

motion was based solely on the assertion that the Trustee had "demonstrated violations of both of

---

[87] The Trustee also asserts that the novel argument that because the initial marketing materials that Morgan Keegan provided indicated that Meyers was a CPA and did not otherwise indicate that he was inactive, Meyers, through his services to Debtor, became subject to the Code of Professional Conduct of the American Institute of Certified Public Accountants, including a duty to disclose any significant findings and fraud or illegal act involving senior management to a higher level group within the company, such as a board of directors. The Trustee alleges this theory as a basis that Meyers had an affirmative duty to disclose. However, as Debtor did not retain Meyers and Morgan Keegan to serve as accountants or auditors and had no expectation of them acting as such, the Court is not convinced that that Meyers and Morgan Keegan had such a duty or that Debtor relied on Meyers and Morgan Keegan in such a capacity. Therefore, the Court is not convinced by the Trustee's arguments.

those [proposed claims]" and thus the Complaint should "be amended to conform to the

evidence." In relevant part, Fed. R. Civ. P. 15(b) allows for amendments to pleadings made during

and after trial in only two circumstances. First, where "a party objects that evidence is not within

the issues raised in the pleadings, the court may permit the pleadings to be amended." Fed. R. Civ.

P. 15(b)(1). This provision is not applicable as there was no relevant objection at trial to trigger

this provision. Second, Fed. R. Civ. P. 15(b)(2) allows a party to move to amend the pleadings, at

any time, to conform to the evidence presented at trial if issues not raised by the pleadings were

tried by the opposing party's express or implied consent. The Fourth Circuit has described the

requirements for amendment under Rule 15(b)(2) as follows:

> That Rule provides that "an issue not raised by the pleadings" will be treated as if
> it were raised, provided it is "tried by the parties' express or implied consent."
> Fed.R.Civ.P. 15(b)(2). Of course, Rule 15(b)(2) does not offer a failsafe for any
> and every faulty pleading. Rather, the Rule sets forth "an exception to the general
> rules of pleading . . . when the facts proven at trial differ from those alleged in the
> complaint, and thus support a cause of action that the claimant did not plead."
> *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 901 (4th
> Cir.1996). But "[b]ecause notice to the defendant of the allegations to be proven is
> essential to sustaining a cause of action, Rule 15(b) applies *only* when the defendant
> has consented to trial of the non-pled factual issues and will not be prejudiced by
> amendment of the pleadings to include them." *Id.* (emphasis added). Thus, Rule
> 15(b)(2) requires that a party expressly or impliedly consent to trial on an unpled
> claim and not be prejudiced by doing so.

*Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 983 (4th Cir. 2015).

Meyers and Morgan Keegan objected to the post trial amendment of the Complaint on the

grounds that (1) allowing the Trustee to amend his Complaint without allowing Meyers and

Morgan Keegan an opportunity for further discovery "to fully investigate, discover, and defend

against these newly-raised claims" would be prejudicial and (2) the Court previously denied the

Trustee's pre-trial motion to amend the Complaint and the circumstances have not changed since

the entry of that Order.

The Fourth Circuit has routinely found that a motion to amend is properly "denied when it has been unduly delayed and when allowing the motion would prejudice the non-movant." *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 940 (4th Cir. 1995) (affirming district court's denial of motion to amend pleading); *Nat'l Bank of Washington v. Pearson*, 863 F.2d 322 (4th Cir. 1988) (same); *Laber v. Harvey*, 438 F.3d 407, 427 (4th Cir. 2006) (noting that a prejudicial amendment is one that "raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial").  Under the circumstances, the Court finds that the timing and nature of the Trustee's proposed amendment would cause prejudice to Meyers and Morgan Keegan, particularly since the Court has previously denied the Trustee's pretrial request to amend the complaint to assert the same causes of action and they would not be prepared to defend against the claims at trial.

The Court denied the Trustee's Pre-Trial Motion to Amend on two grounds.  First, the Court noted that under Fed. R. Civ. P. 16(b)(4), "a deadline in a scheduling order 'may be modified only for good cause and with the judge's consent.'"  The Court found that the failure to assert the additional causes of action were "the result of inadvertence or neglect by Trustee's counsel," and therefore no good cause existed to warrant modification of the Court's scheduling order to allow an amendment of the Trustee's Complaint.  The Court also denied the Pre-Trial Motion to Amend pursuant to Fed. R. Civ. P. 15(a) finding that "granting the Motion to Amend at this stage of the litigation will unfairly prejudice Meyers and Morgan Keegan" because "Meyers and Morgan Keegan would not have had a fair opportunity to fully investigate, discover, and defend against these newly-raised claims."  The Trustee has presented no change in circumstances that supports an amendment to the Complaint at this late stage of the proceedings.  The Trustee has also failed to demonstrate that the issues raised by the proposed amendment were tried with Meyers and

Morgan Keegan's express or implied consent.  Meyers and Morgan Keegan expressly opposed the Trustee's pretrial amendment to include these claims, and the Trustee has not presented any convincing argument to show that Meyers and Morgan Keegan implicitly or expressly agreed to try these claims during the trial.  Moreover, the Court finds any amendment to the Complaint would be futile as the Court finds that each of these claims would also be subject to the defense of *in pari delicto* and the same causation issues discussed in this Order.  Accordingly, the Trustee's Motion to Amend the Complaint pursuant to Fed. R. Civ. P. 15(b) is denied.

### *Motion to Dismiss, Renewed Motion to Strike and Motion for Sanctions*

After the conclusion of the trial, Meyers and Morgan Keegan brought a motion to strike the Trustee's proposed order because it violated the Court's directive on the submission of proposed orders in this proceeding and was filed after the Court's deadline. The Trustee's original proposed order went well beyond the 100 page limit set by the Court as it contained approximately 110 pages of body text (without including a caption), 65 pages of additional single spaced footnotes (listing over 1,100 footnotes) and utilized different formatting conventions than the Court's usual fashion for orders, including using 11 size font and 1.5 line spacing. After adjusting the Trustee's original proposed order into the typical formatting of the Court's orders, the proposed order was nearly 250 pages long.

While the Court provided the parties with an opportunity in advance of the deadline to seek a reconsideration of the page limit, the Trustee did not file such a request. In addressing the motion for sanctions, the Court initially ordered that the Trustee resubmit the proposed order in compliance with the Court's directives and page limit, and the Court indicated that as a sanction and in the interest of fairness, it would not consider the Trustee's originally submitted proposed order that violated the Court's directives. At the hearing and in the Court's Order on the motion to

strike, the Court provided express instructions to the Trustee to not add any additional facts, authority, or arguments in response to the then already submitted proposed order of Meyers and Morgan Keegan. The Court also took the request for sanctions included in the motion to strike under advisement.

After submission of the Trustee's second proposed order, Morgan Keegan and Meyers filed a Motion to Dismiss Adversary Proceeding, Renewed Motion to Strike or in the alternative, Motion for Sanctions, alleging that the Trustee included new arguments and citations not originally included in the Trustee's original proposed order. After a hearing, the Court took the matter under advisement.

Based on the outcome reached in this Order, it is unnecessary for the Court to consider at this time Meyers and Morgan Keegan's Motion to Dismiss Adversary Proceeding, Renewed Motion to Strike or in the alternative, Motion for Sanctions and their request for sanctions in the originally filed Motion to Strike.

## CONCLUSION

Based on the foregoing reasons, the Court finds that the Trustee's remaining causes of action are barred because Debtor was *in pari delicto* with Meyers and Morgan Keegan. Further, the Court finds that, regardless of the application of *in pari delicto*, the Trustee has not met his burden of proof to satisfy the elements of his remaining causes of action. For these reasons, the Court hereby grants judgment in favor of Meyers and Morgan Keegan as to all remaining causes of action. The Court also denies the Trustee's post-trial oral motion to amend his complaint.

**IT IS SO ORDERED.**